FILED
DEC 2 2 2010
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | NO. 1:10CR485 (LMB) |
| v. | ) | Unauthorized Disclosure of National Defense Information, 18 U.S.C.§ 793(d) (Counts One, Four and Six) |
| JEFFREY ALEXANDER STERLING, | ) | Unauthorized Disclosure of National Defense Information, 18 U.S.C. § 793(e) (Counts Two, Five and Seven) |
| Defendant. | ) | Unlawful Retention of National Defense Information, 18 U.S.C. § 793(e) (Count Three) |
| | ) | Mail Fraud, 18 U.S.C. § 1341 (Count Eight) |
| | ) | Unauthorized Conveyance of Government Property, 18 U.S.C. § 641 (Count Nine) |
| | ) | Obstruction of Justice, 18 U.S.C. § 1512(c)(1) (Count Ten) |
| | ) | Forfeiture |

December 2010 Term - At Alexandria

**INDICTMENT**

THE GRAND JURY CHARGES THAT:

**COUNT ONE**
**18 U.S.C. § 793(d)**
**(Unauthorized Disclosure of National Defense Information)**

At all times relevant to this Indictment, unless otherwise stated:

## Background

1. The Central Intelligence Agency ("CIA") was a United States government intelligence agency. The CIA's headquarters was at Langley, Virginia, in the Eastern District of Virginia. The CIA was responsible for, among other things, collecting information that revealed the plans, intentions and capabilities of the United States' adversaries and the bases for their decisions and actions as well as conducting clandestine actions, at the direction of the President and his authorized designees, designed to preempt threats or achieve United States' policy objectives.

2. Pursuant to Executive Order 12958, as amended by Executive Order 13292, national security information was classified as "Top Secret," "Secret" or "Confidential." The designation "Top Secret" applied to information that, if disclosed without proper authorization, reasonably could be expected to cause exceptionally grave damage to the national security. The designation "Secret" applied to information that, if disclosed without proper authorization, reasonably could be expected to cause serious damage to national security. The designation "Confidential" applied to information that, if disclosed without proper authorization, reasonably could be expected to cause damage to national security.

3. Access to classified information at any level could be further restricted through compartmentation in Sensitive Compartmented Information ("SCI") categories. Only individuals with the appropriate security clearance and additional SCI clearance(s) could have access to such classified information.

4. Classified information had to contain markings identifying the level at which it was classified. Classified information, of any designation, could only be shared with persons

determined by an appropriate United States government official to be eligible for access to classified information, who had signed an approved non-disclosure agreement, and who possessed a "need to know." If a person was not eligible to receive classified information, classified information could not be disclosed to that person.

## The Defendant and Other Relevant Persons

5. Between on or about May 14, 1993, and on or about January 31, 2002, defendant JEFFREY ALEXANDER STERLING ("defendant STERLING") worked as an employee for the CIA. After serving as a career trainee for eighteen months, defendant STERLING worked as an operations officer for various divisions within the CIA for approximately the next five years.

6. Defendant STERLING was employed at the CIA's headquarters in Langley, Virginia, in the Eastern District of Virginia, from on or about August 2000 through on or about January 31, 2002. Defendant STERLING resided in Herndon, Virginia, within the Eastern District of Virginia, from on or about August 2000 through on or about August 2003.

7. During his tenure at the CIA, defendant STERLING held a Top Secret security clearance with access to SCI. Defendant STERLING's employment within the CIA afforded him access to classified cables, human asset files and other classified information concerning certain CIA operations and human assets.

8. As part of his employment with the CIA, defendant STERLING, who was a lawyer, signed and had explained to him written agreements in which defendant STERLING agreed, "I will never disclose in any form or any manner, to any person not authorized by the [CIA] to receive it, any information or material . . . received or obtained in the course of my

employment or other service with the [CIA] that is marked as classified or that I know is classified" or "information or material received or obtained in the course of my employment or other service with the [CIA] that I know is in the process of a classification determination." For example, on or about May 14, 1993, on the first day of his employment at the CIA, defendant STERLING signed a Security Agreement and a separate Secrecy Agreement in which he agreed never to disclose such information without the prior consent of the CIA. Defendant STERLING also acknowledged that he understood the unauthorized disclosure of classified information could constitute a criminal offense.

9. Similarly, as part of his employment with the CIA, defendant STERLING signed a SCI Non-Disclosure Agreement on May 20, 1993. Like the Security Agreement, this Non-Disclosure Agreement also clearly stated his duty to safeguard certain information or material, which the Agreement expressly defined as classified information or information in the process of a classification determination that he obtained as a result of his employment relationship with CIA. By signing this Non-Disclosure Agreement, defendant STERLING again acknowledged that he understood that the unauthorized disclosure of classified information could constitute a criminal offense. On January 4, 1994, and May 28, 1999, defendant STERLING signed additional SCI Non-Disclosure Agreements, which contained the same notices and warnings described above.

10. On January 31, 2002, the day of his termination from the CIA, a CIA security officer read defendant STERLING the contents of another SCI Non-Disclosure Agreement and informed defendant STERLING of his lifetime ban against the unauthorized disclosure of classified information. Defendant STERLING refused to sign this Non-Disclosure Agreement.

The CIA security officer informed defendant STERLING that the lifetime ban still applied despite his refusal to sign.

11. All of the security and non-disclosure agreements signed by defendant STERLING specifically informed him, and defendant STERLING explicitly agreed, that "all [classified] information or material that I may acquire in the course of my employment or other service with the [CIA] . . . are and will remain the property of the United States Government unless and until otherwise determined by an appropriate official or final ruling of a court of law." In addition, defendant STERLING also agreed that "I will surrender anything constituting, containing or reflecting such information or material upon demand by an appropriate official of the [CIA], or upon the conclusion of my employment or other service with the [CIA]." This meant that any classified cables, reports or any other classified documents, as well as any other classified information acquired by defendant STERLING during the course of his employment with the CIA, belonged to and was the property of the CIA.

12. All of the security and non-disclosure agreements signed by defendant STERLING also specifically stated, and defendant STERLING explicitly agreed, that "I hereby agree to submit for review by the [CIA] any writing or any preparation in any form . . . , which contains any mention of any intelligence data or activities, or contains any other information or material that might be [classified], that I contemplate disclosing publicly or that I have actually prepared for public disclosure, either during my employment or other service with the [CIA] or at any time thereafter, prior to discussing it with or showing it to anyone who is not authorized to have access to [such information]. I further agree that I will not take any steps toward public disclosure until I have received written permission to do so from the [CIA]." At no time did the

CIA authorize defendant STERLING to de-classify information or to disclose classified information to unauthorized persons, and defendant STERLING never obtained declassification of any of the classified documents and information referenced in this Indictment. At no time did the CIA authorize defendant STERLING to possess classified documents or information at home, on a home computer or in a personal e-mail account.

13. Finally, to the extent that defendant STERLING ever felt that the CIA had engaged in any "unlawful or improper" conduct that implicated classified information, these security and non-disclosure agreements clearly informed defendant STERLING of the proper procedures to follow and the authorized parties to whom such information should be reported. In this way, reports of alleged "unlawful or improper" conduct could be made while still protecting the classified information and not causing the disclosure of information that reasonably could be expected to cause damage, including serious and exceptionally grave damage, to the national security. The media was not an authorized party to receive such information.

14. Human Asset No. 1, a person known to the Grand Jury, moved to the United States in the early 1990s. Human Asset No. 1 agreed to work for the CIA and provided highly valued information to the CIA. Human Asset No. 1 later agreed to assist the CIA operationally in part to impede the progress of the weapons capabilities of certain countries and in return for monetary consideration.

15. Classified Program No. 1 was a clandestine operational program of the CIA. The purpose of Classified Program No. 1, which had been authorized and approved at the appropriate levels of government in the late 1990s, was to impede the progress of the weapons capabilities of certain countries, including Country A.

16. Between on or about November 14, 1998, through on or about May 2000, defendant STERLING became an operations officer assigned to Human Asset No. 1 and Classified Program No. 1. At the time of his assignment, defendant STERLING had no advanced scientific or engineering education or training nor did he ever seek or express any interest in receiving such education or training. In or about May 2000, the CIA reassigned defendant STERLING from Human Asset No. 1 and Classified Program No. 1. Upon his reassignment, defendant STERLING was no longer authorized to receive classified information or possess classified documents concerning Human Asset No. 1 and Classified Program No. 1.

17. Author A, a person known to the Grand Jury, authored a book about the CIA. Among other topics, the book discussed Classified Program No. 1. Author A also was employed by a national newspaper and wrote newspaper articles about the CIA and the intelligence community generally. The United States had never authorized Author A to receive, accept, possess, or review classified documents or classified information, and Author A did not have a United States government security clearance.

**<u>The Scheme to Disclose Classified Information</u>**

18. Beginning in approximately August 2000, and lasting through January 2006, defendant STERLING pursued various administrative and civil actions against the CIA concerning alleged employment-related racial discrimination and decisions made by the CIA's Publications Review Board regarding defendant STERLING's attempt to publish his memoirs. Defendant STERLING's anger and resentment towards the CIA grew over time as the CIA rejected the defendant's settlement offers and made other legal decisions. In retaliation for the CIA's refusal to settle on terms favorable to defendant STERLING, as well as other decisions

made by the CIA, defendant STERLING caused and attempted to cause the publication of classified information about Classified Program No. 1 and Human Asset No. 1 that defendant STERLING characterized in a false and misleading manner.

19. Defendant STERLING employed a scheme to disclose classified information through various means and methods. These means and methods included, but were not limited to:

(a) stealing classified documents and other information from the CIA and unlawfully retaining those documents without the authority of the CIA;

(b) communicating by telephone, via email and in person with Author A in order to arrange for the disclosure of or to disclose classified information to Author A;

(c) meeting with Author A in person to orally disclose classified information to Author A and to provide documents containing classified information to Author A for review or use;

(d) characterizing the classified information in a false and misleading manner as a means of inducing Author A to write and publish a story premised on that false and misleading information;

(e) deceiving and attempting to deceive the CIA into believing that defendant STERLING was a former employee adhering to his secrecy and non-disclosure agreements; and,

(f) deliberately choosing to disclose the classified information to a member of the media, knowing that such an individual would not reveal defendant STERLING's identity, thereby concealing and perpetuating the scheme.

**A. Defendant Sterling's Civil Litigation against the CIA and His Pre-Existing Relationship with Author A**

20. On or about August 22, 2000, defendant STERLING filed a complaint with the CIA's Equal Employment Office in which defendant STERLING alleged employment-related racial discrimination. On November 16, 2000, defendant STERLING caused his then-civil

attorney to send a settlement offer to the CIA in which defendant STERLING demanded, among other things, $30,000 for tuition to pursue a master's degree in taxation law and a severance payment of $45,000, or, alternatively, $30,000 for tuition to pursue a master's degree in taxation law plus reassignment to the CIA's Office of General Counsel while only working twenty hours per week.

21. On or about May 24, 2001, the CIA's Equal Employment Office informed defendant STERLING that its investigation determined that defendant STERLING had not established a *prima facie* case of discrimination and denied his complaint. The Equal Employment Office further advised defendant STERLING of his legal rights, including the right to file civil litigation if he so desired.

22. On or about October 17, 2001, defendant STERLING caused his civil attorney to send a second settlement offer via facsimile and the United States mail to the CIA prior to service of a civil complaint upon the CIA. Defendant STERLING demanded, among other things, $90,000 for one year's salary, a severance payment of $56,000 for eight months, a payment of $30,000 for tuition to pursue a master's degree in taxation law, $1,500 for moving expenses, and $4,000 in attorney fees. On October 30, 2001, the CIA responded to the settlement offer by declining to engage in settlement negotiations.

23. By on or about November 3, 2001, defendant STERLING disclosed classified information belonging to the CIA to Author A. Defendant STERLING in turn caused Author A to transmit and disseminate this classified information through a newspaper article via electronic mail and the United States mails into, among other places, the Eastern District of Virginia.

24. On or about January 11, 2002, defendant STERLING caused the formal filing and

service of an unclassified civil complaint in the Southern District of New York. The civil complaint alleged employment-related racial discrimination by the CIA.

25. On or about January 17, 2002, pursuant to his secrecy and non-disclosure agreements with the CIA, defendant STERLING submitted a book proposal for his memoirs and a sample chapter of the book to the CIA's Publications Review Board. The purpose of this submission was to allow the CIA to review these items and make sure that no classified information would be revealed through the publication of defendant STERLING's memoirs.

26. In or about February 2002, defendant STERLING met with Author A, including at least one meeting at Author A's office in Washington, D.C. One purpose of the meeting(s) was to discuss defendant STERLING's civil litigation against the CIA. Another purpose of the meeting(s) was to provide to Author A documents relating to defendant STERLING's employment at the CIA, including at least one redacted, unclassified document that referenced Human Asset No. 1, although not by name.

27. On or about March 2, 2002, defendant STERLING caused Author A to transmit and disseminate a newspaper article about defendant STERLING via electronic mail and the United States mails into, among other places, the Eastern District of Virginia. The newspaper article, which publicly identified defendant STERLING as a source, largely dealt with defendant STERLING's employment history and his current civil litigation against the CIA and did not appear to contain classified information.

28. On or about April 18, 2002, pursuant to his secrecy and non-disclosure agreements with the CIA, defendant STERLING and his civil attorney met with representatives of the CIA's Publications Review Board to discuss the Board's concerns regarding some of the

classified contents of defendant STERLING's memoirs. The memoirs included a description of Classified Program No. 1 that defendant STERLING had written without referencing classified information. As a result of the meeting, defendant STERLING agreed to make certain modifications to other portions of his manuscript and to draft his memoirs in such a way as to avoid future classification concerns.

29. On or about July 31, 2002, defendant STERLING caused his civil attorney to send a letter to the CIA in which defendant STERLING and his civil attorney represented that they had not disclosed any classified information publicly. In addition, defendant STERLING and his civil attorney re-affirmed their understanding that they could not disclose classified information publicly, and that the unauthorized disclosure of classified information was a criminal offense.

30. On or about October 22, 2002, pursuant to his secrecy and non-disclosure agreements with the CIA, defendant STERLING submitted additional chapters of his memoirs to the CIA's Publications Review Board for classification review. In doing so, defendant STERLING attempted to write other portions of his memoirs consistent with prior classification decisions and guidelines presented to him during the April 2002 meeting. Once again, the memoirs included a description of Classified Program No. 1 that defendant STERLING had written without referencing classified information.

31. On or about January 7, 2003, defendant STERLING contacted the Publications Review Board to express his "extreme unhappiness" over various edits that the Board had made on several chapters of his proposed memoirs. Using the phrases "absolutely disgusted" and "absolutely reprehensible" to describe the Board's actions in his conversation with a Board member, defendant STERLING concluded the conversation by telling the Board member that "he

would be coming 'at us [the CIA] with everything at his disposal'" and would have his lawyer call the CIA to schedule a meeting.

32. On or about January 27, 2003, defendant STERLING caused his civil attorney to send a third settlement offer via facsimile and the United States mail to the CIA. Defendant STERLING demanded, among other things, a payment of $200,000 and a favorable employment recommendation from the CIA.

33. On or about February 12, 2003, defendant STERLING caused his civil attorney to send a letter via facsimile and the United States mail that re-inquired about the status of his third settlement offer to the CIA. Defendant STERLING caused his civil attorney to inform the CIA that he had received no response to his settlement offer and to ask the CIA to notify him if the CIA wanted to pursue settlement discussions. On or about February 12, 2003, the CIA authorized the United States Attorney's Office for the Eastern District of Virginia to reject the third settlement offer.

**B. Defendant Sterling's Attempt to Cause the Disclosure of Classified Information through the Publication of a Newspaper Article**

34. On or about February 27, 2003, approximately two weeks after the CIA had authorized the rejection of his third settlement offer, defendant STERLING placed an interstate telephone call from his personal residence in Herndon, Virginia, to the personal residence of Author A in Maryland.

35. On or about March 4, 2003, consistent with his secrecy and non-disclosure agreements with the CIA, defendant STERLING caused the filing of a civil complaint in the United States District Court for the District of Columbia. The civil complaint alleged that the

CIA had unlawfully infringed upon defendant STERLING's right to publish an unclassified version of his memoirs.

36. On or about March 5, 2003, consistent with his secrecy and non-disclosure agreements with the CIA, defendant STERLING met with two staffers of the Senate Select Committee on Intelligence and disclosed classified information about Classified Program No. 1 and Human Asset No. 1. However, in doing so, defendant STERLING falsely characterized certain facts and circumstances relating to Classified Program No. 1, falsely reported that he had believed Classified Program No. 1 to have been flawed from its inception based solely upon his mischaracterization of a single remark by a participant in Classified Program No. 1, and claimed, based upon that false information, that Classified Program No. 1 may have enhanced the weapons capabilities of Country A.

37. On or about March 10, 2003, defendant STERLING sent an interstate email, which was routed through a server located in the Eastern District of Virginia, from a personal email account to the work email address of Author A. Defendant STERLING stated, "I'm sure you've already seen this, quite interesting, don't you think? All the more reason to wonder . . . J." Defendant STERLING attached a newspaper article about the weapons capabilities of Country A, thereby revealing that defendant STERLING and Author A already had been discussing Classified Program No. 1.

38. Between on or about March 10, 2003, and on or about March 29, 2003, defendant STERLING placed six more interstate telephone calls from his personal residence in Herndon, Virginia, to the personal residence of Author A in Maryland.

39. On or about April 3, 2003, Author A had a telephone conversation with the

Director of the Office of Public Affairs for the CIA (hereinafter "OPA Director") in the Eastern District of Virginia. Author A informed the OPA Director that Author A intended to write a story about Classified Program No. 1, provided the OPA Director with certain highly classified information, and wanted to know whether or not the CIA had any official comment. During their conversation, based upon the information that Author A had revealed, the OPA Director put Author A on notice of the classified nature of the information and the national security implications associated with disclosure of that information. Defendant STERLING caused this telephone call to occur by having disclosed certain classified information relating to Classified Program No. 1 to Author A and providing false and misleading information about Classified Program No. 1 to Author A in order to induce Author A to publish a newspaper article about Classified Program No. 1.

40. On or about April 4, 2003, Author A called the OPA Director again at his office in the Eastern District of Virginia and asked the OPA Director whether the CIA had an official comment about his proposed story about Classified Program No. 1. During this conversation, the OPA Director again put Author A on notice of the classified nature of the information in Author A's possession and the national security implications associated with disclosure of that information. Author A informed the OPA Director that he would think about the OPA Director's concerns, but that at that point he intended to continue to write the story. Defendant STERLING caused this telephone call to occur by having disclosed certain classified information relating to Classified Program No. 1 to Author A and by providing false and misleading information about Classified Program No. 1 to Author A in order to induce Author A to publish a newspaper article about Classified Program No. 1.

41. On or about April 25, 2003, Author A called the OPA Director at his office in the Eastern District of Virginia, described the lead to Author A's story and affirmed that Author A's story had been sourced in part on government documents in Author A's possession. During this conversation, after the OPA Director again put Author A on notice of the classified nature of the information in Author A's possession, the national security implications associated with disclosure of that information, and the OPA Director's plan to recommend that senior Administration officials contact the senior management of Author A's employer, Author A informed the OPA Director that he had thought about the OPA Director's concerns, but that he intended to write the story anyway. Defendant STERLING caused this telephone call to occur by having provided at least one classified document to Author A, by having disclosed certain classified information relating to Classified Program No. 1 to Author A, and by providing false and misleading information about Classified Program No. 1 to Author A in order to induce Author A to write and attempt to publish a newspaper article about Classified Program No. 1.

42. On or about April 30, 2003, United States government officials met with Author A and representatives of Author A's employer and informed them of the classified nature of the information in Author A's possession, the national security implications associated with disclosure of that information and the imminent danger that Human Asset No. 1 potentially would face by its disclosure. During that meeting, Author A stated in so many words that he possessed a copy of a classified document relating to Classified Program No. 1. Defendant STERLING had disclosed and then falsely and misleadingly characterized this classified document to Author A as a means of corroborating his false allegations about Classified Program No. 1 and further inducing Author A to write and attempt to publish a newspaper article about

Classified Program No. 1.

43. In or about early May 2003, senior management from Author A's employer informed a senior United States government official that the newspaper article would not be published.

**C. Defendant Sterling's Disclosure of Classified Information through the Publication of a Book**

44. On or about December 23, 2003, Author A sent an interstate email from Author A's personal email account to defendant STERLING's personal email account. In the email, which was routed through a server located in the Eastern District of Virginia, Author A stated, "Can we get together in early January? [Author A]."

45. Between on or about February 9, 2004, and on or about April 24, 2004, Author A placed fourteen interstate telephone calls from Author A's personal residence to the temporary residence of defendant STERLING and sent one interstate email, which was routed through a server located in the Eastern District of Virginia, from Author A's personal email account to the personal email account of defendant STERLING.

46. Between on or about May 6, 2004, and on or about May 8, 2004, Author A sent several interstate emails from Author A's personal email account to defendant STERLING's email account, each one being routed through a server located in the Eastern District of Virginia. Author A stated in the last email, "I want to call today I'm trying to write the story [Author A]. I need your telephone number again."

47. Between on or about May 10, 2004, and on or about May 12, 2004, Author A placed two more interstate telephone calls from Author A's personal residence in the District

of Maryland to the temporary residence of defendant STERLING in Missouri.

48. On or about May 16, 2004, Author A sent another interstate email from Author A's personal email account to the personal email account of defendant STERLING. In the email, which was routed through a server located in the Eastern District of Virginia, Author A stated, "I'm sorry if I failed you so far but I really enjoy talking to you and would like to continue. [Author A]."

49. Between on or about May 17, 2004, and on or about May 26, 2004, Author A placed two more interstate telephone calls from Author A's personal residence to the temporary residence of defendant STERLING and sent one more interstate email, which was routed through a server located in the Eastern District of Virginia, from Author A's personal email account to the personal email account of defendant STERLING.

50. On or about June 10, 2004, Author A sent another interstate email from Author A's personal email account to the personal email account of defendant STERLING. In the email, which was routed through a server located in the Eastern District of Virginia, Author A stated, "I can get it to you. Where can I send it?"

51. Between on or about June 11, 2004, and on or about July 8, 2004, Author A placed six more interstate telephone calls from Author A's personal residence to the temporary residence or work of defendant STERLING and sent five more interstate emails, which was routed through a server located in the Eastern District of Virginia, from Author A's personal email account to the personal email account of defendant STERLING.

52. In or about September 2004, Author A submitted a book proposal, captioned "Untitled CIA Book," to a national book publisher. By having disclosed certain classified

information relating to Classified Program No. 1 to Author A and by providing false and misleading information about Classified Program No. 1 to Author A, defendant STERLING caused Author A to disclose classified information to the national book publisher.

53. Between on or about November 17, 2004, and on or about November 21, 2004, Author A traveled to Country B in order to obtain more information about Classified Program No. 1. Defendant STERLING enabled Author A's travel by providing Author A certain classified information regarding the operational details of Classified Program No. 1 and Human Asset No. 1, including a hotel at which Human Asset No. 1 stayed in connection with Classified Program No. 1.

54. Between on or about November 6, 2004, and on or about November 20, 2005, defendant STERLING and Author A exchanged sixteen more interstate telephone calls either at their personal residences or at work.

**<u>The Substantive Violation</u>**

55. Between on or about December 24, 2005, and on or about January 5, 2006, in the Eastern District of Virginia,

**JEFFREY ALEXANDER STERLING,**

the defendant herein, having lawful possession of, access to, and control over information relating to the national defense, namely information about Classified Program No. 1 and Human Asset No. 1, did willfully cause to be communicated, delivered and transmitted the same information to any person of the general public not entitled to receive said information, including foreign adversaries, through the publication, distribution and delivery of Author A's book to the Eastern District of Virginia, all the while having reason to believe that said information could be

used to the injury of the United States and to the advantage of any foreign nation.

All in violation of Title 18, United States Code, Section 793(d), and Title 18, United States Code, Section 2.

**COUNT TWO**
**18 U.S.C. § 793(e)**
**(Unauthorized Disclosure of Classified Information)**

The Grand Jury further charges that:

56. The Grand Jury realleges paragraphs 1-54 of this Indictment as though fully set forth herein.

57. Between on or about December 24, 2005 and on or about January 5, 2006, in the Eastern District of Virginia,

**JEFFREY ALEXANDER STERLING,**

the defendant herein, having unauthorized possession of, access to, and control over any document relating to the national defense, namely a letter relating to Classified Program No. 1, did willfully cause to be communicated, delivered and transmitted the same information to any person of the general public not entitled to receive said information, including foreign adversaries, through the publication, distribution and delivery of Author A's book to the Eastern District of Virginia, all the while having reason to believe that said information could be used to the injury of the United States and to the advantage of any foreign nation.

All in violation of Title 18, United States Code, Section 793(e), and Title 18, United States Code, Section 2.

**COUNT THREE**
**18 U.S.C. § 793(e)**
**(Unlawful Retention of Classified Information)**

The Grand Jury further charges that:

58. The Grand Jury realleges paragraphs 1-54 of this Indictment as though fully set forth herein.

59. Beginning on or about January 31, 2002, and continuing thereafter through on or about April 30, 2003, in the Eastern District of Virginia,

**JEFFREY ALEXANDER STERLING,**

the defendant herein, having unauthorized possession of, access to, and control over any document relating to the national defense, namely a letter relating to Classified Program No. 1, did willfully retain the document and fail to deliver the document to the officer and employee of the United States entitled to receive it.

All in violation of Title 18, United States Code, Section 793(e).

**COUNT FOUR**
**18 U.S.C. § 793(d)**
**(Unauthorized Disclosure of Classified Information)**

The Grand Jury further charges that:

60. The Grand Jury realleges paragraphs 1-54 of this Indictment as though fully set forth herein.

61. Between on or about February 12, 2003, and on or about April 30, 2003, in the Eastern District of Virginia,

**JEFFREY ALEXANDER STERLING,**

the defendant herein, having lawful possession of, access to, and control over information relating to the national defense, namely information about Classified Program No. 1 and Human Asset No. 1, did willfully communicate, deliver, and transmit that information directly and indirectly to Author A, a person not entitled to receive it, all the while having reason to believe that said information could be used to the injury of the United States and to the advantage of any foreign nation.

All in violation of Title 18, United States Code, Section 793(d).

**COUNT FIVE**
**18 U.S.C. § 793(e)**
**(Unauthorized Disclosure of Classified Information)**

The Grand Jury further charges that:

62. The Grand Jury realleges paragraphs 1-54 of this Indictment as though fully set forth herein.

63. Between on or about February 12, 2003, and on or about April 30, 2003, in the Eastern District of Virginia,

**JEFFREY ALEXANDER STERLING,**

the defendant herein, having unauthorized possession of, access to, and control over any document relating to the national defense, namely a letter relating to Classified Program No. 1, did willfully communicate, deliver, and transmit that information directly and indirectly to Author A, a person not entitled to receive it, all the while having reason to believe that said information could be used to the injury of the United States and to the advantage of any foreign nation.

All in violation of Title 18, United States Code, Section 793(e).

**COUNT SIX**
**18 U.S.C. § 793(d)**
**(Unauthorized Disclosure of Classified Information)**

The Grand Jury further charges that:

64. The Grand Jury realleges paragraphs 1-54 of this Indictment as though fully set forth herein.

65. Between on or about February 27, 2003, and on or about April 30, 2003, in the Eastern District of Virginia,

**JEFFREY ALEXANDER STERLING,**

the defendant herein, having lawful possession of, access to, and control over information relating to the national defense, namely information about Classified Program No. 1 and Human Asset No. 1, did willfully attempt to communicate, deliver and transmit the same information to any person of the general public not entitled to receive said information, including foreign adversaries, through the publication, distribution and delivery of a national newspaper article, all the while having reason to believe that said information could be used to the injury of the United States and to the advantage of any foreign nation.

All in violation of Title 18, United States Code, Section 793(d), and Title 18, United States Code, Section 2.

**COUNT SEVEN**
**18 U.S.C. § 793(e)**
**(Unauthorized Disclosure of Classified Information)**

The Grand Jury further charges that:

66. The Grand Jury realleges paragraphs 1-54 of this Indictment as though fully set forth herein.

67. Between on or about February 27, 2003, and on or about April 30, 2003, in the Eastern District of Virginia,

**JEFFREY ALEXANDER STERLING,**

the defendant herein, having unauthorized possession of, access to, and control over any document relating to the national defense, namely a letter relating to Classified Program No. 1, did willfully attempt to communicate, deliver and transmit the same information to any person of the general public not entitled to receive said information, including foreign adversaries, through the publication, distribution and delivery of a national newspaper article, all the while having reason to believe that said information could be used to the injury of the United States and to the advantage of any foreign nation.

All in violation of Title 18, United States Code, Sections 793(e), and Title 18, United States Code, Section 2.

**COUNT EIGHT**
**18 U.S.C. § 1341**
**(Mail Fraud)**

The Grand Jury further charges that:

68. The Grand Jury realleges paragraphs 1-54 of this Indictment as though fully set forth herein.

69. Between on or about December 24, 2005, and on or about January 5, 2006, within the Eastern District of Virginia and elsewhere,

**JEFFREY ALEXANDER STERLING,**

the defendant herein, having knowingly devised a scheme and artifice to defraud the CIA of money and property, for the purpose of executing, and attempting to execute said scheme and artifice to defraud, did knowingly cause to be delivered by the United States Postal Service or any private or commercial interstate carrier according to the direction thereon a shipment of Author A's published books for sale at a commercial retail bookstore in the Eastern District of Virginia.

All in violation of Title 18, United States Code, Section 1341, and Title 18, United States Code, Section 2.

**COUNT NINE**
**18 U.S.C. § 641**
**(Unauthorized Conveyance of Government Property)**

The Grand Jury further charges that:

70. The Grand Jury realleges paragraphs 1-54 of this Indictment as though fully set forth herein.

71. Between on or about December 24, 2005, and on or about January 5, 2006, in the Eastern District of Virginia,

**JEFFREY ALEXANDER STERLING,**

the defendant herein, did knowingly cause to be conveyed without authority property of the United States, namely classified information about Classified Program No. 1, having a value of more than $1,000.00 and having come into defendant STERLING's possession by virtue of his employment with the CIA, to any member of the general public not entitled to receive said information, including foreign adversaries, through the publication, distribution and delivery of Author A's book for retail sale in the Eastern District of Virginia.

All in violation of Title 18, United States Code, Section 641, and Title 18, United States Code, Section 2.

**COUNT TEN**
**18 U.S.C. § 1512(c)(1)**
**(Obstruction of Justice)**

The Grand Jury further charges that:

72. The Grand Jury realleges paragraphs 1-54 of this Indictment as though fully set forth herein.

73. At all times material to this Count, the Federal Bureau of Investigation had been conducting a criminal investigation since April 2003, and a federal grand jury empaneled in the Eastern District of Virginia had been conducting a grand jury investigation since approximately January 2006, into allegations regarding the unauthorized disclosures of classified information, including allegations pertaining to Classified Program No. 1.

74. By in or about June 2003, defendant STERLING had been on notice of the Federal Bureau of Investigation. On or about June 16, 2006, special agents of the Federal Bureau of Investigation served a grand jury subpoena upon defendant STERLING, putting him on actual notice of the grand jury investigation. Among other things, the grand jury subpoena requested any documents relating to the Author A's book.

75. Between on or about April 18, 2006, and on or about July 28, 2006,

**JEFFREY ALEXANDER STERLING,**

defendant herein, knowingly and corruptly destroyed a document, records and other object with the intent to impair the object's integrity and availability for use in an official proceeding, that is, an investigation before a federal grand jury empaneled in the Eastern District of Virginia, by deleting and causing the deletion from his email account the March 10, 2003 email between defendant STERLING and Author A to which defendant STERLING had attached a

newspaper article about the weapons capabilities of Country A.

All in violation of Title 18, United States Code, Section 1512(c)(1), and Title 18, United States Code, Section 2.

**Forfeiture Notice**

76. Upon conviction of any of the offenses charged in Counts One through Nine of this Indictment, defendant STERLING shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to any such offense.

77. If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), of said defendant.

A TRUE BILL

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

FOREPERSON

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

William M. Welch II
Senior Litigation Counsel
Criminal Division
United States Department of Justice

Timothy J. Kelly
Trial Attorney
Public Integrity Section
United States Department of Justice

James L. Trump
Senior Litigation Counsel
Eastern District of Virginia