**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:10cr485 (LMB) |
| JEFFREY ALEXANDER STERLING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S MOTION IN LIMINE
TO ADMIT THE TESTIMONY OF JAMES RISEN**

The United States, by and through its attorneys, moves this Court to admit the testimony of James Risen in the Government's case-in-chief.

Risen is a journalist and author.  The Indictment returned by the grand jury charges defendant Jeffrey Sterling, a former CIA operations officer, with disclosing to Risen national security information, intending that Risen would publish and disseminate it.  Risen, referred to in the Indictment as Author A, is therefore a eyewitness to the charged crimes.  His testimony is directly relevant to, and powerful evidence of, facts that are squarely at issue in this trial – including the identity of the perpetrator.  Risen's testimony can also establish venue for certain of the charged counts; can authenticate his book and lay the necessary foundation to admit the defendant's statements in the book; and can identify the defendant as someone with whom he had a source relationship that pre-dated the charged disclosures.  Therefore, on May 23, 2011, the Government served Risen with a trial subpoena.  We expect that Risen will move to quash the subpoena.

As we describe in the following pages, the Supreme Court has held that absent a showing that a criminal proceeding is being conducted in bad faith or for the purpose of harassment, there exists neither a First Amendment nor a common law reporter's privilege that shields a reporter from his obligation to testify, even if the reporter's testimony reveals confidential sources and information. *Branzburg v. Hayes*, 408 U.S. 665 (1972). The Court of Appeals for this Circuit has also so held. *In Re: Shain,* 978 F.2d 850 (4th Cir. 1992). Moreover, the Government is unaware of any case in which a court has excluded from a jury's consideration the testimony of a reporter who personally witnessed a crime, let alone crimes like the ones charged here that are alleged to have endangered the nation's security. Accordingly, to resolve this issue as expeditiously as possible, we move for the admission of Mr. Risen's testimony.[1]

## BACKGROUND

On December 22, 2010, a federal grand jury in the Eastern District of Virginia returned a ten-count Indictment against defendant Sterling, charging him with unauthorized disclosure of national defense information, in violation of 18 U.S.C. §§ 793(d) and (e); unlawful retention of national defense information, in violation of 18 U.S.C. § 793(e); mail fraud, in violation of 18 U.S.C. § 1341; unauthorized conveyance of government property, in violation of 18 U.S.C. § 641; and obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1).

The national defense information Sterling is alleged to have unlawfully transmitted to Risen concerns matters described in the Indictment as Classified Program No. 1 and Human

---

[1] The Government also requests that the Court address this issue now because its resolution could affect other motions, including, for example, CIPA motions related to the disclosure of classified information required by a claim by the defendant that other individuals disclosed the national defense information to Risen.

Asset No. 1.  As alleged in the Indictment, the purpose of Classified Program No. 1, a

clandestine operational program of the CIA, was to impede the progress of the weapons

capabilities of certain countries, including a particular country described in the Indictment as

Country A.  Indictment ("Ind.") ¶ 15.  As the Indictment further describes, Human Asset No. 1

was an individual who moved to the United States in the early 1990s and later agreed to assist the

CIA operationally in connection with Classified Program No. 1.  *Id.* at ¶¶ 14, 53.

The Indictment alleges that Sterling engaged in a scheme to disclose national defense

information relating to Classified Program No. 1 and Human Asset No. 1 to Risen and members

of the public, including foreign adversaries, from on or about August 2000 to or about January

2006.  Ind. ¶¶ 5-54.  More specifically, the Indictment alleges that Sterling attempted to cause the

disclosure of national defense information through a newspaper article to be written by Risen in

early 2003; and then, after the article was not published, caused the disclosure of national defense

information through a book authored by Risen in 2006.[2]  *See id.* at ¶¶ 34-55.  The Indictment

---

[2]  Counts One and Two of the Indictment charge Sterling with, between on or about December 24, 2005 and on or about January 4, 2006, willfully causing national defense information – that is, information about Classified Program No. 1 and Human Asset No. 1, and a letter concerning Classified Program No. 1, respectively – to be communicated, delivered, and transmitted to the general public and foreign adversaries, through the delivery of a book authored by Mr. Risen.  Ind. ¶¶ 55, 57.  Count Three charges Sterling with, between on or about January 31, 2002 and on or about April 30, 2003, willfully retaining the letter concerning Classified Program No. 1.  *Id.* at ¶ 59.  Counts Four and Five charge Sterling with, between on or about February 12, 2003 and on or about April 30, 2003, willfully causing national defense information – that is, information about Classified Program No. 1 and Human Asset No. 1, and a letter concerning Classified Program No. 1, respectively – to be communicated, delivered, and transmitted to Mr. Risen.  *Id.* at ¶¶ 61, 63.  Counts Six and Seven charge Sterling with, between on or about February 12, 2003 and on or about April 30, 2003, willfully attempting to cause national defense information – that is, information about Classified Program No. 1 and Human Asset No. 1, and a letter concerning Classified Program No. 1, respectively –  to be communicated, delivered, and transmitted to the general public and foreign adversaries, through the delivery of a newspaper article authored by Mr. Risen.  *Id.* at ¶¶ 65, 67.

3

further charges that Sterling had previously disclosed classified information to Risen that appeared in a newspaper article as early as November 2001, and that he acted as a non-confidential source for a newspaper article Risen wrote in March 2002 about a lawsuit brought by Sterling against the CIA. *See id.* at ¶¶ 20–33.

As charged in the Indictment, Sterling perpetuated his scheme by, among other things, deliberately choosing to communicate the national defense information to a member of the media, believing that a member of the media would not reveal his identity. *See id.* at ¶ 19. The Indictment further alleges that Sterling characterized the classified information in a false and misleading manner as a means of inducing Risen to write a story premised on that false and misleading information. *See id.*

## ARGUMENT

A trial is a "a search for truth," *Nix v. Whiteside*, 475 U.S. 157, 166 (1986), and "the public . . . has a right to every man's evidence." *Trammel v. United States,* 445 U.S. 40, 50 (1980) (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)). As such, under the Federal Rules of Evidence, all relevant evidence not prohibited by the U.S. Constitution, an Act of Congress, or court rule is admissible. Fed. R. Evid. 402. Relevant evidence is defined as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. And although Rule 403 permits a court to exclude relevant evidence for unfair prejudice, confusion, or waste of time, none of these limitations on admissibility apply here. *See United States v. Mohr*, 318 F.3d 613, 619-20 (4th Cir. 2003).

James Risen is an eyewitness to the serious crimes with which the grand jury charged Sterling, and his testimony is directly relevant to, and powerful evidence of, the factual issues that the jury must decide at trial.  Risen can directly identify Sterling as the individual who illegally transmitted to him national defense information concerning Classified Program No. 1 and Human Asset No. 1.  Because he is an eyewitness, his testimony will simplify the trial and clarify matters for the jury.  Additionally, as set forth below, Risen can establish venue for certain of the charged counts; can authenticate his book and lay the necessary foundation to admit the defendant's statements in the book; and can identify the defendant as someone with whom he had a preexisting source relationship that pre-dated the charged disclosures.  His testimony therefore will allow for an efficient presentation of the Government's case.  And although Risen's testimony is prejudicial in the sense that it will directly incriminate Sterling, it will not be unfairly prejudicial or inflammatory.  The Court therefore should admit Risen's testimony, and the jury should have the opportunity to consider it in evaluating whether the Government has met its burden of proving the defendant's guilt beyond a reasonable doubt.

When Risen's anticipated testimony is viewed fairly, there can be no genuine dispute about its relevance to the trial.  The question here, therefore, is not whether the testimony is probative of factual issues that will be before the jury, but whether there exists a reporter's privilege – either under the First Amendment or common law – that exempts this eyewitness from being called, like any other citizen, to provide relevant facts under oath to the jury.  As described below, the answer is no.  Moreover, as set out below, even if there did exist some privilege that required this Court to engage in a process of balancing the interests of law enforcement against

those of the press, the balance here weighs strongly in favor of the government's need to present

this evidence to the jury and the jury's right to hear it as part of its truth-seeking function.

Risen's testimony should be admitted at trial.

**I.   Mr. Risen's Testimony Is Not Barred by a "Reporter's Privilege" under the First Amendment or Federal Common Law.**

**A.   The First Amendment Does Not Provide for a "Reporter's Privilege" that Shields Mr. Risen from the Obligation to Testify about Relevant Evidence.**

In *Branzburg v. Hayes*, the Supreme Court held in clear and unambiguous terms that the

First Amendment does not exempt a reporter from testifying about his sources, even those to

whom the reporter has promised confidentiality, so long as the reporter's testimony is sought

during criminal proceedings that are brought in good faith.  As the Court held:

> The issue in these cases is whether requiring newsmen to appear and testify before
> state or federal grand juries abridges the freedom of speech and press guaranteed by
> the First Amendment.  *We hold that it does not.*

*Branzburg,* 408 U.S. at 667 (emphasis added).  And, while *Branzburg* rejected the notion of a

First Amendment reporter's privilege in the context of a grand jury proceeding, the Court made

clear that its holding applied equally to trial proceedings.  *Id.* at 690-91 (insisting that "reporters,

like other citizens, respond to relevant questions put to them in the course of a valid grand jury

investigation or criminal trial"), 691 (finding that "neither [reporter nor source] is immune, on

First Amendment grounds, from testifying against the other, before the grand jury or at a criminal

trial").

In *Branzburg*, several reporters served with grand jury subpoenas argued for recognition of

a First Amendment reporter's privilege on the ground that identifying confidential sources and

information to a grand jury would deter persons from providing information to the press "to the

detriment of the free flow of information protected by the First Amendment." *Id.* at 679-80.  The

reporters asserted that they should not be required to testify until the government made a showing

that the testimony was necessary and that requiring the testimony was justified by a compelling

public interest.  *Id.* at 680.

The Supreme Court, noting that the creation of new testimonial privileges obstructs the

search for truth, expressly declined to interpret the First Amendment "to grant newsmen a

testimonial privilege that other citizens do not enjoy." *Id.* at 690.  In particular, the Court

concluded that the refusal to recognize a First Amendment reporter's privilege would not

seriously undermine the ability of the press to collect and disseminate news, and that even if

some news sources would be deterred, it could not "accept the argument that the public interest

in possible future news about crime from undisclosed and unverified sources must take

precedence over the public interest in pursuing and prosecuting those crimes reported to the press

by informants and in thus deterring the commission of such crimes in the future." *Id.*  at 695-99.

In declining to recognize a First Amendment privilege for reporters, the *Branzburg* Court

also noted the incongruence of the notion that an alleged criminal – who also happens to be a

source for a reporter – is somehow shielded from facing justice simply because his crime was

disclosed to, or witnessed by, a reporter.  The Court stated:

> The preference for anonymity of those confidential informants involved in actual
> criminal conduct is presumably a product of their desire to escape criminal
> prosecution, and this preference, while understandable, is hardly deserving of
> constitutional protection.  It would be frivolous to assert–and no one does in these
> cases–that the First Amendment, in the interest of securing news or otherwise, confers
> a license on either the reporter or his news source to violate valid criminal laws....

*Id.* at 691.  In concluding, therefore, that a reporter cannot be exempted from testifying simply

because he promised confidentiality to a source, the Court noted:

> . . . [W]e cannot seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about crime than to do something about it.  Insofar as any reporter in these cases undertook not to reveal or testify about the crime he witnessed, his claim of privilege under the First Amendment presents no substantial question.  The crimes of news sources are no less reprehensible and threatening to the public interest when witnessed by a reporter than when they are not.

*Id.* at 692.

On these grounds, the Supreme Court rejected the suggestion that courts conduct a case-by-case balancing of interests each time a journalist is subpoenaed to testify in criminal proceedings, in part because such case-by-case balancing would "present practical and conceptual difficulties of a high order."  *Id.* at 701-06.  In particular, the Court expressed its concern that such case-by-case balancing would cause the courts to "be embroiled in preliminary factual and legal determinations with respect to whether the proper predicate had been laid for the reporter's appearance."  *Id.* at 705.  The Court also stated its concern that "courts would be inextricably involved in distinguishing between the value of enforcing different criminal laws."  *Id.* at 705-06.

To be sure, in *Branzburg*, the Court also noted that reporters are not without remedy if called to testify merely as a pretext for harassment.  In particular, the Court recognized a limited *protection* (but not *privilege*) for journalists subpoenaed to testify where a criminal proceeding is conducted in bad faith or for the purpose of harassment.  408 U.S. at 707-08.  Justice Powell, who joined the majority opinion, underscored this point in a concurring opinion:

> As indicated in the concluding portion of the opinion, the Court states that no harassment of newsmen will be tolerated.  If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy.  Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered.

*Id.* at 709-10 (Powell, J., concurring).[3]  Of course, there is no basis for alleging either bad faith or

harassment here.

Although the Supreme Court has not directly addressed these issues since *Branzburg*, the

Court has reiterated its holding several times.  *See Cohen v. Cowles Media Co.,* 501 U.S. 663,

669 (1991) ("[n]either does the First Amendment relieve a newspaper reporter of the obligation

shared by all citizens to respond to a grand jury subpoena and answer questions relevant to a

criminal investigation, even though the reporter might be required to reveal a confidential

source") (citing *Branzburg); University of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 201 (1990);

*Pell v. Procunier*, 417 U.S. 817, 833 (1974)(reaffirming *Branzburg*'s holding).  Moreover, since

---

[3]  While Justice Powell used the term "privilege," rather than "protection," to describe the
protections referenced in the majority opinion, it is clear that the majority's rejection of a
reporter's privilege – which Justice Powell joined – governs.  *See, e.g., In Re Grand Jury
Proceedings (Storer Communications, Inc.)*, 810 F.2d 580, 585 (6th Cir. 1987) ("It is readily
apparent, then, that Justice Powell's concurring opinion is entirely consistent with the majority
opinion, and neither limits nor expands upon its holding . . . .").  In *In Re Grand Jury
Proceedings (Scarce)*, 5 F.3d 397 (9th Cir. 1993), for example, the Ninth Circuit flatly rejected
the argument that "the concurrence of Justice Powell and the dissents of the other four Justices
together represent a majority view in favor of rebalancing the interests at stake in every claim of
privilege made before a grand jury."  *Id.* at 400.  As the *Scarce* Court noted:

> This reading of *Branzburg* . . . is at odds with the majority opinion itself, and with the
> manner in which we have applied it in our own cases.  It is important to note that
> Justice White's opinion is *not* a plurality opinion. Although Justice Powell wrote a
> separate concurrence, he also signed Justice White's opinion, providing the fifth vote
> necessary to establish it as the majority opinion of the court.

*Id.* (emphasis in original).  *See also In Re: Grand Jury Subpoena (Judith Miller)*, 438 F.3d 1141,
1148 (D.C. Cir. 2006) ("Justice Powell's concurring opinion was not the opinion of a justice who
refused to join the majority.  He joined the majority by its terms, rejecting none of Justice
White's reasoning on behalf of the majority. . . . Justice White's opinion is not a plurality opinion
of four justices joined by a separate Justice Powell [opinion] to create a majority, it is the opinion
of the majority of the Court. As such it is authoritative precedent.  It says what it says.  It rejects
the privilege asserted by appellants.").

the Court's decision in *Branzburg*, federal appellate courts around the country – including the Fourth Circuit – have relied on it to hold that there exists no First Amendment "reporter's privilege" that exempts a reporter from testifying about his source in a criminal proceeding that is brought in good faith. *See, e.g., The New York Times Co. v. Gonzales*, 459 F.3d 160, 163 (2d Cir. 2006) ("[W]e also hold that no First Amendment protection is available to the [New York] Times on these facts in light of the Supreme Court's decision in *Branzburg*."); *Judith Miller*, 438 F.3d at 1145-49 (citing to *Branzburg* in rejecting, during the litigation over grand jury subpoenas issued to reporters Judith Miller and Matthew Cooper, the notion of a First Amendment reporter's privilege); *In Re: Special Proceedings*, 373 F.3d 37, 44 (1st Cir. 2004) ("In *Branzburg*, the Supreme Court flatly rejected any notion of a general-purpose reporter's privilege for confidential sources, whether by virtue of the First Amendment or of a newly hewn common law privilege."); *McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003) ("It seems to us that rather than speaking of privilege, courts should simply make sure that a subpoena duces tecum directed to the media, like any other subpoena duces tecum, is reasonable in the circumstances, which is the general criterion for judicial review of subpoenas. . . . We do not see why there need to be special criteria merely because the possessor of the documents or other evidence sought is a journalist.") (citations omitted); *Scarce*, 5 F.3d at 402 ("the precise holding of *Branzburg* [has] subordinated the right of the newsmen to keep secret a source of information in [the] face of the more compelling requirement that a grand jury be able to secure factual data relating to its investigation of serious criminal conduct." (quoting *Farr v. Pitchess*, 522 F.2d 464, 467-68 (9th

Cir. 1975));[4] *Storer Communications*, 810 F.2d at 583 (rejecting the notion of a "reporter's privilege" grounded in the First Amendment, because it would require a court of appeals to "restructure the holding of the Supreme Court in *Branzburg v. Hayes*, since the majority opinion in that case rejected the existence of such a first amendment testimonial privilege")(citations omitted).

The Fourth Circuit, too, has declined to recognize a First Amendment privilege that would either exempt journalists from testifying altogether in criminal proceedings, or even require a court to engage in a balancing-of-interests analysis under those circumstances. *In Re: Shain,* 978 F.2d at 852. In particular, the Fourth Circuit has found that, under *Branzburg*, "only when evidence of harassment is presented do we balance the interests involved." *Id.* at 853. And though, to be sure, the Fourth Circuit has recognized a qualified reporter's privilege in *civil* cases that can require a balancing of the relevant interests at stake, *see, e.g.*, *Ashcraft v. Conoco, Inc.*, 218 F.3d 282 (4th Cir. 2000); *LaRouche v. National Broadcasting Co.,* 780 F.2d 1134 (4th Cir. 1986), it has not applied such a qualified privilege in criminal cases.[5]

_____

[4] *See also In re Lewis*, 501 F.2d 418, 422-23 (9th Cir. 1974) (rejecting claim of "reporter's privilege" under the First Amendment) (hereafter "*Lewis I*"); *In re Lewis*, 517 F.2d 236, 237-28 (9th Cir. 1975) ("The holding of *Branzburg* . . . is that the First Amendment does not afford a reporter a privilege to refuse to testify before a federal grand jury as to information received in confidence.") (hereafter "*Lewis II*"); *In Re Grand Jury Subpoenas to Mark Fainaru-Wada and Lance Williams*, 438 F. Supp. 2d 1111, 1116 (N.D. Cal. 2006) ("[T]he holdings of *Branzburg* and *Scarce* are controlling and require the Court to reject Movants' assertion of a First Amendment reporter's privilege.").

[5] Indeed, the Circuit has drawn a sharp distinction between the civil and criminal contexts on this issue. *See Ashcraft*, 218 F.3d at 287 (holding that the trial court abused its discretion in requiring a reporter to testify about his confidential sources in a civil matter, but recognizing *Branzburg's* holding that a "reporter, like [an] ordinary citizen, must respond to grand jury subpoenas and answer questions related to criminal conduct he personally observed . . . regardless of any promises of confidentiality he gave to subjects of stories").

11

The Fourth Circuit's decision in *Shain* is dispositive.  In *Shain,* four reporters were subpoenaed by the Government to testify about on-the-record interviews they conducted with the defendant (a South Carolina State senator), which "arguably evidenced knowledge of wrongdoing" and were therefore admissible as false exculpatory statements by the defendant.  *Id.* at 852.  The reporters' motion to quash the subpoenas in the district court was denied and, after refusing to testify during the trial, all four reporters were held in contempt.  *Id.* at 851-52.

On appeal, the Fourth Circuit held that the reporters' First Amendment argument was foreclosed by *Branzburg* and found that

> the incidental burden on the freedom of the press in the circumstances of this case does not require the invalidation of the subpoenas issued to the reporters, and absent evidence of governmental harassment or bad faith, the reporters have no privilege different from that of any other citizen not to testify about knowledge relevant to a criminal prosecution.

*Id*. at 852, *citing Branzburg* and *United States v. Steelhammer*, 561 F.2d 539 (4th Cir. 1977) (en banc).  Moreover, because there was no allegation of bad faith by the Government that required the court to undertake a balancing of interests analysis,[6] the Fourth Circuit affirmed the district

---

[6]  That the Fourth Circuit requires a finding of governmental bad faith prior to any "balancing of interests" is underscored by Judge Wilkinson's concurrence in *Shain*.  In his concurrence, Judge Wilkinson distanced himself from the majority by advocating the application of a balancing approach.  *In Re: Shain*, 978 F.2d at 854 (Wilkinson, J., concurring).  That Judge Wilkinson did not "embrace [the majority's] reasoning" in *Shain* proves that his approach is not the law in this Circuit.  *Id.*

The *Shain* Court is not alone in its holding that a plain reading of *Branzburg* requires – as a condition precedent – that governmental bad faith must be proven before any balancing of interests is to take place.  *See In Re: Special Proceedings*, 373 F.3d at 45 ("[w]hat *Branzburg* left open was the prospect that in certain situations – *e.g.,* a showing of bad faith purpose to harass – First Amendment *protections* might be invoked by the reporter") (emphasis added);  *Scarce*, 5 F.3d at 401 ("Read together with the majority opinion, with which Justice Powell concurred, [Justice Powell's reference to "balancing"] must be understood to mean that where a grand jury inquiry is not conducted in good faith, or where the inquiry does not involve a legitimate need of

court's denial of the motions to quash and the subsequent contempt findings against the reporters. *Id.* at 854.

The clear lesson from *Shain* and *Branzburg* is that, to warrant a balancing analysis by this Court, it is not enough simply for Risen or Sterling to assert that Risen promised confidentiality to Sterling. *See, e.g., United States v. King*, 194 F.R.D. 569, 584-85 (E.D.Va. 2000) (Payne, J.) (refusing to conduct any balancing test and instead finding that "the predicate for conducting the balancing of factors identified in *LaRouche* is, as a consequence of the decision in *Shain*, the circumstance in which *both* confidentiality of the source material and vexation or harassment is demonstrated by the record"). Instead, before this Court can undertake a balancing of interests, there must be evidence that this criminal proceeding has been brought in bad faith. Here, there is none.

Put simply, there is no basis to conclude that the criminal proceeding is being conducted in anything but good faith, that the reporter is being harassed in order to disrupt his relationship with confidential news sources, that the information sought from Risen bears only some tenuous relationship to the subject of the trial, or that a legitimate law enforcement need will not be served by forced disclosure of the confidential source relationship. *See Storer Communications*, 810 F.2d at 586 (listing factors to consider in determining whether there is bad faith by the Government). To the contrary, a grand jury has already charged Sterling with serious crimes and has alleged that Risen is a critical eyewitness to those crimes. Risen's testimony should therefore be admitted.

---

law enforcement, or has only a remote and tenuous relationship to the subject of the investigation then, the balance of interests struck by the *Branzburg* majority may not be controlling.").

**B.    Federal Common Law, Too, Does Not Give Rise to a "Reporter's Privilege" that Shields Mr. Risen from Testifying.**

The *Branzburg* Court, in declining to recognize a reporter's privilege under the First Amendment, similarly rejected the notion of a federal common law reporter's privilege, finding that "[a]t common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury." *Branzburg*, 408 U.S. at 685.  In concluding that there is no common law reporter's privilege upon which newsmen can rely to resist testifying about relevant information, the Court reasoned:

> We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news.  But this is not the lesson history teaches us.  As noted previously, the common law recognized no such privilege, and the constitutional argument was not even asserted until 1958.  From the beginning of our country the press has operated without constitutional protection for press informants, and the press has flourished.  The existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press.

*Id.* at 698-99.

Courts of appeals that have resolved the question of whether a federal common law "reporter's privilege" exists in the context of a criminal proceeding have found no such privilege. *See In Re: Special Proceedings*, 373 F.3d at 44 (First Circuit holding that *Branzburg* precluded any argument that reporters hold any special privilege "whether by virtue of the First Amendment or of a newly hewn common law privilege"); *Storer Communications*, 810 F.2d at 584 (Sixth Circuit finding that any holding that a common law "reporter's privilege" exists would be "tantamount to . . . substituting, as the holding of *Branzburg*, the dissent . . . for the majority opinion"); *Lewis II*, 517 F.2d at 238 (Ninth Circuit finding that "[i]t would be difficult to argue for a federal common law reporter's privilege to withhold confidential information from a federal

grand jury in the face of this recent and authoritative statement that the general common law rejects such a privilege . . ."). *See also In Re Grand Jury Subpoenas to Mark Fainaru-Wada and Lance Williams,* 438 F. Supp. 2d at 1119 ("[T]he Ninth Circuit's position on the issue appears clear to this Court: unless and until the Supreme Court states that a common law reporter's privilege exists, or unless Congress enacts such a privilege, *Branzburg*'s mandate is binding.").

In the proceedings arising from the grand jury subpoenas issued to reporters Judith Miller, Matthew Cooper and Tim Russert, the United States District Court for the District of Columbia similarly addressed – and rejected – such a common law privilege.  Specifically, the District Court held that "[i]n the absence of a grand jury acting in bad faith or with the sole purpose of harassment, *Branzburg* makes clear that neither the First Amendment nor common law protect reporters from their obligations shared by all citizens to testify before the grand jury when called to do so."  *In Re: Special Counsel Investigation (Matthew Cooper and Tim Russert)*, 332 F. Supp. 2d 26, 28 (D.D.C. 2004).  The District Court reiterated that holding just two months later by finding that "Ms. Miller has no privilege, based in the First Amendment or common law, qualified or otherwise, excusing her from testifying before the grand jury in this matter."  *In Re: Special Counsel Investigation (Judith Miller)*, 338 F. Supp. 2d 16, 19 (D.D.C. 2004).

On appeal, the D.C. Circuit was "not of one mind on the existence of a common law privilege," and, in the end, the divided court did not resolve the issue.  *Judith Miller,* 438 F.3d at 1150.  Chief Judge David B. Sentelle concluded, however, that there is no federal common law privilege that protects reporters from revealing their sources, finding *Branzburg* "to be as dispositive of the question of common law privilege as it is of a First Amendment privilege.  *Id.* at 1154 (Sentelle, C.J., concurring) (finding that it is "indisputable that the High Court rejected a

common law privilege in the same breath as its rejection of such a privilege based on the First Amendment").[7]

Given the great weight of the law rejecting a common law reporter's privilege, Risen is not entitled to invoke such a privilege to resist testifying at Sterling's trial. This Court therefore should not rely on any assertion of a common law reporter's privilege to shield Risen from giving evidence that any other citizen-eyewitness would be compelled to give.

## II. Even Assuming *Arguendo* the Existence of a Qualified "Reporter's Privilege" that Warrants a Balancing of Interests, Mr. Risen's Testimony Should Nevertheless Be Admitted.

Although it is clear that this criminal proceeding is not brought in bad faith or for the purpose of harassment, Risen may nevertheless ask this Court to undertake a balancing analysis based simply on his purported confidentiality agreement with the defendant. For the reasons described above, such a request would be unsupported by the law. But even if this Court undertook to balance the interests at stake here, Risen's testimony should be admitted, as the legitimate law enforcement interests at issue in this prosecution outweigh any interest Risen may have in resisting his obligation to testify.[8]

---

[7] Judge David S. Tatel disagreed, and would recognize a qualified privilege in grand jury proceedings governed by a "balancing test" which would require a balancing of "the public interest in compelling disclosure [of the confidential source's identity], measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's value." *Judith Miller,* 438 F.3d at 1175 (Tatel, J., concurring). The third panel member, Judge Karen L. Henderson, assumed, for purposes of argument, that a qualified common law privilege existed, but held that "the Special Counsel's evidentiary proffer overcomes any hurdle, however high, a federal common-law reporter's privilege may erect." *Id.* at 1159 (Henderson, J., concurring).

[8] As a threshold matter, even if a privilege is found to exist, it should be applied narrowly. The Supreme Court has disfavored construing evidentiary privileges broadly and has explicitly recognized that "even those rooted in the Constitution must give way in proper circumstances."

**A. As an Initial Matter, Much of Mr. Risen's Anticipated Testimony Is Not Subject to Any Confidentiality Agreement He May Have Had with Defendant Sterling and Thus Is Not Even Arguably Protected.**

As an initial matter, even assuming that a confidentiality agreement existed between Risen and his source that would shield the source's identity, much of the testimony the Government seeks from Risen is not covered by any such agreement.

The Government seeks from Risen, among other things, (1) testimony about the specific information that the defendant conveyed to him, much of which was publicly disclosed by Risen in his book; (2) his recollection of where and when the specific information was transmitted to him; (3) testimony authenticating his book and laying the foundation for admitting the defendant's statements contained in it; and (4) his recollection of his preexisting *non*-confidential source relationship with Sterling, including his authorship of a newspaper article about Sterling's civil lawsuit in 2002.[9]  None of this information is covered by any confidentiality agreement between Risen and his source, because none of this testimony would directly reveal the identity of his source.  The Court should, thus, allow these areas of inquiry.  To do otherwise would be to afford Risen a privilege that is unmoored to any interest he may have in maintaining the confidentiality of any source.  And exempting Risen from testifying about these topics would

_____

*Herbert v. Lando*, 441 U.S. 153, 175 (First Amendment must give way in defamation action where proof of actual malice required).  As the Supreme Court has often stated regarding evidentiary privileges, "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974).

[9]  The Government maintains that it is entitled to any and all testimony from Risen, including the identity of his source, because he has no privilege under these circumstances. However, we include this discussion to clarify what testimony we expect he may assert to be covered by such a privilege.

mean exempting any reporter from testifying about any matter relating to his or her job – whether confidential or not.  That is a conclusion that the law does not support.

**B.    Even under a Balancing of the Interests, Mr. Risen's Testimony Is Admissible Because It Is Relevant, No Other Means Exist to Obtain the Information, and the Government Has a Compelling Interest in the Information.**

Even if this Court undertakes to balance the interests that are at stake, all of Risen's anticipated testimony – including his identification of his source – should be admitted.  In the civil context, the Fourth Circuit has developed a three-part test to weigh those interests: (1) whether the information at issue is relevant; (2) whether the information can be obtained by alternative means; and (3) whether there is a compelling interest in the information.  *LaRouche*, 780 F.2d at 1139.  All three factors weigh in favor of compelling Risen to testify at the defendant's trial.

**1.    Mr. Risen's Testimony Is Directly Relevant to the Issues That Will Be before the Jury.**

The information sought from Risen is unquestionably relevant to the issues that the jury must resolve at trial – including the defendant's identity.

**a.    Mr. Risen Can Identify Sterling as the Individual Who Disclosed the National Security Information to Him.**

Most obviously, Risen can identify Sterling as the individual who, as charged in Counts One through Seven of the Indictment, retained and then transmitted national security information

18

to him.[10]  It is difficult to imagine evidence more directly relevant to the defendant's guilt or innocence than testimony about who committed the alleged crime.

At trial, the Government must prove beyond a reasonable doubt that Sterling, and not any other person, committed the crimes alleged in the Indictment.  Proving the identity of the defendant is, of course, critical in any criminal case.  But, it is all the more important here because Sterling expressly denied that he was Risen's source in a letter purportedly written to Risen.  (The letter was found on Sterling's computer and was drafted in 2004, well after Sterling was aware of the F.B.I.'s investigation into the disclosure of national security information to Risen.)  In the letter, Sterling explained away his contemporaneous contacts with Risen as being related to a story about his pending discrimination lawsuit against the CIA, rather than about the disclosure of classified information.  In the letter, Sterling flatly denied disclosing national security information to Risen, and instead suggested that unidentified staffers with the Senate Select Committee on Intelligence may have done so.  Moreover, consistent with Sterling's representations in the letter – and as evidenced through the discovery process and the defendant's use of trial subpoenas – Sterling's counsel have focused their efforts on identifying other individuals who could have communicated the national defense information at issue to Risen.  It is therefore highly likely that, at trial, Sterling will claim that he was not Risen's source for national defense information.

---

[10]  Risen's testimony is similarly relevant to Counts Eight (Mail Fraud) and Nine (Unauthorized Conveyance of Government Property), for which Sterling's *actus reus* is also the causing of the distribution of Mr. Risen book.  However, for the sake of simplicity, the Government limits its discussion here to the counts of the Indictment charging the retention and disclosure of national security information.

In addition, Risen's own representations to his publisher demonstrate the importance of his testimony regarding the defendant's identity. In his book proposal, Mr. Risen represented that, in writing his book, he spoke with more than one CIA officer involved in Classified Program No. 1. Consistent with these representations, moreover, the chapter of Mr. Risen's book that includes information about Classified Program No. 1 appears to reflect the private conversations and inner thoughts of more than one individual.[11] *See, e.g.,* Exhibit A at p. 203. Risen's testimony is therefore relevant to identifying Sterling as a source and to identifying the specific items of national defense information in his book for which Sterling was his source. Put simply, Risen's testimony will directly establish that Sterling disclosed to him the national defense information about which he sought to write in a 2003 newspaper article, and which he ultimately included in his 2006 book. The jury should be permitted to hear that evidence in assessing whether the Government has met its burden of proving the defendant's guilt beyond a reasonable doubt.

> **b.    Mr. Risen's Testimony Regarding *Where* the Acts of Transmission Took Place Is Relevant to Establishing Venue for Counts Three, Four and Five.**

Risen's testimony is also relevant to establishing venue for Counts Three, Four and Five of the Indictment, in which Sterling is charged with retaining a letter relating to Classified Program No. 1 and then disclosing the letter and other information directly to Risen in the Eastern District of Virginia. Ind. ¶¶ 59, 61, 63.

---

[11] The Indictment alleges that some of the information that appears in Risen's book is national defense information – and thus is implicitly true – but also notes that some of the information contained therein is characterized in a false and misleading manner. *See* Ind. ¶¶ 18,19(d). The Government is not here either confirming or denying the accuracy of any particular fact reported in the book.

"The Supreme Court has cautioned that the question of venue in a criminal case is more than a matter 'of formal legal procedure;' rather, it raises 'deep issues of public policy in the light of which legislation must be construed.'" *United States v. Ebersole*, 411 F.3d 517, 524 (4th Cir. 2005) (quoting *United States v. Johnson,* 323 U.S. 273, 276 (1944)).  Venue for the crime of disclosure of classified information rests in the district "where the proscribed act, the act of transmission, took place." *United States v. Truong Dinh Hung*, 629 F.2d 908, 919 n.11 (4th Cir. 1980).  "The prosecution bears the burden of proving venue by a preponderance of the evidence and, when a defendant is charged with multiple crimes, venue must be proper on each count." *Ebersole*, 411 F.3d at 524 (citing *United States v. Bowens,* 224 F.3d 302, 308 (4th Cir. 2000)). Where a factual dispute exists regarding venue, "submitting the venue question to the jury is an appropriate procedure for resolving" the issue.  *Ebersole,* 411 F.3d at 526 n.10.

As to Counts Three, Four and Five, Risen is an eyewitness to the relevant "act[s] of transmission."  His testimony as to where both he and his source were located when these acts occurred is therefore relevant to establishing venue in the Eastern District of Virginia.

### c.    Mr. Risen's Testimony Regarding *When* He Received National Defense Information Is Relevant to Counts Three through Seven.

To prove the defendant guilty, the Government, at trial, must also establish approximately *when* certain disclosures were made to Risen.[12]  Among other things, Risen's testimony about the timing of the disclosures will allow the Government to exclude other individuals with access to the same national defense information from having committed the charged crimes.  Particularly if

---

[12]  Count Three charges Sterling with retaining a letter relating to Classified Program No. 1 from on or about January 31, 2002 to or about April 30, 2003.  Ind. ¶ 59.  Counts Four through Seven each charge Sterling with making unlawful disclosures to Mr. Risen from on or about February 2003 through on or about April 30, 2003.  *Id.* at ¶¶ 60-67.

Risen is not compelled to disclose Sterling as his source, the Government will be required to introduce, in its case-in-chief or rebuttal, evidence eliminating as Risen's possible sources other individuals with access to the same information. If Mr. Risen is required to testify as to when he received the information, many of these other individuals will be definitively excluded as Risen's source, in particular, if any one of them did not become aware of the information until after Mr. Risen had already received it.

> **d.** **Risen's Testimony Will Allow the Government to Authenticate His Book and Lay the Foundation to Move to Admit Some of Its Contents.**

Authentication is a "condition precedent to admissibility" and "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). At trial, the Government will seek to admit portions of Risen's book either as party admissions by Sterling under Fed R. Evid. 801(d)(2) or – to the extent they are not being offered to prove the truth of the matters stated – as non-hearsay under Fed. R. Evid. 801(c). In either instance, to meet its burden of proof at trial, the Government will ask Risen to authenticate his book and lay the foundation necessary to admit portions of the book into evidence. In particular, the Government will seek to elicit testimony from Risen that the book offered into evidence is in fact the book that *he* authored. *Cf. United States v. Baker*, 432 F.3d 1189, 1212 n.23 (11th Cir. 2007)(*Miami Herald* newspaper article regarding identity of gunmen inadmissible as double hearsay of reporter's account of what eyewitnesses stated); *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993)(newspaper article contained double hearsay and was inadmissible).

In *Larez v. City of Los Angeles*, 946 F.2d 630, 641-42 (9th Cir. 1991), the Ninth Circuit held that the district court committed reversible error by admitting into evidence five statements from Robert Gates, the former police chief for the City of Los Angeles, contained within three

22

newspaper articles.  While recognizing that Gates' actual out-of-court statements to the reporters

were admissions of a party opponent or admissible as non-hearsay – as the defendant's

statements to Risen are here – the court nevertheless found that their repetition in the newspapers

created "a difficult problem which the district court failed to address."  *Id*. at 642.  In particular,

the Court reasoned that

> [f]irst, the reporters' transcriptions were out-of-court statements.  By attributing
> quotations to Gates, the reporters necessarily made the implicit statement, "Gates said
> this!" As the reporters' statements were made in newspapers, they were, *a fortiori,*
> statements made out-of-court where they were not subject to the rigors of cross-
> examination.  Second, the statements – "Gates said this!" – were offered for the truth
> of the matter asserted: that Gates did in fact make the quoted statement.

*Id*.  Moreover, even under Fed. R. Evid. 803(24), the residual exception now codified as Fed. R.

Evid. 807, the Court found that the statements were inadmissible because "the newspaper

quotations were not the best available evidence of what Gates said; testimony from the reporters

themselves would have been better."  *Id*. at 644.  Therefore, according to the Ninth Circuit, "the

error was the failure to take testimony from, and particularly to allow the cross-examination of,

the reporters who repeated Gates's comments."  *Id*.

To address the evidentiary issues with which the court in *Larez* grappled, the Government

intends to elicit from Risen the facts necessary to lay the foundation for and authenticate portions

of his book, so that the jury will have the foundation to then conclude that certain of those

portions are, in fact, attributable to the defendant.  To paraphrase *Larez*, the Government will

elicit testimony from Risen that his unnamed source in the book (who the grand jury alleged to

be Sterling) "said this."[13]  Risen's testimony authenticating that he authored the book in which

---

[13]  Unlike in *Larez*, where Gates never denied the statements attributed to him, the
trustworthiness prong of Fed. R. Evid. 807 cannot easily be satisfied here because, as discussed

those statements are memorialized is therefore relevant to the factual issues that will be before the jury.

### e.    Mr. Risen's Testimony Regarding His Prior Relationship with Defendant Sterling Is Relevant Circumstantial Evidence of the Charged Crimes.

Finally, Risen's testimony concerning his prior relationship with Sterling is powerful, circumstantial evidence that Sterling committed the charged crimes.  The Indictment alleges that Risen had a relationship with the defendant prior to 2003 that resulted in Risen authoring one article in 2001 that contained classified information, and another article in 2002 about the defendant's civil lawsuit against the CIA.  *See* Ind. ¶¶ 20–33.  The latter article publicly identified Sterling as a source.  *See id.* at ¶ 27; Exhibit B.  Mr. Risen's testimony concerning this preexisting source relationship with the defendant, and relevant details concerning the articles he wrote, is powerful circumstantial evidence that Sterling, as opposed to any other CIA employee with similar knowledge of Classified Program No. 1 and Human Asset No. 1, communicated the information at issue to him.

### 2.    The Specific Information Sought from Mr. Risen Cannot Be Obtained by Alternative Means.

Having established that Risen's testimony is relevant, any balancing analysis would next require the Court to weigh whether the same information can be obtained by alternative means. Here, the specific information the Government seeks from Risen cannot be obtained elsewhere. No other person can provide eyewitness testimony that directly, as opposed to circumstantially, identifies Sterling as the individual who disclosed the national defense information concerning

---

above, the defendant purported to deny his culpability in his 2004 letter to Mr. Risen.

Classified Program No. 1 and Human Asset No. 1 to Risen.  *See Gonzales*, 459 F.3d at 170 ("It is

beyond argument that the evidence from the reporters is on its face critical to this inquiry. . . .

[A]s the recipients of the disclosures, they are the only witnesses – other than the source(s) –

available to identify the conversations in question and to describe the circumstances of the leaks.

. . . There is simply no substitute for the evidence they have.").  Similarly, Risen's testimony

concerning *where* the acts of transmission took place is not available elsewhere.[14]  Finally, his

testimony authenticating his book is similarly unavailable through alternative means typically

admissible at trial.[15]  This factor therefore weighs heavily in favor of admitting Risen's

testimony.

### 3.    The Government Has a Compelling Interest in the Information.

Finally, in any balancing analysis, a court must weigh the Government's interests against

the reporter's.

Enforcement of our criminal laws in and of itself is a sufficiently compelling interest to

justify obtaining Mr. Risen's testimony.  *See Branzburg*, 408 U.S. at 700-01.  The "need for

information in the criminal context is much weightier because 'our historic[al] commitment to

the rule of law . . .  is nowhere more profoundly manifest than in our view that 'the twofold aim

[of criminal justice] is that guilt shall not escape or innocence suffer.'"  *Cheney v. U.S. District*

---

[14]  The Government will rely on the numerous telephone calls between Risen and Sterling's home in Herndon, Virginia in February and March 2003 –  immediately before Mr. Risen made it known to the CIA that he possessed information about Classified Program No. 1 – in order to prove venue, should Mr. Risen's trial testimony not be admitted.  *See* Ind. ¶¶ 34-39.

[15]  Mr. Risen has executed affidavits in connection with this matter which the Government will move to admit pursuant to Fed. R. Evid. 807 or another hearsay exception should his live testimony not be admitted.

*Court for the District of Columbia*, 542 U.S. 367, 384 (2004) (internal citations omitted; brackets in the original).  Here, that interest is even more powerful because the defendant is charged with extremely serious crimes:  multiple counts of disclosing a clandestine operational CIA program designed to impede the progress of the weapons capabilities of certain countries.  *See* Ind. ¶¶ 15, 55, 57, 61 63, 65, 67.  Specifically, the grand jury has found probable cause that Sterling communicated this information while having reason to believe that it could be used to the injury of the United States and to the advantage of any foreign nation.  *See id.*  There are few scenarios where the United States' interests in securing relevant information is more profound and compelling than in a criminal prosecution like this one.  *Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation."); *United States v. Abu Ali*, 528 F.3d 210, 247 (4th Cir. 2008) ("The Government has a substantial interest in protecting sensitive sources and methods of gathering information," and "a compelling interest in protecting both the secrecy of information to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service") (quoting *United States v. Smith*, 780 F.2d 1102, 1108 (4th Cir. 1985) and *CIA v. Sims*, 471 U.S. 159, 175 (1985)).

In addition, because Risen's testimony is sought at a criminal trial – as opposed to a grand jury proceeding – the Government's immediate interest in securing his testimony is particularly acute.  Here, the trial follows a probable cause finding by the grand jury that the specific crimes in the Indictment have been committed, that Sterling committed them, and that Risen witnessed them.  At trial, then, the Government has a concrete interest in proving the crimes – and, more particularly, in proving to the petit jury that Sterling was the individual who disclosed national

defense information, establishing venue for each count, and authenticating and laying the foundation to admit the statements made by Sterling in Mr. Risen's book.[16]

Additionally, at this stage, the Government must prove its case, and every element of every charged crime, beyond a reasonable doubt and in an adversarial proceeding.  Sterling, assisted by able counsel, will undoubtedly assert his innocence, as he is entitled to do – perhaps by suggesting that other individuals, such as congressional staffers, committed the charged crimes. Accordingly, the Government's interest in Risen's testimony, because it must meet this higher standard and rebut the defendant's case, is particularly compelling now.  Moreover, should Risen not testify at trial, the jury may unfairly assume that his testimony would have been damaging to the Government or speculate that the Government is withholding probative evidence.

Finally, whatever interest Risen has in keeping confidential his source for the national defense information at issue here, it is severely diminished by the fact that the defendant characterized some of that information in a false and misleading manner as a means of inducing Risen to write about it.  *See* Ind. ¶ 18, 19(d).  In short, the Indictment charges that the defendant perpetrated a fraud upon Risen.  If "[s]preading false information in and of itself carries no First Amendment credentials" in the civil context, *see Lando*, 441 U.S. at 171, then it should carry no greater weight in a criminal prosecution.

---

[16]  In addition, Mr. Risen's interest in shielding the defendant's identity is diminished at a trial – as opposed to a grand jury proceeding – because the specificity of charged crimes permits more focused questioning of him.  "The strength of the [reporter's] privilege is further diminished if the questions asked of the reporter are narrowly tailored*."  United States v. Treacy*, 603 F.Supp. 2d 670, 672 (S.D.N.Y. 2009)(citing *United States v. Markiewicz*, 732 F.Supp. 316, 319 (N.D.N.Y. 1990)).

## CONCLUSION

The Supreme Court has recognized a "public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Rakas v. Illinois*, 439 U.S. 128, 137 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174-75 (1969)). Here, the Indictment returned by the grand jury charges Sterling with serious crimes that implicate the national security of the United States. Mr. Risen is an eyewitness to those crimes. Mr. Risen's testimony, like that of any other citizen in his situation, should therefore be admitted to permit the jury to carry out its truth-seeking function.

WHEREFORE, the government respectfully requests that the Court grant the motion and admit the testimony of Mr. Risen in the Government's case-in-chief.

Respectfully submitted,

Neil H. MacBride
United States Attorney
Eastern District of Virginia

Lanny A. Breuer
Assistant Attorney General
Criminal Division
U.S. Department of Justice

William M. Welch II
Senior Litigation Counsel
U.S. Department of Justice

Timothy J. Kelly
Trial Attorney
U.S. Department of Justice

James L. Trump
Senior Litigation Counsel
United States Attorney's Office

By:     _____/s/_____
        Timothy J. Kelly
        Attorney for the United States

        United States Attorney's Office
        Justin W. Williams U.S. Attorney's Building
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        Phone: (703) 299-3700
        Fax: (703) 299-3981
        Email: Timothy.Kelly@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2011, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the following:

Edward B. MacMahon
107 East Washington Street
Middleburg, VA 20118
(703) 589-1124

Barry J. Pollack
Miller & Chevalier
655 Fifteenth Street, NW
Suite 900
Washington, DC 20005-5701
(202) 626-5830
(202) 626-5801 (fax)

_____/s/_____<br>
Timothy J. Kelly<br>
Trial Attorney<br>
United States Department of Justice