**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

|  |  |
|---|---|
| UNITED STATES<br><br>v.<br><br>JEFFREY ALEXANDER STERLING,<br><br>Defendant. | No. 1:10cr485 (LMB) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO THE GOVERNMENT'S MOTION *IN
LIMINE* AND IN SUPPORT OF THE MOTION OF JAMES
RISEN TO QUASH SUBPOENA AND/OR FOR
PROTECTIVE ORDER**

PETER K. STACKHOUSE
219 Lloyds Lane
Alexandria, VA 22302
(703) 684-7184

CAHILL GORDON & REINDEL LLP
DAVID N. KELLEY (admitted *pro hac vice*)
JOEL KURTZBERG (admitted *pro hac vice*)
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for James Risen*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................. 1

CIRCUMSTANCES GIVING RISE TO THE MOTION .............................................................. 3

ARGUMENT ..................................................................................................................... 17

I.      ██████████████████████████████████████ ............ 17

II.    THE INFORMATION SOUGHT TO BE COMPELLED IS PROTECTED BY THE REPORTER'S PRIVILEGE UNDER THE FIRST AMENDMENT ...................... 19

III.   THE INFORMATION SOUGHT TO BE COMPELLED IS ALTERNATIVELY PROTECTED BY THE REPORTER'S PRIVILEGE UNDER FEDERAL COMMON LAW ..................................................................... 25

IV.   ON THE FACTS OF THIS CASE, THE SUBPOENA MUST BE QUASHED AND A PROTECTIVE ORDER ENTERED ON REPORTER'S PRIVILEGE GROUNDS ............................................................................................. 32

       A.    The Subpoena Is Directed at Confidential Source Information .............................. 34
       B.    The Government Must Meet Its Heavy Burden of Overcoming the *LaRouche* Factors ...................................................................................... 36
       C.    The Information Sought from Risen Is Not Critical or Necessary To The Government's Case At Trial .............................................................. 37
       D.    The Newsworthiness of the Leaks at Issue Outweighs Any Alleged Harm Caused By Them ...................................................................... 41
       E.    Mr. Risen Is Willing To Authenticate His Work Under Oath, Subject To An Appropriate Protective Order ........................................... 45
       F.    There Is Evidence that the Subpoena Was Issued To Harass and Intimidate Mr. Risen ...................................................................... 46

CONCLUSION ................................................................................................................... 47

## TABLE OF AUTHORITIES

|  | Page |
|---|---|
| ***Cases*** | |
| *ACLU* v. *National Security Agency*, 438 F. Supp. 2d 754 (E.D. Mich. 2006), *rev'd on other grounds by*, 493 F.3d 644 (6th Cir. 2007), *cert. denied*, 552 U.S. 1179 (2008)............................................................................ | 3n |
| *Ashcraft* v. *Conoco, Inc.*, 218 F.3d 282 (4th Cir. 2000) ............................. | 21-22, 24, 28, 34 |
| *Ayash* v. *Dana-Farber Cancer Institute*, 706 N.E.2d 316 (Mass. App. Ct. 1999) ...................................................................................................... | 30n |
| *Baker* v. *F & F Investment*, 470 F.2d 778 (2d Cir. 1972), *cert. denied*, 411 U.S. 966 (1973)........................................................................................... | 28n |
| *Branzburg* v. *Hayes*, 408 U.S. 665 (1972)................................................... | *passim* |
| *Brown* v. *Virginia*, 204 S.E.2d 429 (Va.), *cert. denied*, 419 U.S. 966 (1974)........... | 30n |
| *Carey* v. *Hume*, 492 F.2d 631 (D.C. Cir.), *cert. dismissed*, 417 U.S. 938 (1974).................................................................................................... | 40 |
| *Christianson* v. *Colt Industries Operating Corp.*, 486 U.S. 800, 815-16 (1988) ................................................................................................... | 18 |
| *Church of Scientology International* v. *Daniels*, 992 F.2d 1329, 1335 (4th Cir.), *cert. denied*, 510 U.S. 869 (1993) ................................................ | 22, 37-38 |
| *Clemente* v. *Clemente*, 56 Va. Cir. 530 (2001)........................................... | 30n |
| *Continental Cablevision, Inc.* v. *Storer Broadcasting Co.*, 583 F. Supp. 427 (E.D. Mo. 1984)....................................................................................... | 35 |
| *In re Grand Jury Subpoena*, 204 F.3d 516 (4th Cir. 2000) ........................... | 36 |
| *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141 (D.C. Cir. 2005)............ | 33, 41-42 |

|  | Page |
|---|---|
| *Gregg* v. *Georgia*, 428 U.S. 153 (1976) | 21n |
| *Grunseth* v. *Marriott Corp.*, 868 F. Supp. 333 (D.D.C. 1994) | 40 |
| *Hawkins* v. *Williams*, Hinds County Circuit Court, No. 29,054 (Mar. 16, 1983) | 30n |
| *Hopewell* v. *Midcontinent Broadcasting Corp.*, 538 N.W.2d 780 (S.D. 1995), *cert. denied*, 519 U.S. 817 (1996) | 30n |
| *Idaho* v. *Salsbury*, 924 P.2d 208 (Idaho 1996) | 30n |
| *Jaffee* v. *Redmond*, 518 U.S. 1 (1996) | 26-30 |
| *In re John Doe Grand Jury Investigation*, 574 N.E.2d 373 (Mass. 1991) | 30n |
| *LaRouche* v. *National Broadcasting Co.*, 780 F.2d 1134 (4th Cir.), *cert. denied*, 479 U.S. 818 (1986) | *passim* |
| *Marks* v. *United States*, 430 U.S. 188 (1977), *superseded in part by statute on unrelated grounds as stated in Armstrong* v. *Bertrand*, 336 F.3d 620 (7th Cir. 2003) | 21n |
| *McIntyre* v. *Ohio Elections Commission*, 514 U.S. 334 (1995) | 28n |
| *McKoy* v. *North Carolina*, 494 U.S. 433 (1990) | 21n |
| *Miller* v. *Transamerican Press, Inc.*, 621 F.2d 721, *modified*, 628 F.2d 932 (5th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981) | 22n, 37 |
| *Missouri ex rel. Classic III, Inc.* v. *Ely*, 954 S.W.2d 650 (Mo. Ct. App. 1997) | 30n |
| *In re National Security Agency Telecommunications Records Litigation*, 700 F. Supp. 2d 1182 (N.D. Cal. 2010) | 3n |
| *New York Times Co.* v. *Gonzales*, 459 F.3d 160 (2d Cir. 2006) | 30-31, 33, 35, 41 |

|  | Page |
|---|---|
| *Opinion of the Justices*, 373 A.2d 644 (N.H. 1977) | 30n |
| *Philip Morris Cos.* v. *ABC, Inc.*, 36 Va. Cir. 1 (1995) | 30n |
| *Riley* v. *City of Chester*, 612 F.2d 708 (3d Cir. 1979) | 29n |
| *Sejman* v. *Warner–Lambert Co.*, 845 F.2d 66 (4th Cir.1988) | 18 |
| *In re Shain*, 978 F.2d 850 (4th Cir. 1992) | 19, 20, 22-24, 34 |
| *Shoen* v. *Shoen*, 5 F.3d 1289 (9th Cir. 1993) | 28n |
| *Sinnott* v. *Boston Retirement Board*, 524 N.E.2d 100 (Mass.), *cert. denied*, 488 U.S. 980 (1988) | 30n |
| *State* v. *Siel*, 444 A.2d 499 (N.H. 1982) | 30n |
| *Trammel* v. *United States*, 445 U.S. 40 (1980) | 27 |
| *United States* v. *Aramony*, 166 F.3d 655 (4th Cir. 1999) | 18 |
| *United States* v. *Burke*, 700 F.2d 70 (2d Cir.), *cert. denied*, 464 U.S. 816 (1983) | 38 |
| *United States* v. *Cuthbertson*, 630 F.2d 139 (3d Cir. 1980), *cert. denied*, 449 U.S. 1126 (1981) | 26 |
| *United States* v. *Lindh*, 210 F. Supp. 2d 780 (E.D. Va. 2002) | 19, 24, 34, 46 |
| *United States* v. *Mid-States Exchange*, 620 F. Supp. 358 (D.S.D 1985) | 17-18 |
| *United States* v. *Montos*, 421 F.2d 215 (8th Cir.), *cert. denied* 397 U.S. 1022 (1970) | 18 |
| *United States* v. *Phillips*, 577 F. Supp. 879 (N.D. Ill. 1984) | 17 |

|  | Page |
|---|---|
| *United States* v. *Regan*, Criminal No. 01-405-A, Memorandum Order at 5 (E.D. Va. Aug. 20, 2002)............................................................................ | 19, 25, 34-35 |
| *United States* v. *Steelhammer*, 539 F.2d 373 (4th Cir. 1976), *adopted by the court en banc*, 561 F.2d 539 (4th Cir. 1977) ........................................... | *passim* |
| *Vermont* v. *St. Peter*, 315 A.2d 254 (Vt. 1974) ......................................... | 30n |
| *Winegard* v. *Oxberger*, 258 N.W.2d 847 (Iowa 1977), *cert. denied*, 436 U.S. 905 (1978).......................................................................................... | 30n |
| *In re Wright*, 700 P.2d 40 (Idaho 1985)...................................................... | 30n |
| *Zerilli* v. *Smith*, 656 F.2d 705 (D.C. Cir. 1981)......................................... | 40 |
| **Constitutional Provisions** |  |
| U.S. Const. amend. I..................................................................................... | *passim* |
| U.S. Const. amend. V.................................................................................... | 8n |
| **Foreign Statutes** |  |
| Code of Criminal Procedure, Article 109(2) (France)................................. | 31n |
| Criminal Procedure Code, Section 53 (Germany) ........................................ | 31n |
| Freedom of Press Act, Chapter 3, Article 1 (Sweden)................................. | 31n |
| Media Act of 1981, Article 31 (Austria)....................................................... | 31n |
| **International Decisions** |  |
| *European Pacific Banking Corp.* v. *Television New Zealand Ltd.*, [1994] 3 N.Z.L.R. 43 (Ct. App. Wellington)*Financial Times Ltd.* v. *United Kingdom*, [2010] Eur. Ct. H.R. 46.......................................................................... | 31n |

|  | Page |
|---|---|
| *Financial Times Ltd.* v. *United Kingdom*, [2010] Eur. Ct. H.R. 46.......................... | 31n |
| *Goodwin* v. *United Kingdom*, [1996] 22 Eur. Ct. H.R. 123 (European Court of Human Rights).......................................................................... | 31n |
| *Oyegbemi* v. *Attorney-General of the Federation & Ors*, [1982] F.N.L.R. 192 (Fed. of Nigeria LR) ........................................................ | 31n |
| *Prosecutor* v. *Radoslav Brdjanin and Momir Talic*, Case No. IT-99-36-AR 73.9 (International Criminal Tribunal for former Yugoslavia 2002).................. | 31n |
| *R.* v. *National Post*, 2010 S.C.C. 16 (2010)............................................. | 31n |
| ***Newspaper Articles*** |  |
| James Risen and Eric Lichtblau, "Bush Lets U.S. Spy on Callers Without Courts," New York Times, Dec. 16, 2005, at A1 .............................. | 3 |
| Scott Shane, "Authorities Trying To Track Funding Back To Bin Laden, The Baltimore Sun, Sept. 21, 2001, at 12A .......................................... | 7 |
| ***Regulations*** |  |
| DOJ Guidelines |  |
| 28 C.F.R. § 50.10(2011) ............................................................. | 31 |
| 28 C.F.R. § 50.10(a) (2011).......................................................... | 35 |
| 28 C.F.R. § 50.10(b) (2011).......................................................... | 32 |
| 28 C.F.R. § 50.10(c) (2011).......................................................... | 32 |
| 28 C.F.R. § 50.10(e) (2011).......................................................... | 35 |
| 28 C.F.R. § 50.10(f) (2011) .......................................................... | 38 |

|  | Page |
|---|---|
| 28 C.F.R. § 50.10(f)(1) (2011)............................................................. | 32 |
| 28 C.F.R. § 50.10(g) (2011)............................................................... | 35 |
| **Rules** |  |
| Fed. R. Crim. P. |  |
| 17.................................................................................................... | 17 |
| 17(c)(2) ......................................................................................... | 17 |
| Fed. R. Evid. |  |
| 501.................................................................................................. | 25-27, 29 |
| 802.................................................................................................. | 45 |
| **Statutes** |  |
| Ala. Code § 12-21-142.......................................................................... | 30n |
| Alaska Stat. §§ 09.25.300-.390 .............................................................. | 30n |
| Ariz. Rev. Stat. Ann. §§ 12-2214, 12-2237 ............................................ | 30n |
| Ark. Code Ann. § 16-85-510 ................................................................. | 30n |
| Cal. Evid. Code § 1070.......................................................................... | 30n |
| Colo. Rev. Stat. Ann. § 13-90-119......................................................... | 30n |
| Conn. Gen. Stat. Ann. § 52-146t............................................................ | 30n |
| D.C. Code Ann. §§ 16-4701 to 16-4704................................................. | 30n |

|  | Page |
|---|---|
| Del. Code Ann. tit. 10, §§ 4320-26 ................................................................... | 30n |
| Fla. Stat. Ann. § 90.5015 ...................................................................... | 30n |
| Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2008, Pub. L. No. 110-261, 122 Stat. 2436 (2008) ....................................... | 4 |
| Ga. Code Ann. § 24-9-30 ...................................................................... | 30n |
| Haw. Rev. Stat. § 621 Notes ................................................................ | 30n |
| 2011 Haw. Sess. Laws ch. 113 (signed into law June 14, 2011) ............................... | 30n |
| 735 Ill. Comp. Stat. Ann. 5/8-901 to 8-909 ................................................ | 30n |
| Ind. Code Ann. §§ 34-46-4-1, 34-46-4-2 .................................................... | 30n |
| Kan. Stat. Ann. § 60-480 to 60-485 ........................................................ | 30n |
| Ky. Rev. Stat. Ann. § 421.100 .............................................................. | 30n |
| La. Rev. Stat. Ann §§ 45:1451-1459 ........................................................ | 30n |
| Me. Rev. Stat. Ann. tit. 16, § 61 .......................................................... | 30n |
| Md. Code. Ann., Cts. & Jud. Proc. § 9-112 ................................................. | 30n |
| Mich. Comp. Laws Ann. §§ 767.5a, 767A.6 .................................................... | 30n |
| Minn. Stat. Ann. §§ 595.021-.025 .......................................................... | 30n |
| Mont. Code Ann. §§ 26-1-902, 26-1-903 ...................................................... | 30n |
| Neb. Rev. Stat. Ann. §§ 20-144 to 20-147 .................................................. | 30n |
| Nev. Rev. Stat. Ann. 49.275, 49.385 ....................................................... | 30n |

|  | Page |
|---|---|
| N.J. Stat. Ann. §§ 2A:84A-21.1 to 21.5............................................................ | 30n |
| N.M. Stat. Ann. § 38-6-7 ........................................................................... | 30n |
| N.Y. Civ. Rights Law § 79-h ....................................................................... | 30n |
| N.C. Gen. Stat. Ann. § 8-53.11 .................................................................... | 30n |
| N.D. Cent. Code § 31-01-06.2 ..................................................................... | 30n |
| Ohio Rev. Code Ann. §§ 2739.04, 2739.12...................................................... | 30n |
| Okla. Stat. Ann. tit. 12, § 2506 ................................................................... | 30n |
| Or. Rev. Stat. §§ 44.510-.540 ...................................................................... | 30n |
| 42 Pa. Cons. Stat. Ann. § 5942(a)................................................................ | 30n |
| Protect America Act of 2007, Pub. L. No. 110-55, 121 Stat. 552 (2007) ................ | 4 |
| R.I. Gen. Laws §§ 9-19.1-1 to 9-19.1-3........................................................ | 30n |
| S.C. Code Ann. § 19-11-100........................................................................ | 30n |
| Tenn. Code Ann. § 24-1-208 ....................................................................... | 30n |
| Tex. Civ. Prac. & Rem. Code Ann. § 22.021)................................................ | 30n |
| Utah Order 08-04 .................................................................................... | 30n |
| Wash. Rev. Code Ann. § 5.68.010................................................................ | 30n |
| 2011 W. Va. Accts 78 (to be codified at W. Va. Code § 57-3-10)........................ | 30n |
| Wis. Stat. § 885.14)................................................................................... | 30n |

|  | Page |
|---|---|
| ***Other Authorities*** |  |
| The Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction, Report to the President of the United States, March 31, 2005 (unclassified version), *available at* <http://www.gpoaccess.gov/wmd/index.html> ................................................ | 5, 5n, 44 |
| National Intelligence Council, National Intelligence Estimate, Iran: Nuclear Intentions and Capabilities (Nov. 2007), *available at* http://www.dni.gov/press releases/20071203 release.pdf.................................... | 43n |
| James Risen, *State of War: The Secret History of the CIA and the Bush Administration* (Free Press 2006) ............................................................................... | *passim* |

## PRELIMINARY STATEMENT

James Risen, a two-time Pulitzer Prize-winning investigative reporter for *The New York Times* ("*The Times*") and the author of three full-length books of investigative journalism, has been served with a subpoena demanding that he testify about the identity of his confidential source(s) at the trial of Jeffrey Alexander Sterling on charges that Sterling leaked classified national defense information that was then published in Chapter 9 of Mr. Risen's book, *State of War: The Secret History of the CIA and the Bush Administration* ("*State of War*"). The Government has made a motion *in limine* to require Mr. Risen's testimony. Mr. Risen respectfully requests that the Court deny that motion and grant his motion to quash the trial subpoena and for a protective order, because the testimony sought by the Government — with one minor exception for testimony seeking authentication of Mr. Risen's work (*see* pp. 45 - 46 below) — is (1) protected by the reporter's privilege rooted in the First Amendment of the United States Constitution; (2) protected by the reporter's privilege recognized in this Circuit under federal common law; and (3) part of a continuing pattern of government harassment of and retaliation against Mr. Risen for reporting important stories that exposed excessive government secrecy and potential wrongdoing during the Bush Administration.

The Government's brief in support of its motion *in limine* reads as if this Court is deciding this issue on a clean slate. But, as both the Government and this Court are well aware, this is not the first time the Government has demanded that Mr. Risen reveal his confidential source(s) on this subject. The Government issued two grand jury subpoenas to Mr. Risen, in 2008 and 2010





Mr. Risen's testimony is not "critical" or "necessary" to the Government's case in light of the evidence the Government claims to have compiled in the course of its investigation. (*See* pages 37 - 41 below.)

The burden of affirmatively demonstrating that Mr. Risen's testimony is "critical" or "necessary" to this prosecution and that the information sought cannot be obtained by reasonable alternative sources is on the Government. *LaRouche* v. *National Broadcasting Co.*, 780 F.2d 1134, 1139 (4th Cir.), *cert. denied*, 479 U.S. 818 (1986). The Government has utterly failed to satisfy that burden here. In short, the Government acknowledges that it has other admissible evidence to support its allegations, making Mr. Risen's testimony about his confidential source(s) unnecessary. Under these circumstances, the subpoena must be quashed and the Government's motion *in limine* must be denied.

-2-

## CIRCUMSTANCES GIVING RISE TO THE MOTION

James Risen has been a journalist for more than thirty years. He has worked as a reporter at the *Fort Wayne (Indiana) Journal Gazette*, the *Miami Herald*, the *Detroit Free Press*, the *Los Angeles Times*, and, since May 1998, *The Times*. *See* Risen Aff. ¶ 5. He currently writes mostly about intelligence matters, national security issues, and terrorism. *Id.* In addition to his newspaper reporting, Mr. Risen has also written three books, all of which have been the product of Mr. Risen's work as an investigative journalist. *Id.* ¶ 10.

Mr. Risen has long written — and won awards for writing — major stories that disclose excessive government secrecy, incompetence, and mismanagement, regardless of what administration has been in power. *Id.* ¶ 14. On December 16, 2005, Mr. Risen co-wrote a Pulitzer-Prize winning article in *The Times* with fellow *Times* reporter Eric Lichtblau entitled "Bush Lets U.S. Spy on Callers Without Courts." *Id.* ¶ 15 & Ex. 6. Shortly thereafter, in early January 2006, Free Press, an imprint of Simon & Schuster, published Mr. Risen's latest book, *State of War*. In *The Times* article and then in Chapter 2 of the book, Mr. Risen revealed that the National Security Agency had for years been secretly listening in on international phone calls and intercepting international email messages originating or terminating in the United States without first securing warrants (the "NSA Warrantless Eavesdropping Program"). *See id.* ¶ 15, Ex. 6. The NSA Warrantless Eavesdropping Program was, in all likelihood, illegal,[1] and by writing about it, Mr. Risen permitted the public, the Congress, and, eventually, the courts to debate and evaluate the legality of the previously secret program for the first time. *Id.* ¶ 9. Mr. Risen's disclosures helped lead to Congressional efforts to modify the Foreign Intelligence Surveillance Act

---

[1] The only courts to have examined the legality of the NSA Warrantless Eavesdropping Program to date found it illegal. *See ACLU* v. *National Security Agency*, 438 F. Supp. 2d 754, 778 (E.D. Mich. 2006), (program violated the First and Fourth Amendments, separation of powers doctrine, and, FISA), *rev'd on other grounds by*, 493 F.3d 644 (6th Cir. 2007) (plaintiffs lacked standing to raise their constitutional claims), *cert. denied*, 552 U.S. 1179 (2008); *In re National Security Agency Telecommunications Records Litigation*, 700 F. Supp. 2d 1182, 1184 (N.D. Cal. 2010) ("plaintiffs were subjected to unlawful electronic surveillance" in violation of FISA).

of 1978 in order to provide more secure legal grounding for domestic surveillance on a going-forward basis. *Id.*; *see also* Protect America Act of 2007, Pub. L. No. 110-55, 121 Stat. 552; Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2008, Pub. L. No. 110-261, 122 Stat. 2436. The wiretapping program remains a central issue in discussions of executive power and was the subject of Congressional questioning of then-Judge (and now Supreme Court Justice) Sotomayor. *See id.* ¶ 9.

In addition to reporting about the NSA Warrantless Eavesdropping Program, *State of War* also exposed additional instances of excessive government secrecy, incompetence, and/or mismanagement in the Bush Administration that had previously been unreported. The book also disclosed that:

- President Bush secretly pressured the CIA to use torture on detainees in secret prisons around the world; *id.* ¶ 11 & Ex. 2 at 11-37;

- the CIA had evidence before the Iraq War that Iraq had already abandoned its program to develop weapons of mass destruction, but failed to share that information with President Bush, even as he was publicly warning of the threat posed by Iraq's quest for such weapons; *id.* & Ex. 2 at 85-107;

- in the aftermath of the invasion of Iraq, the Bush Administration punished CIA professionals who warned that the war in Iraq was going badly; *id.* & Ex. 2 at 109-124;

- on sensitive issues, such as torture, the Bush Administration created a "zone of deniability" whereby the president's top advisors were briefed, but the president himself was intentionally kept in the dark; *id.* & Ex. 2 at 24-25;

- the Bush Administration had turned a blind eye to Saudi involvement in terrorism; *id.* & Ex. 2 at 173-91; and

- the CIA's intelligence operations on weapons of mass destruction in Iraq, Iran, and other countries were dysfunctional, and, in some instances, even reckless. *Id.* & Ex. 2 at 193-218.

Chapter 9 of *State of War* focuses primarily on "Operation Merlin," a reportedly botched attempt by the CIA, during the Clinton Administration, to have a former Russian scientist pass on fake and intentionally flawed nuclear blueprints to Iran. *See* Risen Aff. ¶ 16 & Ex. 2 at 193-218. The idea behind the operation, as described in the book, was to induce the Iranians to build a nuclear weapon based on the flawed blueprints and thus ultimately undermine Iran's nuclear program. But the operation was deeply flawed and mismanaged from the beginning.

The flaws in the nuclear blueprints were so obvious that the Russian scientist noticed them within minutes of seeing the plans. *Id.* ¶ 17 & Ex. 2 at 203, 210-11. When the scientist explained this to his CIA handlers, they inexplicably refused to call off the operation and simply told him to proceed as planned by delivering the blueprints to the Iranians. *Id.* ¶ 17 & Ex. 2 at 203-04, 210-11. Thus, notwithstanding that it came to the CIA's attention that the flaws in the nuclear blueprints could be very easily spotted, the CIA pushed ahead anyway. *Id.* ¶ 17 & Ex. 2 at 203-04, 210-11. By reporting on the failed operation, Mr. Risen called into question the competence of the CIA's intelligence related to Iran's ability to produce weapons of mass destruction. *Id.* ¶ 29.

Mr. Risen knew about most of the information reported in Chapter 9, including Operation Merlin, as early as 2003 but held the story for three years until it became clear to him that the competence of intelligence operations concerning Iran's nuclear capabilities was something that the public needed to examine. Risen Aff. ¶ 19. Mr. Risen made the decision to publish this information only after: (1) it became clear that the main rationale for fighting the Iraq War was based on faulty intelligence about the supposed Iraqi nuclear program; (2) the press, particularly *The Times*, had been harshly criticized for not doing more independent investigative reporting before the Iraq War about the quality of U.S. intelligence concerning Iraq's nuclear program; (3) the March 31, 2005 Report to the President by the Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction described American intelligence on Iran as inadequate to allow firm judgments about Iran's weapons programs;[2] and (4) there was increasing speculation that the U.S. might be planning for a possible conflict with Iran, once again, based on supposed intelligence concerning WMD. Mr. Risen ultimately con-

---

[2] A redacted version of the report, which does not contain the information about the Iranian nuclear program, is available on the Internet. *See* Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction, Report to the President of the United States, Mar. 31, 2005 (unclassified version), *available at* http://www.gpoaccess.gov/wmd/index.html (last visited June 20, 2011).

cluded that U.S. intelligence on Iran's supposed nuclear program was so flawed, and that the information in Chapter 9 was so important, that the public needed to know about this story before another war was launched based on faulty intelligence. *Id.*

Mr. Risen and Mr. Lichtblau received the Pulitzer Prize and other prestigious awards for their reporting on the NSA Warrantless Eavesdropping Program. *Id.* ¶ 6. They both also received the Goldsmith Prize for Investigative Reporting, which is awarded to journalism that "promotes more effective and ethical conduct of government by disclosing excessive government secrecy, impropriety, and mismanagement." *Id.* ¶ 7. Much of Mr. Risen's reporting during the Bush Administration was — as it had been with previous administrations — critical of the federal government. *Id.* ¶ 14.

The Government, however, was not pleased. President Bush called the disclosure of the NSA Warrantless Eavesdropping Program a "shameful act," and the administration and its supporters thereafter publicly speculated about potentially prosecuting Mr. Risen for espionage. *Id.* ¶ 3 & Ex. 11. Mr. Risen soon became the target of an organized campaign of hate mail from right wing groups with close ties to the White House, inundating him with personal threats. *Id.* ¶ 31. Protesters supporting the Bush Administration picketed Mr. Risen's office, and right wing pundits and bloggers supporting the Bush Administration took to television and the Internet to call for the White House and the Justice Department to either prosecute Mr. Risen for espionage or put him in jail by making him the target of a subpoena in a leak investigation concerning the identity of his confidential source(s). *Id.*

In January 2006, then-Attorney General Alberto Gonzales held a press conference and, in May 2006, he went on television to discuss the leaks concerning the NSA Warrantless Eavesdropping Program. Both times, he suggested that the Department of Justice was actively considering prosecuting the journalists involved. *Id.* ¶ 32 & Ex. 12. When later asked to clarify Attorney General Gonzales's remarks, the Justice Department stated in writing that, although the Justice Department had "never in its history prosecuted a member of the press under [the Espio-

-6-

nage Act] or any other statute relating to the protection of classified information," the Department's current position was that "such a prosecution is possible under the law." *Id.* ¶ 35 & Ex. 15. Then-director of the CIA, Porter Goss, soon chimed in, suggesting that it was his "hope" and "aim" that Mr. Risen would receive a grand jury subpoena requiring him to testify about the identity of his confidential source(s). *Id.* ¶ 33 & 13.

In May 2006, ABC News reported that senior federal law enforcement officials had leaked to the press that the Government was tracking the phone numbers of journalists without the journalists' knowledge as part of an effort to root out journalists' confidential sources. *Id.* ¶ 29. Mr. Risen was mentioned by name as one of the journalists whose work the Government was investigating. *Id.* That senior federal law enforcement officials were reported to have leaked this information to the press was not lost on Mr. Risen. *Id.*

On June 23, 2006, Mr. Risen co-authored another article with Eric Lichtblau, published in *The Times*, which disclosed the existence of another government program of questionable legality that was initiated weeks after the September 11, 2001 terrorist attacks and permitted United States government officials to review money transfer records in the international Society for Worldwide Interbank Financial Telecommunications ("SWIFT") database as part of an effort to detect terrorist financiers (the "SWIFT Program"). *Id.* ¶ 41. The same day that *The Times* published the article about the SWIFT Program by Messrs. Risen and Lichtblau, *The Wall Street Journal* and the *Los Angeles Times* also published similar articles about the program. *Id.* ¶ 42 & Exs. 17, 18.

Nonetheless, the Government reacted with expressions of outrage that were directed only at *The Times* and Messrs. Risen and Lichtblau. As CNN reported on June 27, 2006, even though "[t]he story was [also] reported by the *Los Angeles Times* and *Wall Street Journal*, . . . the attacks have focused on *The New York Times*, including its reporters who worked on the case." *Id.* ¶ 44. Public threats from those close to the administration to put Mr. Risen in jail continued. *Id.* ¶ 45. On August 30, 2006, Republican Congressman Peter Hoekstra publicly

-7-

predicted that Mr. Risen and his co-author would "be sitting in jail by the end of the year until they reveal their sources." *Id.* ¶ 45 & Ex. 20. Mr. Risen was even told by one of his sources that Vice President Dick Cheney had pressured the Justice Department to personally target Mr. Risen because Vice President Cheney was unhappy with Mr. Risen's reporting and wanted to see Mr. Risen in jail. *Id.* ¶ 30. After Mr. Cheney left office in 2009, he publicly admitted that the fact that Mr. Risen won a Pulitzer Prize for the NSA story "always aggravated me." *Id.*

### The 2008 Subpoena

It was in this atmosphere of selective threats of prosecution, secret surveillance, and jail time that, on January 24, 2008, the Government issued a grand jury subpoena to Mr. Risen.

 [3]

As set forth in Mr. Risen's affidavit, along with the 2008 affidavits and/or dec-

---

[3]  The Government has now indicated to Mr. Risen's counsel that it will recommend that Mr. Risen be granted immunity in the event he is required to testify. Mr. Risen firmly believes that he has committed no crime, and that any attempt to prosecute him for merely publishing his reports about the NSA Warrantless Surveillance Program or Chapter 9 of his book would be unconstitutional. Given the Government's recent, aggressive, and unprecedented position on the applicability of the Espionage Act to journalists who merely publish classified information, however, Mr. Risen may be obliged to invoke his Fifth Amendment right against self-incrimination if his motion to quash is ultimately unsuccessful. Should Mr. Risen's testimony be sought without immunity, Mr. Risen expressly reserves his Fifth Amendment rights.

larations of journalists Scott Armstrong, Carl Bernstein, Jack Nelson, and Dana Priest, and historian Anna Nelson, compelled disclosure of information related to Mr. Risen's confidential source(s) would seriously impede his ability to gather and report on serious matters of national concern and thus significantly impair the public's ability to learn matters of the greatest potential import. *Id.* ¶¶ 51-53; Armstrong Decl. ¶ 13; Bernstein Decl. ¶¶ 6-8, 10; A. Nelson Aff. ¶¶ 8-11; J. Nelson Aff. ¶¶ 8, 10; Priest Decl. ¶¶ 11, 13 (Exhibits 14 - 18 in the Kurtzberg Affidavit, respectively).







*The 2010 Subpoena*

on April 26, 2010, the United States Attorney's Office issued yet another subpoena to Mr. Risen.







*The Indictment, 2011 Subpoena, and the Government's Motion In Limine*

██████████████████████████ the Government secured an indictment of Jeffrey Sterling.  On May 23, 2011, the Government served a trial subpoena on Mr. Risen.  Risen Aff. ¶ 1 & Ex. 1.  The trial subpoena contains no limitation on the testimony sought from Mr. Risen, and the Government has made clear that it expects to ask Mr. Risen to "directly identify Sterling" as his source, "establish venue for certain of the charged counts," "authenticate his book and lay the necessary foundation to admit" *State of War* and certain statements alleged to have been made by Sterling, and "identify the defendant as someone with whom he had a preexisting source relationship that pre-dated the charged disclosures."  Government's May 23, 2011 Motion *in Limine* ("Motion in Limine") at 5.

By its own description, the Government is seeking Mr. Risen's testimony, not because it is critical or necessary to the Government's case — as the law in this Circuit requires — but rather merely to "simplify the trial and clarify matters for the jury" and to "allow for an efficient presentation of the Government's case." *Id.*  The Government references the evidence it expects to have at trial — although it provides no proof other than citations to the Indictment about the nature of the actual evidence — and does not even argue that Mr. Risen's testimony is necessary or critical to its case.  At this time, Mr. Risen has not been granted access to the Government's evidence — ████████████████████████████████████████████

████████████████████████████████████████ — but according to the Government, that evidence includes:

- Phone records reflecting a series of phone calls were placed by Sterling to Mr. Risen's personal residence and office, and by Mr. Risen to Sterling's residence, tem-

████████████████████████████████████████████████████████████

████████████████████████████████████████

porary residence, and place of employment in 2003 and 2004. Indictment of Jeffrey Alexander Sterling ("Indictment") ¶¶ 19, 34, 38, 45, 47, 49, 51, 54;

- Emails sent between Sterling and Mr. Risen in 2003 and 2004. *Id.* ¶¶ 19, 37, 44-46, 48-51;

- Evidence of a meeting between Sterling and two Senate Select Committee on Intelligence staffers in which he discussed the classified program at issue. *Id.* ¶ 36

- Evidence of calls made by Mr. Risen to the CIA Director of the Office of Public Affairs seeking comment on classified information he intended to write about, roughly coinciding with alleged contacts between Sterling and Mr. Risen. *Id.* ¶¶ 39-43

- Evidence that Mr. Risen traveled internationally to obtain more information about the classified program. *Id.* ¶ 54

- Evidence that on or about November 3, 2001, Sterling disclosed classified information to Mr. Risen, which information was contained in a subsequently published newspaper article written by Mr. Risen. *Id.* ¶ 23.

- Evidence that in or about February 2002, Sterling met with Mr. Risen, at least once at Mr. Risen's office in Washington, D.C., with the purposes of discussing Sterling's civil litigation with the CIA, and to provide Mr. Risen with documents relating to Sterling's employment with the CIA. *Id.* ¶ 26

- Evidence that Sterling provided Mr. Risen with at least one redacted, unclassified document that referenced the individual referred to in the indictment as "Human Asset No. 1." *Id.* ¶ 26

The Government's current demands for Mr. Risen's testimony are a serious threat, not only to Mr. Risen's constitutional rights, but also to his livelihood. Mr. Risen has, over the course of his career, written innumerable newspaper articles based on confidential source information, covering topics that include terrorism, national security issues, weapons of mass destruction, and intelligence issues. Risen Aff. ¶¶ 5, 15. In addition, much of the investigative reporting in his books is based on information that was provided to him by confidential sources. *Id.* ¶ 51. Without promising confidentiality, many if not all of those articles and books would never have been written and disseminated to the public. *Id.* As set forth in Mr. Risen's affidavit, and the affidavits of other investigative journalists, without confidential sources, it would be all but impossible for him to do his job effectively as an investigative reporter. *Id.* ¶¶ 55, 64; *see also* Armstrong Decl. ¶ 25; Bernstein Decl. ¶ 10; J. Nelson Aff. ¶¶ 8, 10; Priest Decl. ¶¶ 11, 13.

-16-

Since the ███████████████ 2008 and 2010 subpoenas, it has become more clear than ever how important Mr. Risen's promises of confidentiality are to his sources. *See* Risen Aff. ¶ 64 ("numerous sources of confidential information have told me that they are comfortable speaking to me in confidence specifically because I have shown that I will honor my word and maintain their confidence even in the face of Government efforts to force me to reveal their identities or information. The fact that I have not previously revealed my sources has allowed me to gain access to newsworthy information that I could not otherwise get."). If Mr. Risen is forced to testify, it will "immediately and substantially harm [his] ability to gather newsworthy information." *Id.*

## ARGUMENT

Federal Rule of Criminal Procedure 17 governs subpoenas for witnesses in criminal cases. In relevant part, Fed. R. Crim. P. 17(c)(2) provides that on a motion promptly made, the Court may quash or modify a subpoena if compliance would be unreasonable or oppressive. Because the information sought by the Government is protected by the reporter's privilege and stems from an effort to harass/intimidate a vocal critic of the Government, that is the case here.

**I.** ███████████████████████████████████





## II.  THE INFORMATION SOUGHT TO BE COMPELLED IS PROTECTED BY THE REPORTER'S PRIVILEGE UNDER THE FIRST AMENDMENT

In any event ████████████████████████████████████ ████████ the Fourth Circuit has consistently recognized the existence of a qualified First Amendment reporter's privilege that protects journalists from being compelled to testify about their confidential sources. ██████████████ This privilege has its roots in Justice Powell's critical concurring opinion in *Branzburg*, 408 U.S. at 709 (Powell, J., concurring).  Both this Court and the Fourth Circuit have interpreted *Branzburg* as providing journalists qualified protection in cases involving either confidential sources or bad faith, intimidation, or harassment of journalists.  *See* ███████████; *see also, e.g., LaRouche*, 780 F.2d at 1139 (recognizing qualified reporter's privilege in civil case); *In re Shain*, 978 F.2d 850, 852-53 (4th Cir. 1992) (recognizing qualified reporter's privilege in criminal cases involving claims of confidentiality, harassment, or bad faith) (citing *United States* v. *Steelhammer*, 539 F.2d 373, 376 (4th Cir. 1976) (Winter, J., dissenting), *adopted by the court en banc*, 561 F.2d 539 (4th Cir. 1977); *United States* v. *Lindh*, 210 F. Supp. 2d 780, 783 (E.D. Va. 2002) (recognizing a First Amendment reporter's privilege in a criminal case "where the journalist produces some evidence of confidentiality or governmental harassment") (Ellis, J.); *United States* v. *Regan*, Criminal No. 01-405-A, Memorandum Order at 5 (E.D. Va. Aug. 20, 2002) (unpublished; attached to Kurtzberg Aff. as Ex. 19) (Lee, J.) ("Several circuit courts of appeals, including the Fourth Circuit, have held that the reporter holds a qualified First Amendment privilege against disclosing information acquired during news gathering activities through confidential sources").  Because this case involves both confidential sources and harassment/intimidation, the privilege applies.

In *Branzburg*, the Supreme Court was presented with journalists who had been held in contempt for failure either to appear or testify before grand juries that were investigating criminal conduct that the reporters had learned about in the course of preparing stories for publication.  The Supreme Court upheld the contempt convictions in a 5-4 decision.  But Justice Powell, who joined the majority with his deciding vote, wrote separately in a concurring opinion to

illustrate the narrow scope of the majority opinion. In so doing, Justice Powell clarified that the Court's holding did not mean that "newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources." *Branzburg*, 408 U.S. at 709 (Powell, J., concurring). In clarifying the nature of these "constitutional rights," Justice Powell explained, in an oft-quoted passage, that:

> [I]f the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationship without legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. *The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct.* The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions. *Id.* at 710 (emphasis added).

Justice Powell's concurring opinion — which was intended to "emphasize" the narrow basis on which he provided the fifth and deciding vote for the majority opinion — makes clear that the majority's decision in *Branzburg* did not in any way preclude journalists from asserting in any case, civil or criminal, a "claim to privilege" that is rooted in "constitutional rights with respect to the gathering of news or in safeguarding [reporters'] sources." *Id.* at 709. The opinion further clarifies that courts are required to judge such assertions of privilege "on [their] facts" and on "a case-by-case basis," by balancing the "vital constitutional and societal interests" of freedom of the press, on the one hand, and the obligation of citizens to give relevant testimony concerning criminal conduct on the other. *Id.* at 724.

The Fourth Circuit has unequivocally held time and again that Justice Powell's concurring opinion is the controlling decision in *Branzburg* and has read that opinion as supporting the existence of a qualified reporter's privilege in both civil and criminal cases involving confidential sources. *See, e.g.*, *LaRouche*, 780 F.2d at 1139 (citing Justice Powell's concurring opinion as support for the reporter's privilege in civil cases involving confidential sources); *In re Shain*, 978 F.2d at 852-53 (citing Powell's opinion in support of reporter's privilege in criminal

cases involving either confidential sources or bad faith); *see also Ashcraft* v. *Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000); *Steelhammer*, 539 F.2d at 376 (Winter, J., dissenting), *adopted by the court en banc*, 561 F.2d at 540.[5]

The Court of Appeals has been extraordinarily protective of journalists who are subpoenaed to testify about their confidential sources. In the only two reporter's privilege cases brought in the Fourth Circuit involving confidential sources, the Court quashed the subpoenas both times. *See LaRouche* v. *National Broadcasting Co., Inc.*, 780 F.2d 1134 (4th Cir.), *cert. denied*, 479 U.S. 818 (1986); *Ashcraft* v. *Conoco, Inc.*, 218 F.3d 282 (4th Cir. 2000). As the Court explained in *Ashcraft*, constitutional protection for confidential sources is both mandated by Supreme Court precedent and viewed as essential to a free and open society:

> News reporters are "entitled to some constitutional protection of the confidentiality of [their] sources." *Pell* v. *Procunier*, 417 U.S. 817, 834, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974) (citing *Branzburg* v. *Hayes*, 408 U.S. 665, 92 S. Ct. 2646, 33 L. Ed. 2d 66 (1972)); *see also Branzburg*, 408 U.S. at 707, 92 S. Ct. 2646 ("news gathering is not without its First Amendment protections"). Such protection is necessary to ensure a free and vital press, without which an open and democratic society would be impossible to maintain. *See Time, Inc.* v. *Hill*, 385 U.S. 374, 389, 87 S. Ct. 534, 17 L. Ed. 2d 456 (1967) ("A broadly defined freedom of the press assures the maintenance of our political system and an open society"). If reporters were routinely required to divulge the identities of their sources, the free flow of newsworthy information would be restrained and the public's understanding of important issues and events would be hampered in ways inconsistent with a healthy republic.

---

[5] That Justice Powell's opinion is controlling, notwithstanding that he joined the five person majority opinion, is further supported by Supreme Court authority. The concurring opinion of a Justice who joins a 5-4 majority but issues a separate opinion that "clarifies" the meaning of the majority opinion, represents the holding of the Court because the majority opinion is not a true majority except to the extent that it accords with the views of the concurrence. *Cf. Marks* v. *United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . .'" (quoting *Gregg* v. *Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)), *superseded in part by statute on unrelated grounds as stated in Armstrong* v. *Bertrand*, 336 F.3d 620 (7th Cir. 2003); *see also McKoy* v. *North Carolina*, 494 U.S. 433, 462 n.3 (1990) (Scalia, J., joined by Rehnquist, C.J. and O'Connor, J., dissenting) (in such situations, what the Justice writes in a concurring opinion is "not a 'gloss,' but the least common denominator").

-21-

*Ashcraft*, 218 F.3d at 287 (citations omitted).  In the 39 years since *Branzburg* was decided, the Fourth Circuit has never ordered a journalist to testify about his or her confidential sources.

The relevant test in applying the privilege in the Fourth Circuit was first set forth in *LaRouche*.  *See* ███████████.  There, following Justice Powell's opinion in *Branzburg*, the Court "balance[d] the interests involved" to determine whether the privilege applied.  *La-Rouche*, 780 F.2d at 1139 (citing *Branzburg*, 408 U.S. at 710 (Powell, J., concurring)).  The Court of Appeals instructed that three factors had to be considered in evaluating the privilege — "(1) whether the information is relevant, (2) whether the information can be obtained by alterna-tive means, and (3) whether there is a compelling interest in the information"[6] — but never ruled out consideration of other factors in the balancing.  *See LaRouche*, 780 F.2d at 1139 (three-factor test is described as an "aid" to district courts in balancing the relevant interests).  The Court ap-plied this test in both *LaRouche* and *Ashcraft* and, in both cases, quashed the subpoenas after per-forming the necessary balancing.  *See LaRouche*, 780 F.2d at 1139; *Ashcraft*, 218 F.3d at 287.  Both *LaRouche* and *Ashcraft* were civil cases; *see also Church of Scientology International* v. *Daniels*, 992 F.2d 1329, 1335 (4th Cir.), *cert. denied*, 510 U.S. 869 (1993) (applying *LaRouche* test in civil case involving request for newsgathering materials).

In the criminal context, the Fourth Circuit has declined to apply the *LaRouche* balancing test in cases that do not involve confidential sources but has made clear that it does require a balancing of the interests whenever confidential sources are involved.  *See In re Shain*, 978 F.2d 850, 853 (4th Cir. 1992).  In *In re Shain*, four South Carolina journalists interviewed a United States Senator separately and without witnesses.  *Id.* at 851.[7]  The trial court ordered the

---

[6]    *LaRouche*, 780 F.2d at 1139 (citing *Miller* v. *Transamerican Press, Inc.*, 621 F.2d 721, *modified*, 628 F.2d 932 (5th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981)).

[7]    The interviews were all "on the record," and none of the information was given to the reporters in confidence.  *In re Shain*, 978 F.2d at 851.  In the interviews, the Senator claimed that he received a legal campaign contribution of no more than $300 from a registered lobbyist who was in fact a federal undercover agent.  Each reporter published portions of their interviews, quoting the Sena-tor.  *Id.*  The Senator was later indicted for allegedly violating the Hobbs Act by accepting $2,800

Footnote continued on next page.

-22-

journalists to testify in response to narrowly drawn subpoenas for them to "testify for no more than five minutes each to confirm that Senator Long had in fact made the statements they had reported." *Id.* at 852. The Fourth Circuit affirmed, emphasizing the importance that the lack of confidential sources played in reaching its result. In cases that do not involve confidential sources, the Court concluded that the requisite balancing of interests under the reporter's privilege does not apply without evidence of governmental harassment or bad faith. *Id.* at 852-53. Because there was no evidence of confidentiality or governmental harassment, the Court concluded that no balancing needed to be done under the facts of that case:

> In this case the reporters concede that neither Senator Long's identity nor his statements during interviews with him were confidential. Nor do they contend that the government seeks their testimony to harass them or otherwise seeks it in bad faith. . . . The reporters do not . . . assert that their testimony would be irrelevant or duplicative. . . . We conclude, therefore, that the absence of confidentiality or vindictiveness in the facts of this case fatally undermines the reporters' claim to a First Amendment privilege.

*In re Shain*, 978 F.2d at 853.[8] The Court relied heavily on Justice Powell's concurring decision in *Branzburg* and on *United States* v. *Steelhammer*, 539 F.2d 373, 376 (4th Cir. 1976) (Winter, J., dissenting), *adopted by the court en banc*, 561 F.2d at 540. *See In re Shain*, 978 F.2d at 852.

*Steelhammer* similarly involved an attempt to compel journalists to testify as witnesses in a contempt trial about nonconfidential information. The trial court found the reporters in contempt for refusing to testify and rejected their argument that the subpoenas should be quashed because they violated the First Amendment reporter's privilege. The Fourth Circuit reversed and vacated the contempt finding, with Judge Winter issuing a dissenting opinion. *Steel-*

---

Footnote continued from previous page.

> from the lobbyist. The government believed that the Senator's insistence before he was arrested that he had received no more than $300 was relevant to proving intent. *Id.* at 852.

[8]   A concurring opinion by Judge Wilkinson expressed the view that the *LaRouche* balancing test should have been applied to reach the same result. *See* 978 F.2d at 854 (Wilkinson, C.J., concurring separately).

*hammer*, 539 F.2d 373 (4th Cir. 1976); *id.* at 376 (Winter, J., dissenting). An *en banc* Court reversed the panel, upholding the contempt finding for the reasons set forth in Judge Winter's dissenting panel opinion. *Steelhammer*, 561 F.2d at 540.

The *en banc* Court in *Steelhammer*, like the Court in *In re Shain*, found that the balancing of interests required by the reporter's privilege did not need to be done in cases that involved neither confidential sources nor allegations of bad faith or harassment. *Steelhammer*, 539 F.2d at 376 (Winter, J., dissenting), *adopted by the court en banc*, 561 F.2d at 540. That the lack of confidential sources was central to the Court's holding is plain from its opening lines:

> In the instant case it is conceded that the reporters did not acquire the information sought to be elicited from them on a confidential basis; one of them (Steelhammer) so testified in the District Court. My study of the record fails to turn up even a scintilla of evidence that the reporters were subpoenaed to harass them or to embarrass their newsgathering abilities at any future public meetings that the miners might hold. It therefore seems to me that, in the balancing of interests suggested by Mr. Justice Powell in his concurring opinion in *Branzburg* v. *Hayes*, 408 U.S. 665, 709, 92 S. Ct. 2646, 33 L. Ed 2d 626 (1972), the absence of a claim of confidentiality and the lack of evidence of vindictiveness tip the scale to the conclusion that the district court was correct in requiring the reporters to testify.

539 F.2d at 376; *see also In re Shain*, 978 F.2d at 853 (quoting part of this quote from *Steelhammer*).

The decisions in *In re Shain* and *Steelhammer* (both of which did not involve confidential information but stressed that the analysis would have been different if they had), when coupled with the Fourth Circuit's rigorous application of the privilege in *LaRouche* and *Ashcraft* (which are the only cases that did involve confidential information), demonstrate that the Fourth Circuit affords journalists a qualified First Amendment privilege in both civil and criminal cases whenever there is evidence of confidentiality, bad faith, or harassment. As this Court held in the criminal prosecution of John Walker Lindh, after examining Justice Powell's concurring opinion and *In re Shain*, it is clear that in criminal cases, "[a] First Amendment journalist privilege is properly asserted in this circuit where the journalist produces some evidence of confidentiality *or governmental harassment.*" ███████████ *Lindh*, 210 F. Supp. 2d at 783 ████████

-24-

███████; *see also Regan*, Criminal No. 01-405-A, Memorandum Order at 5 (Kurtzberg Aff. ¶ 28 & Ex. 19) (quashing a subpoena in a criminal case and holding that "[s]everal circuit courts of appeals, including the Fourth Circuit, have held that a reporter holds a qualified First Amendment privilege against disclosing information acquired during news gathering activities through confidential sources"). This case involves evidence of both confidentiality and government harassment/intimidation; the First Amendment privilege therefore applies.

## III. THE INFORMATION SOUGHT TO BE COMPELLED IS ALTERNATIVELY PROTECTED BY THE REPORTER'S PRIVILEGE UNDER FEDERAL COMMON LAW

████████████████████████████████████████ We respectfully submit that the existence of a federal common law privilege provides an additional basis for granting Mr. Risen's motion to quash.

In *Steelhammer*, the Fourth Circuit became the first court of appeals to expressly recognize the existence of a common law reporter's privilege in civil cases. *See Steelhammer*, 539 F.2d at 377 n.\* (Winter, J., dissenting), *adopted by the court en banc*, 561 F.2d at 540. Supreme Court case law since then further supports application of a common law privilege here.

As noted above, in *Steelhammer*, an *en banc* Fourth Circuit adopted Judge Winter's dissenting panel opinion, which affirmed an order finding journalists in contempt for refusing to testify about nonconfidential newsgathering information in a civil contempt trial. *See Steelhammer*, 539 F.2d at 377-78 (Winter, J., dissenting), *adopted by the court en banc*, 561 F.2d at 540. The journalists had argued that the reporter's privilege under the First Amendment shielded their testimony from disclosure, but Judge Winter and the *en banc* Court rejected that argument in the absence of evidence of confidentiality or bad faith/harassment. *Id.* In that same opinion, however, Judge Winter (and later, the *en banc* Court) found that reporters should be afforded a common law privilege under Federal Rule of Evidence 501 not to testify in civil cases:

> In my view the prerequisites to the establishment of a privilege against disclosure of communications set forth in VIII J. Wigmore, Evidence, §2285 at 527 (1961) should apply to reporters. *Under Federal Rules of Evidence 501, they should be afforded a common law privilege not to testify in civil litigation between private parties.* I do not prolong this opinion by developing this point.

*Steelhammer*, 539 F.2d at 377 n.* (Winter, J., dissenting), *adopted by the court en banc*, 561 F.2d at 540 (emphasis added). *Steelhammer* was a civil case, so it is not surprising that Judge Winter limited his finding to civil litigation. But in light of the criminal precedents outlined above — which provide for a reporter's privilege in criminal cases involving confidential sources — there is no reasoned basis for limiting the common law privilege to the civil context. *See also United States* v. *Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980), *cert. denied*, 449 U.S. 1126 (1981) ("[T]he interests of the press that form the foundation for the privilege are not diminished because the nature of the underlying proceeding out of which the request for information arises is a criminal trial."). Thus, federal common law provides an alternative ground for recognition of the reporter's privilege in this Circuit.

The case law post-*Steelhammer* provides additional support for a common law reporter's privilege. In *Jaffee* v. *Redmond*, 518 U.S. 1 (1996), the Supreme Court recognized the existence of a psychotherapist/patient privilege under Fed. R. Evid. 501, which provides that privileges in federal criminal cases "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." The test outlined in that case for recognizing a privilege under the common law — which is similar to the Wigmore test cited by Judge Winter in the *Steelhammer* footnote quoted above — leads to no other conclusion but that a common law reporter's privilege exists under Fed. R. Evid. 501.

In *Jaffee*, the Supreme Court held that, although the general rule is that "the public . . . has a right to every man's evidence," "[e]xceptions from the general rule . . . may be justified by a 'public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Jaffee*, 518 U.S. at 9 (citations omitted). The development of a privilege under Rule 501 is justified if protecting confidential communications of a particular

sort "'promotes sufficiently important interests to outweigh the need for probative evidence. . . .'" *Jaffee*, 518 U.S. at 9-10 (quoting *Trammel* v. *United States*, 445 U.S. 40, 51 (1980)). That is plainly true of the reporter's privilege that we urge this Court to apply.

The Supreme Court's application of these principles in *Jaffee* is instructive. In recognizing a psychotherapist-patient privilege under Fed. R. Evid. 501, the Court noted that protecting communications between psychotherapists and patients serves important private and public interests. "Effective psychotherapy," the Court noted, "depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. . . . For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment. . . . By protecting confidential communications between a psychotherapist and her patient from involuntary disclosure, the proposed privilege thus serves important private interests." *Jaffee*, 518 U.S. at 10-11. The Court concluded that the privilege also serves the public interest by "facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem. The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance." *Id.* at 11.

The Court also held that the costs of recognizing the psychotherapist-patient privilege — in terms of a loss of potentially relevant evidence — were modest. The Court reasoned that, without a privilege, there would likely be a considerable chill on the very type of evidence sought; for example, parties would be unlikely to make statements against their interest to a therapist if they knew in advance that any statements could later be disclosed to govemmental authorities or adversarial litigants. *Id.* at 11-12.

Finally, the Court relied upon the fact that "all 50 States and the District of Columbia have enacted into law some form of psychotherapist privilege." *Id.* at 12. "[T]he policy decisions of the States," the Court held, "bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one." *Id.* at 12-13. In light of the

-27-

general consensus in favor of the privilege, the Court concluded that "[d]enial of the federal privilege therefore would frustrate the purposes of the state legislation that was enacted to foster these confidential communications." *Id.* at 13.

Application of the *Jaffee* standards demonstrates that there is a reporter's privilege in the grand jury context under federal common law that protects Mr. Risen from compelled disclosure in this case. That the reporter's privilege serves important private and public interests is clear from the Fourth Circuit's decision in *Ashcraft*. As the Court observed there, protections for the press serve the private end of encouraging individuals to provide journalists with truthful, newsworthy information anonymously;[9] in addition, they serve the important public function of keeping the public informed. *See Ashcraft*, 218 F.3d at 287 (protection of confidential sources "is necessary to ensure a free and vital press, without which an open and democratic society would be impossible to maintain. . . . If reporters were routinely required to divulge the identities of their sources, the free flow of newsworthy information would be restrained and the public's understanding of important issues and events would be hampered in ways inconsistent with a healthy republic.") (citations omitted)  In short, confidentiality is essential for journalists to sustain the relationships they need with sources and to obtain sensitive information from them. Without it, the press cannot effectively serve the public by keeping it informed.  Other federal courts of appeal have unanimously emphasized these strong public and private interests in finding the existence of the reporter's privilege in various contexts.[10]  Thus, just as the Supreme

---

[9]   Significantly, the Supreme Court has held that the freedom to publish anonymously is protected by the First Amendment. *See McIntyre* v. *Ohio Elections Commission*, 514 U.S. 334 (1995) (striking down a state law regulating anonymous leafleting under the First Amendment because it was not narrowly tailored to serve an overriding state interest).

[10]   *See, e.g., Shoen* v. *Shoen*, 5 F.3d 1289, 1292, 1292 n.5 (9th Cir. 1993) (citing cases and noting that the reporter's privilege furthers society's interest in protecting the integrity of the newsgathering process and in ensuring the free flow of information to the public); *Baker* v. *F & F Investment*, 470 F.2d 778, 782 (2d Cir. 1972) ("Compelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis. . . . The deterrent effect such disclosure is likely to have upon future 'undercover' investigative reporting . . . threatens freedom of the press and the public's need to be in-

Footnote continued on next page.

-28-

Court concluded that the psychotherapist-patient privilege serves "the mental health of our citizenry," an interest that the Court found to be "a public good of transcendent importance," there is a clear consensus today among federal courts that the reporter's privilege enhances the political, economic, and social health of our citizenry by allowing the public to make informed decisions.

Moreover, the important interests served by the reporter's privilege outweigh the likely evidentiary costs. This is because, without a privilege, sources will be much less likely to make statements to the press that prosecutors will be interested in discovering. Armstrong Decl. ¶ 25; Bernstein Decl. ¶ 8; J. Nelson Aff. ¶ 8; Priest Decl. ¶ 13; 2008 Risen Aff. ¶¶ 44-45; *see also* Risen Aff. ¶ 64 ("[N]umerous sources of confidential information have told me that they are comfortable speaking to me in confidence specifically because I have shown that I will honor my word and maintain their confidence even in the face of Government efforts to force me to reveal their identities or information.") (citations omitted). The *Jaffee* Court's analysis of the psychotherapist-patient privilege in this regard is equally applicable here:

> If the [psychotherapist-patient] privilege were rejected, confidential conversations between psychotherapists and their patients would surely be chilled, particularly when it is obvious that the circumstances that give rise to the need for treatment will probably result in litigation. Without a privilege, much of the desirable evidence to which litigants such as petitioners seek access — for example, admissions against interest by a party — is unlikely to come into being. This unspoken "evidence" will therefore serve no greater truth-seeking function than if it had been spoken and privileged. *Jaffee*, 518 U.S. at 11-12.

In *Jaffee*, as noted, the Court recognized a privilege under Rule 501, in part because "all 50 States and the District of Columbia have enacted into law some form of psychotherapist privilege." *Id.* at 12. Noting that "[w]e have previously observed that the policy deci-

---

Footnote continued from previous page.

formed. It thereby undermines values which traditionally have been protected by federal courts applying federal public policy."), *cert. denied*, 411 U.S. 966 (1973); *Riley* v. *City of Chester*, 612 F.2d 708, 714 (3d Cir. 1979) ("A journalist's inability to protect the confidentiality of sources s/he must use will jeopardize the journalist's ability to obtain information on a confidential basis. This in turn will seriously erode the essential role played by the press in the dissemination of information and matters of interest and concern to the public.").

sions of the States bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one," the Court held that in light of the consensus on the State level about the propriety of the psychotherapist-patient privilege, "[d]enial of the federal privilege . . . would frustrate the purposes of the state legislation that was enacted to foster these confidential communications." *Id.* at 12-13.

A similar overwhelming consensus exists now about the reporter's privilege. Today, 40 states (plus the District of Columbia) have such statutes.[11] Of the 10 states without statutory shield laws, all but one — Wyoming, which has remained silent on the issue — have recognized a reporter's privilege in one context or another.[12] *See also New York Times* v. *Gonzales,*

---

[11]     *See* Ala. Code § 12-21-142; Alaska Stat. §§ 09.25.300-.390; Ariz. Rev. Stat. Ann. §§ 12-2214, 12-2237; Ark. Code Ann. § 16-85-510; Cal. Evid. Code § 1070; Colo. Rev. Stat. Ann. § 13-90-119; Conn. Gen. Stat. Ann. § 52-146t; Del. Code Ann. tit. 10, §§ 4320-26; Fla. Stat. Ann. § 90.5015; Ga. Code Ann. § 24-9-30; Haw. Rev. Stat. § 621 Notes; 2011 Haw. Sess. Laws ch. 113 (signed into law June 14, 2011); 735 Ill. Comp. Stat. Ann. 5/8-901 to 8-909; Ind. Code Ann. §§ 34-46-4-1, 34-46-4-2; Kan. Stat. Ann. § 60-480 to 60-485; Ky. Rev. Stat. Ann. § 421.100; La. Rev. Stat. Ann. §§ 45:1451-1459; Me. Rev. Stat. Ann. tit. 16, § 61; Md. Code Ann., Cts. & Jud. Proc. § 9-112; Mich. Comp. Laws Ann.§§ 767.5a, 767A.6; Minn. Stat. Ann. §§ 595.021-.025; Mont. Code Ann. §§ 26-1-902, 26-1-903; Neb. Rev. Stat. Ann. §§ 20-144 to 20-147; Nev. Rev. Stat. Ann. 49.275, 49.385; N.J. Stat. Ann. §§ 2A:84A-21.1 to 21.5; N.M. Stat. Ann. § 38-6-7; N.Y. Civ. Rights Law § 79-h; N.C. Gen. Stat. Ann. § 8-53.11; N.D. Cent. Code § 31-01-06.2; Ohio Rev. Code Ann. §§ 2739.04, 2739.12; Okla. Stat. Ann. tit. 12, § 2506; Or. Rev. Stat. §§ 44.510-.540; 42 Pa. Cons. Stat. Ann. § 5942(a); R.I. Gen. Laws §§ 9-19.1-1 to 9-19.1-3; S.C. Code Ann. § 19-11-100; Tenn. Code Ann. § 24-1-208; Tex. Civ. Prac. & Rem. Code Ann. §§ 22.021-0.27; Utah Order 08-04 [Utah R. Evid. 509]; Wash. Rev. Code Ann. § 5.68.010; 2011 W. Va. Acts 78 (to be codified at W. Va. Code § 57-3-10); Wis. Stat. § 885.14; D.C. Code Ann. § 16-4701 to 16-4704.

[12]     *See Idaho* v. *Salsbury,* 924 P.2d 208 (Idaho 1996) (criminal); *In re Wright,* 700 P.2d 40 (Idaho 1985) (criminal); *Winegard* v. *Oxberger,* 258 N.W.2d 847 (Iowa 1977) (civil), *cert. denied,* 436 U.S. 905 (1978); *In re John Doe Grand Jury Investigation,* 574 N.E.2d 373 (Mass. 1991) (grand jury); *Sinnott* v. *Boston Retirement Board,* 524 N.E.2d 100 (Mass. 1988) (civil), *cert. denied,* 488 U.S. 980 (1988); *Ayash* v. *Dana-Farber Cancer Institute,* 706 N.E.2d 316 (Mass. App. Ct. 1999) (civil); *Missouri ex rel. Classic III, Inc.* v. *Ely,* 954 S.W.2d 650 (Mo. Ct. App. 1997) (civil); *State* v. *Siel,* 444 A.2d 499 (N.H. 1982) (criminal); *Opinion of the Justices,* 373 A.2d 644 (N.H. 1977) (civil statutory proceeding); *Hopewell* v. *Midcontinent Broadcasting Corp.,* 538 N.W.2d 780 (S.D. 1995) (civil), *cert. denied,* 519 U.S. 817 (1996); *Vermont* v. *St. Peter,* 315 A.2d 254 (Vt. 1974) (criminal); *Brown* v. *Virginia,* 204 S.E.2d 429 (Va. 1974) (criminal), *cert. denied,* 419 U.S. 966 (1974); *Clemente* v. *Clemente,* 56 Va. Cir. 530 (2001) (civil); *Philip Morris Cos.* v. *ABC, Inc.,* 36 Va. Cir. 1 (1995) (civil). In Mississippi, a trial court has concluded that the state constitution provides a basis for a qualified reporter's privilege. *Hawkins* v. *Williams,* Hinds County Circuit Court, No. 29,054 (Mar. 16, 1983) (unpublished opinion).

459 F.3d 160, 181 (2d Cir. 2006) ("A qualified journalists' privilege seems to me easily — even obviously — to meet each of those qualifications [i.e., for establishing a federal common law privilege]. The protection exists. It is palpable; it is ubiquitous; it is widely relied upon; it is an integral part of the way the American public is kept informed and therefore of the American democratic process.") (Sack, J., dissenting). In fact, the protection of confidential sources has now even been recognized in countries around the world that typically afford far less protection to journalists than the United States.[13]

The DOJ has itself articulated a policy statement that, if properly applied, effectively provides for a qualified privilege in all federal cases by requiring the Department of Justice not to issue subpoenas to members of the press unless the standard factors of the qualified privilege are first met. *See* 28 C.F.R. § 50.10. Those guidelines prohibit DOJ members from issuing subpoenas to members of the press in criminal cases unless: (1) all reasonable attempts to obtain the information from alternative sources have been exhausted; (2) negotiations with the media have been pursued in which the government clarifies what its needs are in the case and its willingness to respond to concerns of the media; and (3) the Attorney General has authorized the subpoena after considering, among other things, whether there are reasonable grounds to believe, based on information obtained from nonmedia sources, that a crime has occurred, and that the

---

[13]   *See, e.g., R.. v. National Post*, 2010 S.C.C. 16 (2010) (Canada) (holding that courts should protect confidential sources when such protection is in the public interest); *Goodwin v. United Kingdom*, [1996] 22 Eur. Ct. H.R. 123, 143 (European Court of Human Rights) (holding that Article 10 of the European Convention on Human Rights provides protection against the disclosure of confidential sources, and stating that "[p]rotection of journalistic sources is one of the basic conditions for press freedom"); *Financial Times Ltd. v. United Kingdom*, [2010] Eur. Ct. H.R. 46 (same); *European Pacific Banking Corp. v. Television New Zealand Ltd.*, [1994] 3 N.Z.L.R. 43 (Ct. App. Wellington) (New Zealand) (establishing general rule protecting confidential sources in all cases, both in discovery and at trial); *Oyegbemi v. Attorney-General of the Federation & Ors*, [1982] F.N.L.R. 192 (Fed. of Nigeria LR) (Nigeria); *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No. IT-99-36-AR 73.9 (International Criminal Tribunal for former Yugoslavia 2002) (establishing qualified privilege for war correspondents even when no confidential sources are involved); Freedom of Press Act, Chapter 3, Article 1 (Sweden); Code of Criminal Procedure, Article 109(2) (France); Media Act of 1981, Article 31 (Austria); Criminal Procedure Code, Section 53 (Germany).

information sought is essential to a successful investigation of that crime. *See* 28 C.F.R. § 50.10(b), (c), and (f)(1). The Guidelines, which are not enforceable by third parties, make no distinction between civil, criminal and grand jury cases, and further support a finding of a common law privilege.

In addition to the Fourth Circuit's holding in *Steelhammer* that a reporter's privilege exists under federal common law in civil cases, all of these factors demonstrate the existence of a strong public policy in this district in favor of protecting journalists from making compelled disclosures, in criminal cases as well. This Court should therefore conclude that based on the confluence of these multiple factors there is a federal common law privilege that protects confidential source information in this case.

## IV. ON THE FACTS OF THIS CASE, THE SUBPOENA MUST BE QUASHED AND A PROTECTIVE ORDER ENTERED ON REPORTER'S PRIVILEGE GROUNDS

Whether the reporter's privilege is grounded in the First Amendment, federal common law, or both, the ultimate test is ███████████████████████████ ███ to "balance the interests involved" — here, the Government's interest in obtaining evidence for trial versus the interest of Mr. Risen and the public in protecting Mr. Risen's confidential source(s) and thereby ensuring the free flow of newsworthy information. *See LaRouche*, 780 F.2d at 1139 (citing *Branzburg*, 408 U.S. 665, 710 (Powell, J., concurring)) ███████ ████.

Under this test, the Court is required to consider the three *LaRouche* factors — "(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information," *LaRouche*, 780 F.2d at 1139; █████████ but those factors are not the only ones to be considered. Courts in this Circuit have also considered other factors, such as (1) whether confidential sources were at issue and (2) whether the subpoena was issued in bad faith or for the purpose of harassment. In leak cases, such as this one, we respectfully submit that the relevant balancing must also involve

-32-

a weighing of the competing interests as they manifest themselves in the case at hand — that is, by "weigh[ing] the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's value." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1175 (D.C.Cir. 2005) (Tatel, J., concurring in the judgment); *see also Gonzales*, 459 F.3d at 186 (Sack, J., dissenting) (in leak cases courts should look at whether "'nondisclosure of the information would be contrary to the public interest, taking into account both the public interest . . . in newsgathering and maintaining a free flow of information to citizens'") (quoting Free Flow of Information Act, S. 2831, 109th Cong. § 4(b)(4) (2006)). It is only by balancing the newsworthiness against the harm of this specific leak, that one can determine whether the First Amendment interests in this case outweigh those of compelling disclosure.

When all of the relevant factors are considered, it is clear that the subpoena to Mr. Risen should be quashed.



The subpoena seeks information about Mr. Risen's confidential source(s); the information is not critical or necessary to the Government's trial because Mr. Risen's testimony is unnecessary in light of the evidence that the Government claims to have; the benefits of the leaks at issue outweigh any potential harm caused by them; and there is evidence that the subpoena is motivated largely by a desire to intimidate/harass Mr. Risen, who has worked hard to uncover major governmental abuses by the administration that initiated the criminal investigation that led to this indictment.

### A.    The Subpoena Is Directed at Confidential Source Information

 this subpoena seeks, among other things, direct testimony from Mr. Risen about the name(s) of his confidential source(s).  Motion in Limine at 17.  The Government also seeks, in the alternative, additional information from Mr. Risen ▮▮▮▮▮▮▮▮▮▮.  All of the information sought (with the exception of authentication evidence) is protected by the reporter's privilege.

▮▮▮▮▮▮▮ Mr. Risen's confidentiality agreement with his source(s) for Chapter 9 extends to all of the types of testimony the Government is seeking here. ▮▮▮▮▮▮▮▮▮ Mr. Risen has determined that providing the Government with the information it seeks would indirectly reveal the identity/ies of his confidential source(s).  Risen Aff. ¶ 63.

In cases involving confidential sources, the Fourth Circuit has always tipped the balance in favor of the First Amendment.  *See, e.g., LaRouche*, 780 F.2d at 1139; *Ashcraft*, 218 F.3d at 287.  As noted above, in the 39 years since *Branzburg* was decided, as far as we are aware, neither the Fourth Circuit nor this Court has ever ordered a reporter to testify about the identity of his or her confidential source(s).  *See LaRouche*, 780 F.2d at 1139; *Ashcraft*, 218 F.3d at 287; *Regan*, Memorandum Opinion at 6 (Kurtzberg Aff., Ex. 19).  Moreover, those cases in this Circuit that have denied reporters' motions to quash have all stressed that the lack of confidentiality was central to the decision.  *See Steelhammer*, 539 F.2d at 376 (Winter, J., dissenting), *adopted by the court en banc*, 561 F.2d at 540; *In re Shain*, 978 F.2d at 853; *Lindh*, 210 F. Supp. 2d at 783.  As this Court held in *Regan* when quashing a subpoena to a reporter that sought in-

formation about the identity of confidential sources in the context of a criminal trial, "[i]n balancing the interests at stake, the fact that [the reporter] claims privilege with respect to a confidential source(s) places the thumb on the scale of protecting First Amendment interests at the onset." *Regan*, Memorandum Opinion at 6 (Kurtzberg Aff., Ex. 19).

The Government argues that, even if there is a reporter's privilege, it does not protect information beyond the identity of any confidential source(s).  But, ███████████ ███ the reporter's privilege has never been interpreted so narrowly as to only cover the names of confidential sources.  Rather, courts have made clear that the privilege covers information that will implicitly reveal the identity of confidential sources. *See, e.g., Continental Cablevision, Inc. v. Storer Broadcasting Co.*, 583 F. Supp 427, 436 (E.D. Mo. 1984) (noting that to determine whether privilege applies to questions about the circumstances of an interview, the court must consider whether the answer sought might "implicitly reveal the identity of a confidential source").  Thus, both courts and the DOJ Guidelines governing subpoenas issued to journalists, 28 C.F.R. §§ 50.10(a), (e), and (g), recognize that the First Amendment interests that implicate the reporter's privilege are triggered even when parties subpoena telephone companies for the telephone records of journalists.  For example, the court in *Gonzales* performed the balancing analysis derived from *Branzburg* and required that the Government demonstrate a compelling interest in a case where the Government sought the telephone records of a reporter.  That was necessary even though telephone records, by themselves, do not reveal any confidential information or directly tie any particular source to any particular information.  "Although a record of a phone call does not disclose anything about the reason for the call, the topics discussed, or other meetings between the parties to the calls, it is a first step of an inquiry into the identity of the reporters' source(s) of information. . . ." *Id.* at 168. *See also* 28 C.F.R. §§ 50.10(a), (e), and (g). In this case, the Government has made clear its intent to seek direct testimony for not just the first step, but as many steps as are necessary to identify Mr. Risen's source(s).

The relevant case law also takes as a given that any protection covers information received in confidence, not just identities. In *Steelhammer*, for example, both the initial panel and, later, the entire Court, noted the crucial fact that the reporters in that case were asked to testify about "events they had observed, seen or written of," all of which information was obtained with "no confidences seal[ing] their lips." 539 F.2d. at 375; *see also Id.* at 376-77 (Winter, J., dissenting), *adopted by the court en banc*, 561 F.2d at 540 ("the absence of a claim of confidentiality and the lack of evidence of vindictiveness tip the scale" against the applicability of the reporter's privilege, and noting that the facts of that case "d[id] not involve confidential communications or observations.").

Furthermore, this circuit has generally adopted an expansive view of confidentiality where other evidentiary privileges were implicated. *See, e.g., In re Grand Jury Subpoena*, 204 F.3d 516, 520 (4th Cir. 2000) (noting the Circuit's consistent recognition that, under attorney-client privilege, a client's identity could remain privileged if its disclosure "would in essence reveal a confidential communication"). Without such a broad reading, the privilege would be meaningless. A party should not be able to obtain privileged information indirectly — here, by asking for enough information to identify confidential source(s), without asking for names — if it cannot get such information directly. Risen Aff. ¶ 63.

## B.  The Government Must Meet Its Heavy Burden of Overcoming the *LaRouche* Factors

The burden is on the Government to demonstrate that the three factors set forth in *LaRouche* as an aid in the balancing of interests required by the reporter's privilege — "(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information," *LaRouche*, 780 F.2d at 1139 — have been satisfied.

Here the Government has come forward with no affirmative evidence to satisfy its burden. Although the Government cites to the Indictment concerning what it expects the evi-

-36-

dence to be at trial, it has provided neither the Court nor counsel for Mr. Risen with any evidence — through affidavit or otherwise — that demonstrates the need for Mr. Risen's testimony. Nor should the Government be permitted to do so for the first time on reply.

### C. The Information Sought from Risen Is Not Critical or Necessary To The Government's Case At Trial

The Government's burden under *LaRouche* is more significant than the Government portrays in its brief in support of its motion *in limine* — particularly as to prong 3, which asks "whether there is a compelling interest in the information." The Government examines prong 3 solely at a general level. It argues, for example, that the Government's interest in Mr. Risen's testimony about his confidential source(s) is compelling because this is a criminal trial and the defendant is charged with extremely serious crimes. Motion in Limine at 25-26. But nowhere does the Government demonstrate — as it must — that the particular information the Government seeks from Mr. Risen is "necessary" or "critical" to its case.

There are only a few cases in this Circuit that apply the *LaRouche* balancing test. But those cases and others make plain that the third prong of the test requires the party seeking evidence from a reporter to show that the particular evidence sought is necessary or critical to that party's case. *LaRouche* itself supports such a reading. The *LaRouche* Court adopted the three-part balancing test directly from *Miller* v. *Transamerican Press, Inc.*, 621 F.2d 721, *modified*, 628 F.2d 932 (5th Cir. 1980), *cert. denied* 450 U.S. 1041 (1981). *See LaRouche*, 780 F.2d at 1139. And *Miller* makes clear that a showing of "necessity" is required to satisfy prong three. Specifically, in a paragraph added to the original opinion in response to a request for rehearing *en banc*, the *Miller* court clarified that, to succeed under the three-part test, a party seeking confidential source information from a reporter must show, among other things, "that knowledge of the identity of the informant is *necessary to proper preparation and presentation of the case*." 628 F.2d 932 (emphasis added).

The Fourth Circuit has also interpreted the *LaRouche* test to impose such a requirement in *Church of Scientology* v. *Daniels*, 992 F.2d 1329, 1335 (4th Cir.), *cert. denied*, 510

-37-

U.S. 869 (1993). In that case, the Court affirmed denial of discovery from *USA Today* in a civil case involving a subpoena seeking nonconfidential information. Relying on *LaRouche*, the Court made clear that the *LaRouche* balancing test requires that information sought from a reporter be "critical to the case" of the party seeking it. Specifically, the Court held that:

> Nothing in the record shows that there was an abuse of discretion in the denial of discovery of the materials. In fact, the consideration that Daniels [the reporter] offered to stipulate to the accuracy of the quotation that appeared in *USA Today* makes the relevance of the materials CSI seeks questionable, *rather than critical to the case, as the law requires. See [LaRouche]*, 780 F.2d at 1139 (the fact that the plaintiff already knew the names of sources made need for information less than compelling).

*Church of Scientology*, 992 F.2d at 1335 (emphasis added.). Other circuits have imposed a similar requirement. *See, e.g., United States* v. *Burke*, 700 F.2d 70, 76-77 (2d Cir.) ("The law in this Circuit is clear that to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, *necessary or critical to the maintenance of the claim*, and not obtainable from other available sources.") (emphasis added), *cert. denied*, 464 U.S. 816 (1983).

Whether characterized as "necessary" or "critical" to the case, the bottom line is clear: *LaRouche* imposes a stringent test on those who seek discovery of confidential sources to demonstrate that the material sought is more than just relevant to their case. Thus, to the extent that the information sought is peripheral, nonessential, speculative, or cumulative of other evidence, then the Government fails to satisfy its burden that the information is relevant and that there is a compelling interest in obtaining it. *LaRouche*, 780 F.2d at 1139; *Burke*, 700 F.2d at 77; 28 C.F.R. § 50.10 (f) (Attorney General should not authorize subpoenas to members of the news media in criminal cases unless "the information sought is essential to a successful investigation — particularly with reference to directly establishing guilt or innocence. The subpoena should not be used to obtain peripheral, nonessential, or speculative information."). Without such a showing, the subpoena must be quashed.

-38-

To meet its burden of demonstrating that there is a "compelling interest in the information" it seeks, then, the Government cannot rely solely on generalities about the importance of national security, but rather must demonstrate why the specific testimony they seek from Mr. Risen is "necessary" or "critical" to those broad interests. The Government makes no effort to — and cannot — do so here. In fact, it claims just the opposite. Motion in Limine at 5 (Risen's testimony will merely "simplify the trial and clarify matters for the jury" and "allow for an efficient presentation of the Government's case."). We respectfully submit that this is exactly the kind of non-critical, unnecessary testimony — ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ — that the reporter's privilege must shield if it is to have any meaning at all.

In fact, the Government has failed to meet its burden to demonstrate that it needs any information from Mr. Risen. Although Mr. Risen does not have access to the full evidentiary record, the Government's papers ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ describe the Government's evidence from other sources as follows:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indictment ¶¶ 19, 34, 38, 45, 47, 49, 51, 54 (claiming that a series of phone calls were placed by Sterling to Mr. Risen's personal residence and office, and by Mr. Risen to Sterling's residence, temporary residence, and place of employment in 2003 and 2004.)

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indictment ¶¶ 19, 37, 44-46, 48-51; (describing the content of emails purportedly sent between Sterling and Mr. Risen in 2003 and 2004).

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

-39-



The Government has also made no effort to demonstrate that it has exhausted alternative sources. Courts examining the exhaustion requirement have emphasized that the burden of satisfying it is "very substantial." *Zerilli* v. *Smith*, 656 F.2d 705, 714 (D.C. Cir. 1981); *Carey* v. *Hume*, 492 F.2d 631 (D.C. Cir. 1974) (suggesting that taking of 60 depositions might be a reasonable prerequisite to compelling disclosure), *cert. dismissed*, 417 U.S 938 (1974). Thus, the Government may not subpoena Mr. Risen until it has affirmatively demonstrated that it has exhausted all reasonable alternative sources of information. *LaRouche*, 780 F.2d at 1139. Such a showing may not consist of mere conclusory assertions about the insufficiency of the Government's current efforts, but must rather be an affirmative demonstration that the reporter is truly the last reasonable resort for the information. *Grunseth* v. *Marriott Corp.*, 868 F. Supp. 333, 335 (D.D.C. 1994) ("Nor has Plaintiff demonstrated, other than in conclusory language, that he has exhausted all other reasonable sources for obtaining the information."). If the Court finds even a single reasonable alternative source for the information the Government is seeking from Mr. Risen, the subpoena must be quashed.[14]



---

[14]    Given the inherently secret nature of grand jury proceedings, Mr. Risen must rely on the Court's analysis of the Government's evidence as he does not know, for example, what steps have been taken by the Government to obtain from alternative sources the information it now seeks from Mr. Risen.

██████ the Government ████████████████████████████

████████████████████████████████████████ effectively concedes that it can

prove venue without his testimony. Motion In Limine at 25 n.14. Accordingly, Mr. Risen's tes-

timony is not necessary or critical for this purpose, and the Government's demand for this testi-

mony should be quashed.

**D.    The Newsworthiness of the Leaks at Issue
        Outweighs Any Alleged Harm Caused By Them**

The overall reporter's privilege test in the Fourth Circuit involves a weighing of

the competing interests as they manifest themselves in the case before the Court. We respect-

fully submit that this requires the Court to weigh "the public interest in compelling disclosure,

measured by the harm the leak caused, against the public interest in newsgathering, measured by

the leaked information's value." *Judith Miller*, 438 F.3d at 1175 (Tatel, J., concurring in the

judgment), *see also Gonzales*, 459 F.3d at 86 (Sack, J., dissenting) (in leak cases courts should

look at whether "'nondisclosure of the information would be contrary to the public interest, tak-

ing into account both the public interest in newsgathering and maintaining a free flow of infor-

mation to citizens'") (quoting Free Flow of Information Act, S. 2831, 109th Cong. § 4(b)(4)

(2006)). Such an approach is consistent with Justice Powell's admonition that the privilege must

be evaluated "on a case-by-case basis." *Branzburg*, 408 U.S. at 710 (Powell, J., concurring).

Such an approach is also the only way to ensure that leaks that cause more good

than harm are protected and those that cause more harm than good are not. As Judge Tatel ex-

plained in his concurring opinion in *Judith Miller*:

> [Some] leaks — the design for a top secret nuclear weapon, for example, or plans
> for an imminent military strike — could be . . . damaging, causing harm far in ex-
> cess of their news value. In such cases, the reporter privilege must give way. Just
> as attorney-client communications "made for the purpose of getting advice for the
> commission of a fraud or crime" serve no public interest and receive no privilege,
> neither should courts protect sources whose leaks harm national security while
> providing minimal benefit to the public debate.
>
> Of course, in some cases a leak's value may far exceed its harm, thus calling into
> question the law enforcement rationale for disrupting reporter-source relation-
> ships. . . . News reports about a recent budget controversy regarding a super-

-41-

> secret satellite program inspire [an] example. . . . Despite the necessary secrecy of intelligence-gathering methods, it seems hard to imagine how the harm in leaking generic descriptions of such a program could outweigh the benefit of informing the public about billions of dollars wasted on technology considered duplicate and unnecessary by leading Senators from both parties. In contrast to the nuclear weapon and military strike examples mentioned above, cases like these appear to involve a balance of harm and news value that strongly favors protecting news-gathering methods.

*Judith Miller*, 438 F.3d at 1173-74 (Tatel, J., concurring in the judgment) (citations omitted). It is simply not the case that all news stories containing classified information harm national security. In fact, the opposite is often true. As journalist Dana Priest points out in her declaration submitted along with this motion:

> Consider what happened when the news media did not work hard enough before the Iraq war to determine whether the Bush administration's assertions of weapons of mass destruction in Iraq were accurate. For the press to have done a better job reporting about Iraq's nuclear capabilities in the run-up to the war, of course, it would have had to have access to secret or classified information, and it would almost certainly have had to have the assistance of confidential sources.

Priest Decl. ¶ 10. In hindsight, it is clear that the public would have been well served if, during the time period leading up to the Iraq War, more journalists published stories that thoroughly examined the flaws in our intelligence concerning Iraqi WMD. The balancing that we respectfully propose is faithful to both Supreme Court and Fourth Circuit precedent and is the only way to allow the reporter's privilege to protect those leaks of classified information that benefit society while leaving those that cause more harm than good unprotected.

Applying that test to the facts of this case, it clear that the newsworthiness of the information contained in Chapter 9 of *State of War* outweighs any alleged harm that was caused by its publication. As outlined above, the chapter deals with the incompetence and mismanagement of certain intelligence efforts concerning Iran's nuclear ambitions. Its main focus — Operation Merlin, the now-eleven-year old intelligence operation that was intended to stall, but which may have actually helped Iran in its efforts to develop a nuclear program — is undoubt-

-42-

edly newsworthy.[15]  As Mr. Risen himself explains in his affidavit, at a time when the press has

been taken to task for failing to scrutinize our intelligence in evaluating Iraq's WMD capabilities

during the time leading up to the most recent war in Iraq, reporting about our intelligence in

evaluating Iran's nuclear program is essential.  Risen Aff. ¶ 23.  Moreover, given the about-face

in the National Intelligence Estimate concerning our intelligence agencies' views about whether

Iran halted its nuclear program in Fall 2003[16] and subsequent reports claiming that our govern-

ment has tended to overstate the threat of the Iranian nuclear program, it is that much more im-

portant to understand why our intelligence efforts in evaluating Iran's nuclear threat have been

limited.  In Mr. Risen's own words:

> I believe my decision to report about the matters discussed in Chapter 9 of *State of War* has been vindicated, particularly given subsequent reports about the unre-liability of our intelligence about Iran's nuclear capabilities and about our gov-ernment's tendency to overstate the threat in a way that is not entirely consistent with the intelligence actually gathered.  For example, in December 2007, the United States intelligence community published a National Intelligence Estimate ("2007 NIE") on Iran, in which the U.S. government acknowledged that virtually everything it had been saying about Iran's nuclear program for the last four years had been wrong.  The 2007 NIE stated that Iran had abandoned its nuclear weap-ons program in 2003, a complete reversal from previous intelligence assessments that had concluded that Iran was actively seeking a nuclear weapon.  It revealed that almost all of the public statements by the Bush Administration about Iran and its weapons program had been wrong, and had been based on bad information.  The 2007 NIE . . . . must be seen as a public disavowal of the CIA's earlier intel-ligence efforts on Iran's supposed nuclear program.
>
> Since then, U.S. intelligence assessments of Iran's nuclear program have swung back and forth.  Ever since the 2007 NIE was published, U.S. intelligence analysts

---

[15]   *See* A. Nelson Aff. ¶ 9 ("Mr. Risen's reporting in Chapter 9 of *State of War* deals with an issue that almost certainly will be the subject of countless historical analyses: the incompetence and mismanagement of certain intelligence efforts in Iran.  This will be a critically important subject to historians in light of, among other things, recent changes to the National Intelligence Estimate regarding Iran's supposed nuclear capabilities."); *see also*  Priest Decl. ¶ 11 (Mr. Risen's report-ing in Chapter 9 deals with the "important and newsworthy subject" of "potential incompetence and mismanagement of certain intelligence efforts concerning Iran's WMD capabilities"); Arm-strong Decl. ¶ 24 ("Regardless of whether one agrees with all [of Chapter 9's] assertions and analysis, it is by simple definition 'newsworthy'").

[16]   National Intelligence Council, *National Intelligence Estimate, Iran: Nuclear Intentions and Ca-pabilities* (Nov. 2007), *available at*, http://www.odni.gov/press_releases/20071203_release.pdf (last visited June 20, 2011).

have been under pressure to disavow it and issue a new one that concludes that Iran is racing to build a nuclear weapon.  But while there is substantial evidence of Iran's ongoing uranium enrichment program, the intelligence about the status of Iran's efforts to actually build a nuclear bomb has been far less conclusive.  In an article that was quickly attacked by the Obama Administration, Seymour M. Hersh, wrote recently in *The New Yorker* that a new 2011 NIE from the United States intelligence community reaffirms that there is no conclusive evidence that Iran has made any effort to build a nuclear bomb since 2003.  *See* "Iran and the Bomb," by Seymour M. Hersh, published on June 6, 2011 in *The New Yorker* at pp. 30-35. . . . "There's a large body of evidence," wrote Mr. Hersh, "including some of America's most highly classified intelligence assessments, suggesting that the U.S. could be in danger of repeating a mistake similar to the one made with Saddam Hussein's Iraq eight years ago — allowing anxieties about the policies of tyrannical regime to distort our estimates of the state's military capacities and intentions." *Id.* at 30.

Whether one agrees with Mr. Hersh's article or not, it is clear that, five years after I wrote *State of War*, there is still a serious national debate about Iran's nuclear ambitions and about whether the current administration has incentives to exaggerate intelligence related to this topic.

The point of Chapter 9 of *State of War* was that the CIA was just as blind and just as reckless in the way it dealt with intelligence on Iran's weapons of mass destruction as it had been on Iraq.  That was clearly the message of the 2007 NIE, and perhaps it is the message of the 2011 NIE as well.  Given the CIA's own disavowal of its past work on Iran's nuclear program, it is that much more important to understand *why* our intelligence efforts in evaluating Iran's nuclear threat have failed in the past.  Chapter 9 of *State of War* is one of the few sources of information covering this important subject.

Risen Aff. ¶¶ 25-28; *see also* A. Nelson Aff. ¶ 9.  These types of considerations played a large role in Mr. Risen's decision to publish Chapter 9 in the first place.  Significantly, as noted above, Mr. Risen knew about Operation Merlin as early as 2003 but held the story for three years until it became clear to him that the competence of intelligence operations concerning weapons of mass destruction was something that the public needed to examine.  Risen Aff. ¶ 19.  It was only after: (1) it became clear that the main rationale for fighting the Iraq War was based on faulty intelligence about the Iraqi's nuclear program; (2) the press had been criticized for not doing more independent investigative reporting before the Iraq War about the quality of our intelligence concerning Iraq's nuclear program; (3) the March 31, 2005 Report to the President by the Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction described American intelligence on Iran as inadequate to allow firm judgments about Iran's weapons programs; and (4) there was increasing speculation that the United States might be

-44-

planning for a possible conflict with Iran based on intelligence concerning weapons of mass de-struction, just as in Iraq, that Mr. Risen decided that this was a story that he had to publish. *Id.* "After all of this," explains Mr. Risen, "I realized that U.S. intelligence on Iran's supposed weapons of mass destruction was so flawed, and that the information I had was so important, that this was a story that the public had to know about before yet another war was launched." *Id.*

As for the potential harm caused by the leak, although the Government has pub-licly criticized the reporting as harming national security, it has never been able to articulate why. Operation Merlin is now approximately eleven years old, and it has been over five years since *State of War* was published. At the time of publication, these stories were old enough that they were not likely to cause any real harm to national security. *Id.* ¶ 21.

The Government may not like the scrutiny that Mr. Risen's reporting — in Chap-ter 9 and elsewhere — has subjected them to. But there can be no doubt that Mr. Risen's report-ing has served the public well. Because the information reported in Chapter 9 benefits the public considerably more than it harms them, the subpoena seeking the identity of Mr. Risen's confi-dential source(s) for that chapter must be quashed.

**E.    Mr. Risen Is Willing To Authenticate His Work
Under Oath, Subject To An Appropriate
Protective Order**

The only subject matter that the Government has identified that Mr. Risen is will-ing to testify to is authentication of his work. ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ The prohibition against hearsay ██████████ will apply at any criminal trial in this matter. *See* Fed. R. Evid. 802. Accordingly, Mr. Risen is willing to provide authentication testimony, subject to a protective order limiting the subject of his testimony to confirming (1) that he wrote a particular

newspaper article or chapter of a book; (2) that a particular newspaper article or book chapter that he wrote is accurate; (3) that statements referred to in his newspaper article or book chapter as being made by an unnamed source were in fact made to him by an unnamed source; and (4) that statements referred to in his newspaper article or book chapter as being made by an identified source were in fact made to him by that identified source. Risen Aff. ¶ 60. Mr. Risen therefore does not oppose the portion of the Government's motion *in limine* seeking this testimony, provided that an appropriate protective order is entered so as to ensure that the questions posed on direct or cross examination will not go beyond this very limited subject area.

### F.    There Is Evidence that the Subpoena Was Issued To Harass and Intimidate Mr. Risen

*Branzburg* and the Fourth Circuit precedents outlined above make clear that, in cases where there is evidence that the subpoena is brought in bad faith to harass, intimidate, or silence a journalist, the subpoena must be quashed. As Justice Powell noted in *Branzburg*:

> [N]o harassment of newsmen will be tolerated. If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered.

*Branzburg*, 408 U.S. at 709-10 (Powell, J., concurring). For Justice Powell's admonition that "no harassment of newsmen will be tolerated" to be observed, no harassment must mean no harassment. *See also United States* v. *Lindh*, 210 F. Supp. 2d 780, 783 (E.D. Va. 2002) (recognizing a First Amendment reporter's privilege in a criminal case "where the journalist produces some evidence of confidentiality or governmental harassment"). Thus, if the Government conducts its investigation in a way that appears designed — even in part — to chill a reporter's speech or silence his criticism of the Government, that fact must weigh heavily in favor of quashing the subpoena.

Mr. Risen's reporting about the NSA Warrantless Surveillance Program and in Chapter 9 of *State of War* exposed potential government wrongdoing, incompetence, and mis-management. He was immediately subject to threats of prosecution, possible secret surveillance, and public expressions of outrage from Government officials (*see* Risen Aff. ¶¶ 31 - 37, 44-45), in addition to the threat of potential contempt under the 2008 grand jury subpoena.



That revelation further supports a finding that the quest for Mr. Risen's testimony has been part of a pattern of harassment. The current subpoena — though issued by a new administration — is simply the continuation of that impermissible course of conduct.

## CONCLUSION

Because the information sought by the Government is protected by the reporter's privilege under the First Amendment and federal common law, and the subpoena is part of an

effort to harass and retaliate against Mr. Risen for writing things that were critical of the government, Mr. Risen respectfully requests that the Court deny the Government's motion *in limine* and grant Mr. Risen's motion to quash the grand jury subpoena and/or for a protective order. Mr. Risen is willing, however, to provide testimony concerning authentication of information contained his newspaper articles and books provided that an appropriate protective order is entered.

June 21, 2011

Respectfully submitted,

Peter K. Stackhouse
219 Lloyds Lane
Alexandria, VA 22302
(703) 684-7184

David N. Kelley (admitted *pro hac vice*)
Joel Kurtzberg (admitted *pro hac vice*)
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for James Risen*

-48-