# JEFFREY STERLING



13455 Farmcrest Court, #721
Herndon, VA 20171
Phone 703/793-9388

March 21, 2001

Office of Equal Employment Opportunity
ATT:    Ms. F.
Rm 1B17 OHB
Central Intelligence Agency
Washington, DC 20505

Dear    Ms. F.,

As a follow-up to my March 21, 2001 telephone conversation with your office, I am submitting this letter as a formal request for an immediate final decision on EEO Case No. 00-23.  This request is being made pursuant to Title 29 C.F.R. § 1614.108 (f).  My attorney received the investigative file on March 9, 2001.  Please forward any correspondence relating to this request to my attorney and me.

Sincerely,

Jeffrey Sterling

GOVERNMENT
EXHIBIT
61
1:10CR485

X00044

Jeffrey Sterling
13455 Farmcrest Court; #721
Herndon, VA 20171



Office of Equal Employment Opportunity
ATT:        F̄

Central Intelligence Agency
Washington, DC 20505

X00045

CONFIDENTIAL//XI    **DECLASSIFIED**

7 May 2001

| | |
|---|---|
| **MEMORANDUM FOR:** | (C) Jeffrey Sterling |
| **FROM:** | Special Activities Staff, Center for CIA Security |
| **SUBJECT:** | Personnel Evaluation Board Meeting on, 30 March 2001 |
| **REFERENCE:** | SAS Memorandum, dated 5 March 2001, Same Subject |

1. (C) This is to advise you that the Personnel Evaluation Board (PEB) met on 30 March 2001], to consider your suitability for continued employment. As discussed with you on 5 March 2001, the specific issues brought to the attention of the PEB related to:

- In August 2000, you returned short-of-tour from the New York office at the convenience of the government. You reported to NE Division on 28 august 2000 and began a search for an assignment. In accordance with          , you had until 13 November 2000 to identify a suitable onward assignment. You did not identify any employment opportunities during that time frame. In December 2000, NE Division management directed you to an assignment in a NE unit    (NE-1)    , based n your Farsi language ability and your previous solid record of performance as a desk officer in NE -1 , and your understanding of Iranian targeting and operations. You did not perform any duties for NE -1 , instead you took leave during the holidays and then announced to NE -1 management that you would be resigning from the Agency soon after the start of the year. On 15 February 2001, you were again directed to work in NE -1 and to report on 20 February 2001. You have refused to report to this assignment, and have also refused to locate employment elsewhere within the Agency.

2. (C) The PEB recommended that you be separated from the Agency for suitability reasons. The Director, Center for CIA Security, Director of Human Resources and the Deputy Director for Operations

**DECLASSIFIED**    CONFIDENTIAL//XI



GOVERNMENT
EXHIBIT
62
1:10CR485



P00526
X00051

CONFIDENTIAL//XI   **DECLASSIFIED**

concurred with the PEB recommendation. The consensus of the Panel was to provide you the following options:

A) You are offered the opportunity to resign in lieu of termination and be provided with a 30-day contract which will continue you in a paid employee status through 6 June 2001. In addition, you will be provided access to the Career Transition Center, and the Supplemental Care Program will be available to you.

B) You may appeal the PEB decision in writing to the Executive Director. Your appeal must be received in SAS by close of business, 17 May 2001. If your appeal is denied, you will have the option of a second appeal to the DCI. If your appeal is denied by the DCI, your employment will be terminated effective the date of the DCI's signature. If either the Executive Director or the DCI upholds your appeal, you will be reinstated to the workplace.

3.      If you elect to appeal, the offer to resign, and the offer of a contract, will be withdrawn. Furthermore, you will continue on administrative leave while your case is being adjudicated.

4.      If you have not already done so, you are required to surrender any Agency ID, and any US Government credit cards or equipment, to SAS today. You remain suspended from entering Agency buildings, except as designated by SAS, during the period of your contract or appeal.

5.      SAS continues to be administratively responsible for you. During the period of either your contract or appeal you are to call SAS every morning by 10 am. If you fail to call by 10 am, you will be placed on leave without pay.

                                                        **Special Activities Staff**

**DECLASSIFIED**

CONFIDENTIAL//XI

CONFIDENTIAL//XI

(AIUO) I have read and acknowledge this memorandum and elect the following option:

_____    Option A; resignation with a 30-day contract.

_____    Option B; appeal the decision to the Executive Director within 10 calendar days.

(C) Jeffery Sterling

$5/7/01$

Date

**DECLASSIFIED**

CONFIDENTIAL//Xi

P00528
X00053

The Director
Equal Employment Opportunity



24 May 2001

Robert Levy, Esq.
Bantle & Levy
817 Broadway, 6th Floor
New York, New York 10003

     RE:  EEO Complaint No. 00-23, Samuel L. Crawford

          FINAL AGENCY DECISION

I.  Procedural Statement

On 22 August 2000 your client, Samuel L. Crawford,
filed a complaint of discrimination against the Agency.
The Agency completed the Report of Investigation (ROI) of
his complaint and made a copy available to him on 8 March
2001. By letter received by the Agency on 28 March 2001,
your client requested that the Agency issue a Final
Agency Decision (FAD) on his complaint, in accordance
with 29 C.F.R § 1614.110.

II.  Issues

The issues and bases upon which your client received
counseling and upon which he subsequently filed his formal
complaint are set forth in the 13 September 2000 letter
from the Chief, Counseling and Investigations Staff, Office
of Equal Employment Opportunity. In that letter, the
Agency accepted in part and dismissed in part your client's
complaint of discrimination. That letter (attached hereto

GOVERNMENT
EXHIBIT
63
1:10CR485

X00054

Robert Levy, Esq.

and incorporated as part of this decision) also explains
the rationale for dismissing the complaint in part.

The issues and bases that were accepted for
investigation and that were investigated are as follows:

> Issue and Bases 1: Your client alleged
> discrimination on the bases of race (African
> American) and reprisal[1] when he received an
> unrealistic and unjustified Advanced Work Plan
> (AWP) on 6 April 2000.

> Issue and Basis 2: Your client alleged
> harassment on the basis of reprisal when office
> management failed to prevent the destruction of
> his personal property.

III.  Evidence

Issue 1:

Your client testified that at a meeting on 6 April
2000  with the  Head of the office, David Cohen  (Tab E-2),   Mr. S. 2
(Tab E-4), and his then supervisor,   Mr. L.
(Tab E-5), he was given a revised AWP that
was discriminatory because:

a. It was more severe than a revised AWP given
   to a similarly situated officer not in his
   protected category;
b. It was issued in spite of his notice to management
   he was not provided operational opportunities or
   cover equal to that provided to other similarly
   situated officers not in his protected category;

Affiant 2 Cohen testified that the AWP was given because
of your client's "deficient" performance from mid-1999 to
April 2000, a period of time that included a January 2000
counseling session when he was advised that "he was failing to
meet the minimal standards of performance for the operations

---

[1]Your client testified (ROI, Tab E-1) that reprisal did not apply to
this issue because he had not had any prior EEO activity by that date;
as a result, I find that there could be no discrimination for reprisal
by the Agency for Issue 1.

Robert Levy, Esq.

officer [OO], for his grade." From January 2000 to April 2000, your client "continued with the same performance record" that had resulted in the January session. Also,   Cohen stated that your client's performance "was so deficient that a clearly defined and tightly established time frame was essential to getting [his] attention focused on what he needed to do to address th[ese] serious and sustained performance deficiencies." In addition,   Cohen  ,  Mr. S. 2  , and   Mr. L.   agreed that the requirements addressed in the AWP were "a fair and appropriate step" and "easily achievable within the two month period."   Cohen   testified that your client had the "same opportunities and cover constraints as any other officer with the   office   " and that your client never mentioned any concern to him regarding these matters.

Affiant 3   Mr. S. 2   testified that "in addition to regular counseling sessions" by your client's supervisor, he,   Cohen and   Mr. L.   met with your client in January 2000 to review his performance and noted your client's "failure to make any effort to initiate   certain   operations." As a result of this meeting, your client was informed that his performance would be "monitored closely" and "in approximately three months,   office   management would review his performance again." The   Mr. S. 2   testified that when he and   Cohen reviewed your client's performance in early April 2000 "it was apparent that he had completely disregarded [the] previous guidance ... [and] there was no evidence that [your client] had made any effort to generate and pursue any
      certain   contacts ...."  Moreover,   Mr. S. 2   stated that he and   Cohen   gave your client the choice of "curtailing his assignment ... or continuing with his assignment with a firm commitment to pursue the requirements of the AWP." The AWP required, within a two-month period, that your client identify three   individuals of interest   and have three meetings with each.   Mr. S. 2   testified that in the environment where your client was operating, the requirements of the proposed AWP were "neither unrealistic or unjustified."

Regarding your client's cover,   Mr. S. 2   testified that the first time your client mentioned concerns about his cover was in the January 2000 meeting

Also, your client acknowledged to the   Mr. S. 2   that he had made no effort to acquire cover in spite of encouragement from his supervisors. The

3

X00056

Robert Levy, Esq.

Mr.S.2 testified that the supposedly similarly situated non-African American officer identified as having been given an AWP (ROI, Tab F-4) with fewer requirements and more time was a GS-14    unlike your client, who is a GS-12. Moreover, the Mr.S.2 stated that, in fact, the other officer was given tasks that were "arguably" as demanding as your client's and that the officer agreed to fulfill the tasks of the AWP, whereas your client refused to remain at the    office    under the conditions of his AWP.

Affiant 4 ( Mr. H., who served in one position January 1999 to April 1999, and another from May 1999-July 2000) testified that while he served in the first position your client performed well in all areas except the one particular    area, and he counseled your client on this matter. Further, Affiant 4 stated that comparing your client's AWP with the AWP of the supposedly similarly situated non-African American "would be difficult as they were different grades with different expectations, different responsibilities, different referent duties, etc." Affiant 4 testified that operational opportunities in the    office    area are traditionally developed by individual officers rather than being provided by the    office    , and that it was the responsibility of an individual officer    to work with an appropriate person    regarding cover.

. He also stated that, as of 15 April 1999, your client still had not resolved the cover issue and that your client told him that he had "a block" on the cover issue.

The testimony of Affiant 5, ( Mr. L. , your client's immediate supervisor and author of the April 2000 AWP), mirrors that of    Cohen    and Mr.S.2 regarding the January and April 2000 meetings with your client. Affiant 5 further pointed out that your client was counseled regarding his lack of    certain    activity in July and October 1999 and that a review of his record showed "no record of    that    related activity since 2 November 1999." Mr.L. testified that your client was given the same opportunities as other officers in the    office    , and the other officers were able to be successful while he was not. Specifically, Mr.L. stated that he provided your client with a specific lead, but that your client decided to take leave rather than pursue it.

4

X00057

Robert Levy, Esq.

         With respect to the Performance Appraisal Reports (PAR)
of your client and the only similarly situated officer at the
GS-12 grade level, your client's PAR for the reporting period
10 January 1999-31 July 1999 (ROI, Tab F-5) reveals that he
has not yet mastered the skills of a full performance OO.   It
further states that your client did not meet expectations in
            a certain         competency. His PAR for the reporting
period 1 August 1999-31 July 2000 (ROI, Tab E-1, Att. 2)
shows that he failed to master all the competencies required
of an OO to advance to the GS-13 grade level. The PAR
demonstrates that your client did not fully meet expectations
because of a lack of    a certain    work. The PAR for the
other similarly situated officer        at the GS-12 grade
level (ROI, Tab F-6) reveals that the officer had
sufficiently mastered the competencies for an OO to advance
from GS-12 to GS-13. It further shows that the other officer
significantly exceeded expectations in the
competency.

         The evidence at ROI, Tab F-4 demonstrates that the
supposedly similarly situated non-African American officer,
identified by your client as having been given a less
severe AWP, was a GS-14      . In addition, the only GS-
12        was not given a revised AWP.  (See PAR
comparisons above.)  Documentation presented in evidence at
ROI, Tab F-2 reveals that the performance standards
required of a GS-12 and GS-14 are significantly different.

Issue 2:

         Your client testified (ROI, Tab E-1) that on 14 June 2000,
upon returning to his office from a TDY, he discovered that the
cord to a pair of his headphones had been cut.  He also
testified that the only individuals who would have committed
such an act of vandalism and violence are those individuals he
accused of racial discrimination—namely, Cohen and Mr. S 2,  Mr. L  , or
Mr. H. and that one of those individuals either committed the
act or failed to prevent someone else who may have been angered
by his participation in the EEO process from committing the
act.  Your client testified that the prior EEO activity was on
19 April 2000, when he met with a counselor from OEEO to
complain about the 6 April 2000 AWP. Your client has proffered
no evidence, other than his own speculation, of who may have
committed the destructive act.

5.

X00058

Robert Levy, Esq.

Cohen and Mr. S 2 , Mr. L. and Mr. H. all testified that at
the time of the alleged discriminatory event they were unaware
that your client had ever participated in any EEO
administrative proceeding or that he had otherwise opposed
any unlawful employment discrimination. They also agree that
office management was not negligent in protecting your
client's personal property. Each individual denied that
reprisal on his part accounted for the destruction of the
headphones.

The record shows that Cohen , upon learning of the
destruction of your client's personal property, asked
another CIA officer      to consult with Headquarters
for advice on the best way to proceed. The record further
demonstrates that, at the request of Cohen , the other officer
conducted an investigation into the vandalism and concluded
that because there was no first-hand information regarding
the incident, it was impossible to determine what actually
happened to your client's headphones. (ROI, Tab E-7.)

IV.   Applicable Law

To establish a *prima facie* case of discrimination on the
basis of race (African American), a complainant must
establish that (1) he is a member of the protected category;
and (2) he was treated differently than similarly situated
officers not in his protected category. McDonnell Douglas
Corp. v. Green, 411 U.S. 792, 802 (1973). If a complainant
establishes these factors, an employer must then articulate a
legitimate, nondiscriminatory reason for its action. Texas
Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253
(1981). Once the employer has articulated such a reason, the
complainant must persuade the fact finder (by a preponderance
of the evidence) that the employer's asserted reason was
merely a pretext for unlawful discrimination. To find for
the complainant, the trier of fact must find not only that
the employer's proffered reason is not true, but also that it
is more likely than not that the employer acted because of
discrimination. St. Mary's Honor Center v. Hicks, 509 U.S.
502, 113 S. Ct. 2742, 2749 (1993). See also Reeves v.
Sanderson Plumbing Products, Inc., 530 U.S. ___ (June 12,
2000). Throughout the analysis, the burden of proof remains
on the complainant. Burdine, supra, at 253.

6

X00059

Robert Levy, Esq.

To prevail in a reprisal claim, a complainant must establish, by a totality of the circumstances, that (1) he engaged in an activity protected by Title VII; (2) the responsible agency official(s) knew of the prior EEO activity; (3) the employer thereafter took an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. Christopher v. Stouder Memorial Hospital, 936 F.2d. 870, 877 (6th Cir. 1991); Zanders v. National Railroad Passenger Corp., 898 F.2d 1127, 1134-35 (6th Cir. 1990); Wrenn v. Gould, 808 F.2d 493, 500 (6th Cir. 1987); cert. denied, 484 U.S. 1067 (1988).

V.   Analysis

Issue 1:

After a careful review of the record, I find that your client has not established a *prima facie* case of discrimination based on race. Testimony and documentation presented in evidence demonstrate that the officer identified by your client as similarly situated was a GS-14; therefore, he was not similarly situated to your client, a GS-12. Because of the grade difference, the other officer's performance standards on which his AWP was based were significantly different than the performance standards for your client's AWP. Moreover, your client has not shown that the managers responsible for the AWP harbored any discriminatory animus against him based on his race.

Even if your client had established a *prima facie* case for discrimination based on race, the Agency has articulated a legitimate nondiscriminatory reason for its action by demonstrating that your client was counseled on several occasions prior to January 2000 concerning his lack of    certain    operations. Specifically, in January 2000 office   management met with your client and advised him that his work would be closely monitored for three months, with another evaluation at the end of that period to assess his efforts in    certain    operations. In April 2000, office   management then met with your client and noted that he had made absolutely no progress in    this particular area since November 1999. As a result, in an attempt to give him more focus, management then provided your client

X00060

Robert Levy, Esq.

with specific requirements to be met in a new two-month
period.

   If your client had established his *prima facie* case,
and if the Agency had not articulated a legitimate
nondiscriminatory reason for its action, your client would
still have had to establish that the Agency's given
nondiscriminatory reason was a mere pretext for
discrimination. Again, after a careful review of the
record, I find that your client has presented absolutely no
evidence that the Agency's reasons for the AWP were
pretextual. Taken as a whole, the record contains no
evidence upon which I can find that the Agency's actions
were based on unlawful motivation. Employers generally
have broad discretion to set policies and carry out
personnel decisions and should not be second-guessed by a
reviewing authority absent evidence of unlawful motivation.
Burdine, supra, at 259.

Issue 2:

   After a careful review of the record, I find that your
client has not established a *prima facie* case of
discrimination based on retaliation. Each of the managers
your client believed could have been responsible for the
alleged discriminatory action testified that he was unaware
of your client's involvement in the EEO process at the time
the alleged vandalism took place. Therefore, this
allegation must fail.

   Even assuming, *arguendo*, that your client had
established a *prima facie* case of retaliation, his claim
does not meet the criteria for harassment. To prevail in a
harassment claim, your client must establish, by a totality
of the circumstances, the existence of a hostile working
environment. The general standards are as follows: your
client must establish that (1) he suffered intentional
discrimination because of his previous EEO activity; (2)
the discrimination was pervasive and regular; (3) the
discrimination detrimentally affected him; (4) the
discrimination would have detrimentally affected a
reasonable person in that position; and (5) the existence
of *respondeat superior* liability. Andrews v. City of
Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).[3]

---

[3] The Supreme Court decisions of Burlington Indus., Inc. v. Ellerth,

Robert Levy, Esq.

The Supreme Court and EEOC have both held that
harassment is actionable if it is "sufficiently severe or
pervasive to alter the conditions of the complainant's
employment." Harris v. Forklift, Inc., 510 U.S. 17, 21
(1993), citing to Meritor Savings Bank v. Vinson, 477 U.S.
57, 67 (1986); Samuel T. Cobb, III v. Rubin, Secretary,
Dep't of the Treasury, EEOC No. 059070077, March 13, 1997;
EEOC Notice No. 915.002 (March 8 1994) Enforcement Guidance
on Harris v. Forklift Systems, Inc. at 3. The Harris Court
also explained that an "objectively hostile or abusive work
environment" is created when a "reasonable person would
find [it] hostile or abusive" and the complainant
subjectively perceives it as such. Harris at 21-22; EEOC
Guidance at 3. The Commission concluded that if a
complainant does not challenge an agency action or inaction
"regarding a specific term, condition, or privilege of
employment, a claim of harassment is actionable only if,
allegedly, the harassment to which the complainant has been
subjected was sufficiently severe or pervasive as to alter
the conditions of the complainant's employment." Samuel T.
Cobb, EEOC No. 059070077.

Your client has not claimed any discriminatory
employment action as a result of the alleged harassment,
and this single incident is not "sufficiently severe or
pervasive as to alter the conditions of [your client's]
employment." Therefore, this allegation must fail.

VI.    Finding

The evidence does not support a finding of discrimination
against your client in either Issue 1 or Issue 2; therefore, I
find that the Agency did not unlawfully discriminate against
him on the basis of race or reprisal.

---

118 S. Ct. 2275 (1998) and Faragher v. City of Boca Raton, 118 S. Ct.
2257 (1998), although dealing with sexual harassment claims, are being
applied to other claims of racial harassment. See, e.g., Defenbaugh-
Williams v. Wal-Mart Stores, Inc., 156 F.3d 581; and Wright-Simmons v.
City of Oklahoma City, 155 F.3d 1264 (10th Cir. 1998). Thus, the
question of employer liability, once harassment is established, would
be resolved pursuant to these cases.

9

X00062

Robert Levy, Esq.

VII.  Right of Appeal.

If your client is dissatisfied with this decision or
the dismissal of a portion of his complaint, he has the
following appeal rights:

> He may appeal the Agency's final decision to
> the Office of Federal Operations of the Equal
> Employment Opportunity Commission (EEOC) within
> 30 calendar days of your receipt of this
> decision.  The appeal must be postmarked, or in
> the absence of a postmark, received by the
> Commission within 30 calendar days of your
> receipt of this decision.  A copy of the
> regulation (29 C.F.R. § 1614.403) providing for
> appeal rights and Form 573, Notice of
> Appeal/Petition, is enclosed with this letter.
> The appeal, and any statement or brief in support
> thereof, must be submitted in duplicate to the
> EEOC and to the Central Intelligence Agency
> within 30 calendar days of the filing of the
> notice of appeal.  The address of the Commission
> is:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> P. O. Box 19848
> Washington, D.C. 20036

Your client also may file a civil action
ninety (90) days after your receipt of this final
decision.

If your client files an appeal with the
Commission, he may still file a civil action in
U.S. District Court within ninety (90) calendar
days of your receipt of the Commission's final
decision on his appeal.

A civil action also may be filed any time
after one hundred and eighty (180) calendar days
from the date of filing his appeal to the
Commission if a final decision has not been
issued by the Commission's Office of Federal
Operations.

10

X00063

Robert Levy, Esq.

If your client files a civil action under Title VII or the Rehabilitation Act, and he does not have or is unable to obtain the services of an attorney, he may request that the Court appoint an attorney to represent him and that the Court permit him to file the action without payment of fees, costs, or security. The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend his time in which to file a civil action. Both the request and the civil action MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS of the date you receive the Commission's decision.

You are further notified that, if your client files a civil action, he must name the appropriate department or agency head as the defendant. Failure to name the head of the department or agency may result in the loss of any judicial redress to which you may be entitled. The head of the Central Intelligence Agency is George J. Tenet.

Sincerely,

**Ms. F.**

Ms. F.

Enclosures
  As Stated

cc:  Samuel L. Crawford

X00064

DOC # ̲ ̲

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*JUDGE SCHWARTZ*

_____ X
                                   )      Case No.
Jeffrey Alexander Sterling          )
(aka Samuel L. Crawford)            )    **01 CV 8073**
        -plaintiff-                 )
                                    )
    -against-                       )
                                    )
                                    )
                                    )
George Tenet                        )
Director, Central Intelligence Agency )
John Doe (1-10)                     )
        -defendants-                )
_____ X


### COMPLAINT


1.  It is hereby complained that Jeffrey Alexander Sterling (aka Samuel L. Crawford; hereinafter

    referred to as Complainant) was subjected to employment discrimination on the basis of race

    (African American) as a member of (1) a protected category; and (2) treated differently than

    non-African American officers. Complainant was also subjected to retaliation for

    participation in the Equal Employment Opportunity (hereinafter referred to as EEO) process.


<u>PLAINTIFF</u>

2.  An employee with the Central Intelligence Agency (hereinafter referred to as CIA) as an

    Operations Officer (hereinafter referred to as OO).


GOVERNMENT
EXHIBIT
65
1:10CR485

X00071

DEFENDANTS

3. George Tenet is the Director of the CIA and is responsible for actions of the CIA. The John
   Does indicated are covert employees of the CIA who participated in the discrimination and
   retaliation against Complainant.

## JURISDICTION AND VENUE

4. The United States District Court for the Southern District of New York has jurisdiction over
   New York County, the location of the discriminatory acts that are the basis of the Complaint.
   This is the venue chosen for filing this Complaint.

## ALLEGATIONS

5. Complainant joined the CIA in May 1993 as an OO. Complainant successfully completed
   required training and obtained certification as an OO in December 1994. After certification,
   Complainant served in the Washington, DC area; an overseas posting; and the New York
   Office   : (hereinafter referred to as   NYO ). Complainant was serving in the capacity of
   an OO in the NYO   when he was subjected to discrimination on the basis of race (African
   American) and retaliation for participation in the EEO process.

6. Complainant arrived in New York January 1999. Complainant's duties were to include those
   normal to an OO in a CIA   office   . As a member of a select and elite cadre of

X00072

Specialists, Complainant was to also serve as Coordinator for          Iranian subject
matter. During Complainant's tenure at the  NYO  , his direct supervisors and management
included:      **Head of the office David Cohen, Mr. S. 2,   Mr. H.,   ; and      supervisor Mr. L.**
(hereinafter referred to as  NYO  Mgmt). Complainant was the only African American OO
serving in the  NYO .

7. While serving as an OO, Complainant was not provided with the same opportunities or tools
   for fulfilling his duties as an OO. Despite not providing him with the same operational tool
   as non-African American OOs,  NYO  Mgmt. placed expectations on Complainant far above
   those required of non-African American OOs. Complainant was therefore effectively
   precluded from career advancement potential as an OO.  NYO  Mgmt. also subjected
   Complainant to a harsh and unequal working environment whereby he was unable to
   compete with non-African American OOs. Specifically,  NYO  Mgmt. demonstrated a clear
   discriminatory animus towards Complainant when on April 6, 2000; it presented
   Complainant with an unrealistic and unjustified Advanced Work Plan (AWP) that was
   considerably more demanding and harsher than any requirements placed on non-African
   American OOs.

8. NYO  Mgmt's disparate action on April 6, 2000 was part of a pattern and practice of
   discrimination based on race (African American) that Complainant was subjected to from the
   start of his tour at the  NYO . Complainant was repeatedly passed over for operational
   opportunities and subjected to routine disparate treatment as the only African American OO
   at the  NYO .

X00073

9.    **NYO**   Mgmt subjected Complainant to retaliation for his participation in the EEO process.
On May 3, 2000 Complainant was scheduled to undergo updated security processing.
Security processing is an arbitrary regime within the CIA that is utilized more for its nature
as a tool for intimidation than any substantive security implications.  Complainant was not
scheduled to undergo updated security processing until sometime during the year 2001 in
accordance with CIA regulations and documentation in Complainant's security file.   **NYO**
Mgmt. was aware of Complainant's participation in the EEO process when updated security
processing was scheduled.   **NYO**   Mgmt. also subjected Complainant to retaliation for
participation in the EEO process when it either committed or failed to prevent the destruction
of Complainant's personal property, which Complainant first discovered on June 15, 2000.
**NYO**  ¹ Mgmt was also aware of Complainant's participation in the EEO process at the time
of the vandalism to Complainant's personal property.

10. The disparate treatment that Complainant underwent at the   **NYO**   was part of a pattern and
practice of discrimination based on race (African American) and disparate treatment that
Complainant has suffered during the tenure of his career as an OO at the CIA.  Complainant
had previously been denied work opportunities and routinely passed over for assignments
based on the statements made by CIA management to Complainant that he could not be
operationally inconspicuous considering his size, color of his skin and use of a language
(taught to Complainant by the CIA) not typical for those in his race (African American).

11. CIA interfered with Complainant's Constitutional right to access to an attorney. Prior to
having effective counsel with his attorney, Complainant's chosen private attorney was
required to undergo security screening and be security cleared to meet with Complainant.
Complainant fully complied with this requirement and did not have substantive discussions
regarding Complainant's affiliation with the CIA or details as to Complainant's identity until
the attorney was granted the necessary security clearance. The attorney was not granted the
necessary security clearance until four months after initiation of the EEO process.
Complainant was effectively denied the access to or benefit of counsel during the EEO
process.

X00075

WHEREFORE, Complainant Jeffrey Alexander Sterling (aka Samuel L. Crawford) request

that the Court award him the following relief:

(1) Declare that the CIA subjected Complainant to employment discrimination on the

basis of race (African American) as a member of (1) a protected category; and (2)

treated differently than officers not in the same protected category;

(2) Declare that the CIA subjected Complainant to retaliation for his participation in the

EEO process;

(3) Declare that the CIA has perpetrated a pattern and practice of employment

discrimination against Complainant throughout his career;

(4) Declare that CIA interfered with Complainant's access to legal counsel;

(5) Award Complainant the maximum monetary amount allowed by applicable law for

the employment discrimination and damages suffered at the CIA by Complainant;

(6) Award Complainant the costs of the action and reasonable attorney's fees under the

Equal Access to Justice Act or any other applicable law;

(7) Grant such other relief as the Court may deem just and proper.

X00076

LAW OFFICES OF

MARTIN LOBEL
JACK A. BLUM
LEE ELLEN HELFRICH
HENRY M. BANTA

LOBEL, NOVINS & LAMONT
SUITE 770
1875 K STREET, N.W.
WASHINGTON, D.C. 20005-4048

(202) 371-6626
TELECOPIER: (202) 371-6643
LNLlaw.com

OF COUNSEL

ALAN S. NOVINS
ARTHUR L. FOX II
MARK S. ZAID

WILLIAM JOHN LAMONT
(1916 - 1994)

October 17, 2001

VIA FACSIMILE AND MAIL
PRIVILEGED AND CONFIDENTIAL
FOR SETTLEMENT PURPOSES ONLY

Robert McNamara, Jr.
General Counsel
Office of General Counsel
Central Intelligence Agency
Washington, D.C. 20505

Dear Mr. Macnamara:

I have been retained, as well as authorized by the Central Intelligence Agency ("CIA")
to represent, Jeffrey Sterling, a GS-12/Operations Officer assigned to the DO/Near East
and South Asia Division. This is to inform you that a civil action has been filed against
Mr. George Tenet, Director, in his capacity as DCI, for the CIA's discrimination against
Mr. Sterling, who is African-American. A copy of the lawsuit, Sterling v. Tenet et al.,
Civil Action 01-8070 (S.D.N.Y. Aug 28, 2001), is enclosed as a courtesy. It has not yet
been served, which is the reason for this letter. As a gesture of good faith, we offer the
Agency a final opportunity to amicably resolve this dispute.

The events of September 11, 2001, bring this case into a new light. The allegations
asserted by Mr. Sterling are sufficiently crystallized in the enclosed Complaint (please be
advised that several new claims will shortly be filed). Of course, additional relevant
classified information (all information set forth in this letter is taken from either publicly
available or declassified documents) is available from within the Agency and cannot be
stated herein. Notwithstanding this fact, it is clear that Mr. Sterling's CIA training as an
Iranian specialist is now even more valuable in the new world that was created one month
ago. Yet despite the conscious affirmative action decision to place Mr. Sterling in the
important programs and positions he has experienced, the CIA has not permitted him to
utilize his training in the war against terrorism simply because, as my client claims he was
told by CIA officials, he would "stick out as a big black guy speaking Farsi." This is an
outrage.

GOVERNMENT
EXHIBIT
66
1:10CR485

_UBEL. NOVINS & LAMONT

Page 2

There is little doubt that the CIA faces a formidable obstacle in the new world. Intense pressure is being brought to bear upon it to help solve the terrorism problem. As time elapses, criticism of the CIA, some perhaps deserved, some not, is becoming a matter of public discussion. I would certainly hope that you agree that during these difficult times for the Agency the public airing of the facts of Mr. Sterling's case - that of a young, highly educated black American who possesses rare language skills now highly in demand yet rejected by the CIA after nearly a decade of service because of his skin color - is a topic of discussion that would be preferably avoided.

Therefore, we would propose to enter into an amicable and mutually acceptable settlement of this dispute. Mr. Sterling is willing to voluntarily dismiss his lawsuit (as well as terminate his employment relationship with the CIA) in exchange for the following consideration:

- payment of one year of his most recent salary (approximately $90,000);
- payment of tuition to secure a LLM (approximately $30,000);
- payment of moving expenses from Virginia to New York (approximately $1,500);
- a severance package of 8 months salary (approximately $56,000);
- payment of all attorney's fees (approximately $4,000.00); and
- a favorable employment recommendation/statement, the language of which is to be negotiated in good-faith.

This offer remains open for one week from the date of receipt of this letter, or Thursday, October 25, 2001. Should the CIA be amenable to these terms, or notify me within that time frame that it wishes to suggest alternative terms that do not significantly deviate from what is set forth above, we are willing to refrain from serving the Complaint and negotiate a settlement over a period of one additional week.

We hope that our offer will be seriously considered and look forward to your timely response.

Sincerely,

Mark S. Zaid

cc: Jeffrey Sterling

31 October 2001


MEMORANDUM FOR:    Jeffrey A. Sterling

FROM:    Office of Security
         Special Activities Staff (OS/SAS)

SUBJECT:    Second Appeal of the Recommendation
            of the Personnel Evaluation Board/
            Employee Review Panel


This is to inform you that after a full review, the Director of Central Intelligence (DCI) has concurred in the decision of the PEB and the Executive Director to separate you from Agency employment and deny your second and final appeal. Effective close of business 31 October 2001, the date of the DCI's signature, your employment with the Central Intelligence Agency has been terminated. Exit processing will be coordinated in SAS.


Special Activities Staff


ACKNOWLEDGED:


Jeffrey A. Sterling                        10/31/01
                                           Date


GOVERNMENT
EXHIBIT
73
1:10CR485

P00443
X00082

SSN:

Dear Mr. Sterling:

Agreement is hereby made between you and the United States Government for the terms and conditions of this contract which requires no security clearance.

The United States Government hereby employs you as a full-time Contract Employee and you hereby accept and agree to such employment subject to the general supervision and pursuant to the orders, advice and direction of authorized officials of the United States Government.

1. Compensation.  In full consideration for the use of your services and the performance of specified confidential duties, you will be compensated in an amount calculated at the rate of $58,470 annually, the equivalent of a GS-12/4. In addition, you will be entitled to legislative pay adjustments and locality pay. You are not authorized overtime pay, language incentive pay, or premium pay while under this contract. You will not be entitled to accrue annual or sick leave while under this contract. Should this contract extend beyond the end of the leave year, any current annual leave balance will be subject to the maximum carryover limits as provided by law. Payments, less federal income taxes, will be made as directed by you in writing in a manner acceptable to the Government. Changes to compensation due to legislative pay adjustments will be effective as of the date of the official personnel action concerning such adjustment. A copy of the official personnel action will be filed with and incorporated by reference in this agreement. You will be given a copy of the personnel action or otherwise notified of any such changes to compensation.

2. Benefits.  By virtue of your employment relationship with the Government hereunder, you are herein authorized:

(a)  Death and disability benefits equal to those authorized under the Federal Employees' Compensation Act, as amended.

By virtue of your previous employment relationship with the Government, you are herein authorized:

(b)  To continue your coverage under the Federal Employees Health Benefits Act. This Organization is presently authorized to bear a portion of the premium cost, you will bear the remainder. Your financial contribution will be effected by payroll deduction.

ADMINISTRATIVE - INTERNAL USE ONLY
1

GOVERNMENT
EXHIBIT
74
1:10CR485



P00439
X00083

(c)  To continue your coverage under the Federal Employees'
Group Life Insurance Act unless you have previously executed
a written waiver of said coverage.  This Organization is
presently authorized to bear a portion of the premium cost,
you will bear the remainder.  Your financial contribution
will be effected by payroll deduction.

(d)  Continued participation in the Federal Employees
Retirement System (FERS).  Your participation, the payment
of required employee contributions and the like, will be
administered in conformance with the procedures of this
Organization.

(e)  Continuation of your existing sick and annual leave
balances.  However, during the term of this contract you
will not accrue additional annual or sick leave.

3.  Repayment.  It is understood and agreed that your
failure to account for or refund any monies advanced under this
agreement shall entitle the Government to withhold the total
amount of such indebtedness or any portion thereof from any
monies due you under the terms of this contract in such manner
as it deems appropriate.

4.  Execution of Documents.  If, in the performance of
services under this contract, you assume the custody of
Government funds or take title of record to property of any
nature whatsoever and wherever located, which property has in
fact been purchased with monies of the U.S. Government, you
hereby recognize and acknowledge the existence of a trust
relationship, either expressed or implied, and you agree to
execute whatever documents may be required by the Government to
evidence this relationship.

5.  Instructions.  Instructions received by you from this
Organization in briefing, training or otherwise are a part of
this contract and are incorporated herein provided that such
instructions are not inconsistent with the terms hereof.

6.  Secrecy.

(a)  This contract specifically incorporates the provisions
of the secrecy agreement signed by you in consideration for
your employment.

(b)  In the event you marry or remarry during the term of
this contract you agree to advise this Organization, if
applicable, at least one hundred twenty (120) days in
advance of such contemplated marriage or otherwise as soon
as known and to furnish such personal history data on your
prospective spouse as may be required by this Organization.
You understand and agree that should this Organization
determine that your marriage would limit or otherwise impair

P00440
X00084

ADMINISTRATIVE - INTERNAL USE ONLY

your usefulness to the Government, this contract may be
terminated.

7.  Rules of Conduct/Conflict of Interest.  As a specific
condition of this contract you agree to observe and be bound by
the Code of Conduct and all conduct regulations of this
Organization.  You further agree to provide, upon request, a
listing of your relationships and activities which are external
to this Organization, and it is understood by you that such
listing shall be reviewed by appropriate members of this
Organization for the purpose of determining whether a real or
potential conflict of interest exists.

8.  Term.  This contract is effective as of 1 November 2001
and shall continue thereafter until 31 January 2002 unless
sooner terminated in one of the following ways:

(a)  By this Organization with ten (10) days notice in the
event that a determination is made by this Organization that
a real or potential conflict of interest exists with respect
to the relationships described in paragraph seven (7) above.

(b)  Upon thirty (30) days notice by either party for any
reason;

(c)  By the Director of this Organization (or an official of
this Organization to whom he has delegated appropriate
authority) whenever, in accordance with the Director's
unreviewable discretion under law, such termination is
deemed necessary or advisable in the interests of the United
States.

Subject to the availability of appropriations, this
agreement may be extended upon notice by the Government.
Termination or expiration of this agreement will not release you
from the restrictions set forth in paragraph five (5) above or
from the obligations of any security oath you may be required to
take.

9.  Merger Clause.  The parties mutually agree that the
above contract encompasses all benefits and entitlements offered
prior to your employment and that no promises or commitments
pertaining to rights, privileges or benefits other than those
expressly stipulated in writing in this agreement or any written
amendment thereto shall be binding on the United States
Government.  It is hereby understood and agreed that this
agreement may not be modified except by a written instrument,
signed by the party to be charged.

10.  Choice of Law.  This agreement is to be interpreted
under the laws of the United States of America and the
Commonwealth of Virginia.

P00441
X00085

ADMINISTRATIVE - INTERNAL USE ONLY

UNITED STATES GOVERNMENT

ACCEPTED:

_Jeffrey Sterling_                                    10/31/01

                                                     Date

WITNESS:

**Ms. B.**

SAS Case Officer                                     10/31/01

                                                     Date

APPROVED:

**Mr. S. 6**

                        , C/OS/SAS                   10/31/01

                                                     Date

ADMINISTRATIVE - INTERNAL USE ONLY

4

P00442

X00086

GOVERNMENT
EXHIBIT
75
1:10CR485

**The New York Times**

**MARTHA**

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers, please click here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now. »

November 4, 2001
A NATION CHALLENGED: THE INTELLIGENCE AGENCY

# A NATION CHALLENGED: THE INTELLIGENCE AGENCY; Secret C.I.A. Site in New York Was Destroyed on Sept. 11

By JAMES RISEN

**WASHINGTON, Nov. 3—** The Central Intelligence Agency's clandestine New York station was destroyed in the Sept. 11 attack on the World Trade Center, seriously disrupting United States intelligence operations while bringing the war on terrorism dangerously close to home for America's spy agency, government officials say.

The C.I.A.'s undercover New York station was in the 47-story building at 7 World Trade Center, one of the smaller office towers destroyed in the aftermath of the collapse of the twin towers that morning. All of the agency's employees at the site were safely evacuated soon after the hijacked planes hit the twin towers, the officials said.

The intelligence agency's employees were able to watch from their office windows while the twin towers burned just before they evacuated their own building.

Immediately after the attack, the C.I.A. dispatched a special team to scour the rubble in search of secret documents and intelligence reports that had been stored in the New York station, either on paper or in computers, officials said. It could not be learned whether the agency was successful in retrieving its classified records from the wreckage.

A C.I.A. spokesman declined to comment.

The agency's New York station was behind the false front of another federal organization, which intelligence officials requested that The Times not identify. The station was, among other things, a base of operations to spy on and recruit foreign diplomats stationed at the United Nations, while debriefing selected American business executives and others willing to talk to the C.I.A. after returning from overseas.

The agency's officers in New York often work undercover, posing as diplomats and business executives, among other things, depending on the nature of their intelligence operations.

The recovery of secret documents and other records from the New York station should follow well-rehearsed procedures laid out by the agency after the Iranian takeover of the United States

Embassy in Tehran in 1979. The revolutionaries took over the embassy so rapidly that the C.I.A. station was not able to effectively destroy all of its documents, and the Iranians were later able to piece together shredded agency reports. Since that disaster, the agency has emphasized rigorous training and drills among its employees on how to quickly and effectively destroy and dispose of important documents in emergencies.

As a result, a C.I.A. station today should be able to protect most of its secrets even in the middle of a catastrophic disaster like the Sept. 11 attacks, said one former agency official. "If it was well run, there shouldn't be too much paper around," the former official said.

The agency's New York officers have been deeply involved in counterterrorism efforts in the New York area, working jointly with the Federal Bureau of Investigation and other agencies. Many of the most important counterterrorism cases of the last few years, including the bureau's criminal investigations of the August 1998 bombings of two United States Embassies in East Africa and the October 2000 bombing of the U.S.S. Cole in Yemen have been handled out of New York.

The United States has accused Osama bin Laden and his Al Qaeda terrorist network of conducting both of those attacks.

But United States intelligence officials emphasize that there is no evidence that the hijackers knew that the undercover station was in the World Trade Center complex.

With their undercover station in ruins, C.I.A. officers in New York have been forced to share space at the United States Mission to the United Nations, as well as borrow other federal government offices in the city, officials said. The C.I.A.'s plans for finding a new permanent station in New York could not be determined.

The agency is prohibited from conducting domestic espionage operations against Americans, but the agency maintains stations in a number of major United States cities, where C.I.A. case officers try to meet and recruit students and other foreigners to return to their countries and spy for the United States. The New York station, which has been led by its first female station chief for the last year, is believed to have been the largest and most important C.I.A. domestic station outside the Washington area.

The station has for years played an important role in espionage operations against Russian intelligence officers, many of whom work undercover as diplomats at the United Nations. Agency officers in New York often work with the F.B.I. to recruit and then help manage foreign agents spying for the United States. The bureau's New York office, at 26 Federal Plaza, was unaffected by the terrorist attack.

The destruction of the C.I.A.'s New York station has added to the intense emotions shared by many of its employees about the agency's role in the battle against terrorism. For some, the

station's destruction served to underscore the failure of United States intelligence to predict the attacks.

In the immediate aftermath of the attacks, morale suffered badly within the C.I.A., some officials said, as the agency began to confront what critics have called an intelligence failure on the scale of Pearl Harbor.

But the terrorist attacks have also brought an urgent new sense of mission to the agency, which has been flooded with job applications as well as inquiries from former officers eager to return to work. Congress is pouring money into the agency's counterterrorism operations, and the C.I.A. seems poised to begin focusing its resources on terrorism in much the same way it once focused on the Soviet Union in the cold war.

The attacks were not the first in which the C.I.A. was directly touched by terrorists. In 1983, seven agency officers died in the suicide car bombing of the United States Embassy in Beirut. Among the others killed was the agency's station chief in Lebanon, William Buckley, who died in captivity after being kidnapped by terrorists in 1984, and Richard Welch, the agency's Athens station chief, who was shot to death by Greek terrorists in 1975.

---

Copyright 2011 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Back to Top